**SUMMONS - CIVIL**
JD-CV-1   Rev. 2-13
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a,
52-48, 52-259, P.B. Secs. 3-1 through 3-21, 8-1

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
www.jud.ct.gov

*See page 2 for instructions*

☐ "X" if amount, legal interest or property in demand, not including interest and costs is less than $2,500.

☒ "X" if amount, legal interest or property in demand, not including interest and costs is $2,500 or more.

☒ "X" if claiming other relief in addition to or in lieu of money or damages.

TO: Any proper officer; BY AUTHORITY OF THE STATE OF CONNECTICUT, you are hereby commanded to make due and legal service of this Summons and attached Complaint.

| Address of court clerk where writ and other papers shall be filed (Number, street, town and zip code) (C.G.S. §§ 51-346, 51-350) | Telephone number of clerk (with area code) | Return Date (Must be a Tuesday) |
|---|---|---|
| 1061 Main Street, Bridgeport, CT 06604 | ( 203 ) 579-6527 | March 18, 2014 |

| | | At (Town in which writ is returnable) (C.G.S. §§ 51-346, 51-349) | Case type code (See list on page 2) |
|---|---|---|---|
| ☒ Judicial District | G.A. Number: | Fairfield at Bridgeport | Major: C    Minor: 40 |
| ☐ Housing Session | | | |

**For the Plaintiff(s) please enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented (Number, street, town and zip code) | Juris number (to be entered by attorney only) |
|---|---|
| Updike, Kelly & Spellacy P.C., 100 Pearl Street, Hartford, CT 06103 | 065040 |

| Telephone number (with area code) | Signature of Plaintiff (if self-represented) |
|---|---|
| ( 860 ) 548-2600 | |

Number of Plaintiffs: 1    Number of Defendants: 3    ☐ Form JD-CV-2 attached for additional parties

| Parties | Name (Last, First, Middle Initial) and Address of Each party (Number; Street; P.O. Box; Town; State; Zip; Country, if not USA) | |
|---|---|---|
| First Plaintiff | Name: Trefoil Park, LLC  Address: 788 Morris Turnpike, Short Hills, New Jersey | P-01 |
| Additional Plaintiff | Name:  Address: | P-02 |
| First Defendant | Name: Key Holdings, LLC  Address: 144 Quincy Street, Brooklyn, NY 11216 | D-01 |
| Additional Defendant | Name: Hamlin, Keith  Address: 45 Westchester Avenue, Pound Ridge, NY 10576 | D-02 |
| Additional Defendant | Name: Levine, Douglas  Address: 2760 North Bay Road, Miami Beach, FL 33140 | D-03 |
| Additional Defendant | Name:  Address: | D-04 |

## Notice to Each Defendant

1. YOU ARE BEING SUED. This paper is a Summons in a lawsuit. The complaint attached to these papers states the claims that each plaintiff is making against you in this lawsuit.
2. To be notified of further proceedings, you or your attorney must file a form called an "Appearance" with the clerk of the above-named Court at the above Court address on or before the second day after the above Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to come to court.
3. If you or your attorney do not file a written "Appearance" form on time, a judgment may be entered against you by default. The "Appearance" form may be obtained at the Court address above or at www.jud.ct.gov under "Court Forms."
4. If you believe that you have insurance that may cover the claim that is being made against you in this lawsuit, you should immediately contact your insurance representative. Other action you may have to take is described in the Connecticut Practice Book which may be found in a superior court law library or on-line at www.jud.ct.gov under "Court Rules."
5. If you have questions about the Summons and Complaint, you should talk to an attorney quickly. The Clerk of Court is not allowed to give advice on legal questions.

| Signed (Sign and "X" proper box) | ☒ Commissioner of the Superior Court  ☐ Assistant Clerk | Name of Person Signing at Left  Benjamin J. Berger, Esq. | Date signed  02/18/2014 |
|---|---|---|---|

**If this Summons is signed by a Clerk:**
a. The signing has been done so that the Plaintiff(s) will not be denied access to the courts.
b. It is the responsibility of the Plaintiff(s) to see that service is made in the manner provided by law.
c. The Clerk is not permitted to give any legal advice in connection with any lawsuit.
d. The Clerk signing this Summons at the request of the Plaintiff(s) is not responsible in any way for any errors or omissions in the Summons, any allegations contained in the Complaint, or the service of the Summons or Complaint.

For Court Use Only
File Date

| I certify I have read and understand the above: | Signed (Self-Represented Plaintiff) | Date  02/18/2014 |
|---|---|---|

Name and address of person recognized to prosecute in the amount of $250
Deneen L. Seifel, 4 Enrico Road, Bolton, CT 06043

| Signed (Official taking recognizance; "X" proper box) | ☒ Commissioner of the Superior Court  ☐ Assistant Clerk | Date  02/18/2014 | Docket Number |
|---|---|---|---|

## Instructions

1. Type or print legibly; sign summons.
2. Prepare or photocopy a summons for each defendant.
3. Attach the original summons to the original complaint, and attach a copy of the summons to each copy of the complaint. Also, if there are more than 2 plaintiffs or more than 4 defendants prepare form JD-CV-2 and attach it to the original and all copies of the complaint.
4. After service has been made by a proper officer, file original papers and officer's return with the clerk of court.
5. The party recognized to pay costs must appear personally before the authority taking the recognizance.
6. Do not use this form for the following actions:

(a) Family matters (for example divorce, child support, custody, paternity, and visitation matters).
(b) Summary process actions.
(c) Applications for change of name.

(d) Probate appeals.
(e) Administrative appeals.
(f) Proceedings pertaining to arbitration.
(g) Any actions or proceedings in which an attachment, garnishment or replevin is sought.

---

**ADA NOTICE**

The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at *www.jud.ct.gov/ADA*.

---

## Case Type Codes

| Major Description | Codes Major/ Minor | Minor Description | Major Description | Codes Major/ Minor | Minor Description |
|---|---|---|---|---|---|
| Contracts | C 00 | Construction - All other | Torts (Other than Vehicular) | T 02 | Defective Premises - Private - Snow or Ice |
| | C 10 | Construction - State and Local | | T 03 | Defective Premises - Private - Other |
| | C 20 | Insurance Policy | | T 11 | Defective Premises - Public - Snow or Ice |
| | C 30 | Specific Performance | | T 12 | Defective Premises - Public - Other |
| | C 40 | Collections | | T 20 | Products Liability - Other than Vehicular |
| | C 90 | All other | | T 28 | Malpractice - Medical |
| Eminent Domain | E 00 | State Highway Condemnation | | T 29 | Malpractice - Legal |
| | E 10 | Redevelopment Condemnation | | T 30 | Malpractice - All other |
| | E 20 | Other State or Municipal Agencies | | T 40 | Assault and Battery |
| | E 30 | Public Utilities & Gas Transmission Companies | | T 50 | Defamation |
| | E 90 | All other | | T 61 | Animals - Dog |
| | | | | T 69 | Animals - Other |
| Miscellaneous | M 00 | Injunction | | T 70 | False Arrest |
| | M 10 | Receivership | | T 71 | Fire Damage |
| | M 20 | Mandamus | | T 90 | All other |
| | M 30 | Habeas Corpus (extradition, release from Penal Institution) | Vehicular Torts | V 01 | Motor Vehicles* - Driver and/or Passenger(s) vs. Driver(s) |
| | M 40 | Arbitration | | V 04 | Motor Vehicles* - Pedestrian vs. Driver |
| | M 50 | Declaratory Judgment | | V 05 | Motor Vehicles* - Property Damage only |
| | M 63 | Bar Discipline | | V 06 | Motor Vehicle - Products Liability Including Warranty |
| | M 66 | Department of Labor Unemployment Compensation Enforcement | | V 09 | Motor Vehicle* - All other |
| | M 68 | Bar Discipline - Inactive Status | | V 10 | Boats |
| | M 80 | Foreign Civil Judgments - C.G.S. 52-604 & C.G.S. 50a-30 | | V 20 | Airplanes |
| | M 82 | Housing Civil Matters | | V 30 | Railroads |
| | M 83 | Small Claims Transfer to Regular Docket | | V 40 | Snowmobiles |
| | M 84 | Foreign Protective Order | | V 90 | All other |
| | M 90 | All other | | | *Motor Vehicles include cars, trucks, motorcycles, and motor scooters. |
| Property | P 00 | Foreclosure | | | |
| | P 10 | Partition | | | |
| | P 20 | Quiet Title/Discharge of Mortgage or Lien | Wills, Estates and Trusts | W 10 | Construction of Wills and Trusts |
| | P 30 | Asset Forfeiture | | W 90 | All other |
| | P 90 | All other | | | |

RETURN DATE: MARCH 18, 2014      :      SUPERIOR COURT

TREFOIL PARK, LLC      :      JUDICIAL DISTRICT OF FAIRFIELD

V.      :      AT BRIDGEPORT

KEY HOLDINGS, LLC, KEITH HAMLIN AND      :
DOUGLAS LEVINE      :      FEBRUARY 18, 2014

## COMPLAINT

<u>FIRST COUNT</u>: Breach of Contract (As to Key Holdings, LLC)

     1.      The plaintiff, Trefoil Park, LLC ("Trefoil"), is a Connecticut limited liability company with a business address at 788 Morris Turnpike, Short Hills, New Jersey.

     2.      The defendant, Key Holdings, LLC ("Key Holdings") is a New York limited liability company with an address at 144 Quincy Street, Brooklyn, New York.

     3.      On or about November 13, 2012, Key Holdings entered into a written lease (the "Lease") (Exhibit A) with Trefoil for the permission to utilize approximately 6,747 square feet of space within the building owned by Trefoil located at 126 Monroe Turnpike, Suite 120, Trumbull, CT (the "Premises").

     4.      Key Holdings agreed to pay rent in accordance with the terms of the Lease.

     5.      Key Holdings also agreed to pay certain rent adjustments in addition to base rent in accordance with the terms of the Lease.  .

     6.      Key Holdings thereafter took possession of the Premises pursuant to the Lease.

     7.      Trefoil fully performed its duties, obligations and agreements under the Lease.

100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Tel. (800) 548-2680 • Fax (860) 548-2680 • Juris No. 65040

Updike, Kelly & Spellacy, P.C.

688595

Updike, Kelly & Spellacy, P.C.

100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

8.      Key Holdings failed to make all payments due to Trefoil under the Lease.

9.      On December 11, 2013, Trefoil provided Key Holdings with written notice of its failure to pay rent when due.

10.     Key Holdings defaulted under the Lease after failing to pay rent due to Trefoil within five days of Trefoil's written notice.

11.     In December 2013, Key Holdings abandoned use of the Premises.

12.     Trefoil has suffered monetary damages as a result of Key Holdings' breach of the Lease.

13.     Pursuant to the Lease, Key Holdings is liable to pay Trefoil's legal fees and costs if it prevails in this action.

**SECOND COUNT**: Fraudulent Misrepresentation (As to Keith Hamlin and Douglas Levine)

1.      The plaintiff, Trefoil Park, LLC ("Trefoil"), is a Connecticut limited liability company with a business address at 788 Morris Turnpike, Short Hills, New Jersey.

2.      The defendant, Keith Hamlin, is an individual who resides at 46 Westchester Avenue, Pound Ridge, New York.

3.      The defendant, Douglas Levine, is an individual who resides at 2760 North Bay Road, Miami Beach, Florida.

4.      Key Holdings, LLC ("Key Holdings") is a New York limited liability company with an address at 144 Quincy Street, Brooklyn, New York.

2

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 68040

5.      Upon information and belief, Hamlin and Levine are, and at all times pertinent were, the members of Key Holdings.

6.      In and during 2012, Trefoil had vacant space in its building located at 126 Monroe Turnpike, Trumbull, Connecticut (the "Building"), which it was seeking to lease.

7.      Levine and Hamlin expressed interest in leasing space in the Building for a fitness center.

8.      Levine and Hamlin represented that they had substantial resources to make the proposed tenant a well-capitalized operation.

9.      Levine and Hamlin represented that they had experience in a successful enterprise with several fitness centers.

10.     Levine and Hamlin additionally represented that they were in the midst of establishing a partnership with a local hospital (St. Vincent's Hospital), who would ensure that its patients needing rehabilitation and physical therapy would be referred to this fitness center.

11.     Levine and Hamlin made these representations to Trefoil and its representative, the real estate brokers involved in the transaction (Cushman & Wakefield) and municipal officials who were involved in the approval process necessary for approval of the proposed tenancy and its signage.

12.     Levine and Hamlin ultimately represented to Trefoil that Key Holdings successfully established a partnership agreement with St. Vincent's Hospital for treatment of rehabilitation and physical therapy patients from the hospital.

3

13.    While negotiating a lease with Trefoil, Levine and Hamlin repeatedly represented to Trefoil that the partnership with St. Vincent's Hospital had been reduced to writing and would ensure a steady and consistent referral of patients to Key Holdings' fitness center.

14.    Levine and Hamlin specifically represented that St. Vincent's Hospital was contractually obligated to make the referrals and this would – based upon similar arrangements in other locations with other hospitals – ensure the success of Key Holdings' fitness center.

15.    In reliance upon such representations, Trefoil entered into a written lease (the "Lease") (Exhibit A) with Key Holdings dated November 13, 2012 granting Key Holdings permission to utilize approximately 6,747 square feet of space within the Building (the "Premises").

16.    The term of the Lease was for ten years and six months.

17.    Levine and Hamlin falsely represented that Key Holdings was adequately capitalized and that St. Vincent's Hospital was contractually obligated to refer patients to Key Holdings.

18.    Unbeknownst to Trefoil, the agreement between Key Holdings and St. Vincent's Hospital did not obligate St. Vincent's to make referrals to Key Holdings or otherwise support it.

19.    Contrary to the representations of Levine and Hamlin, they had not adequately capitalized Key Holdings with sufficient funds to operate and meet the company's obligations as they accrued.

20.    Instead, Key Holdings was no more than a shell and was never solvent and, upon information and belief, never adequately funded.

100 Pearl Street  •  P.O. Box 231277  •  Hartford, Connecticut 06123-1277  •  Tel. (860) 548-2600  •  Fax (860) 548-2680  •  Juris No. 65040

UpDike, Kelly & Spellacy, P.C.

4

21.   Levine and Hamlin knowingly made false representations to Trefoil to induce it to enter into the Lease.

22.   Trefoil reasonably relied on Levine and Hamlin's false statements to its detriment by entering into the Lease and expending substantial sums of money to fit-up the Premises, pay a brokerage fee and provide Key Holdings with a period of "free" rent.

23.   In early December, 2013, and after Key Holdings had paid only one and one-half month's rent, Key Holdings notified Trefoil that it was immediately terminating operations and abandoning the Premises.

24.   Shortly thereafter, Key Holdings discontinued its operations and abandoned the Premises.

25.   If Levine and Hamlin had been truthful and honestly provided Trefoil with accurate information, Trefoil would not have executed the Lease and thereafter performed the landlord's obligations.

26.   Trefoil has suffered damages as a direct and proximate result of the fraudulent misrepresentations by Levine and Hamlin.

**THIRD COUNT:** Negligent Misrepresentation (As to Keith Hamlin and Douglas Levine)

1-20.   Trefoil repeats and re-alleges paragraphs 1-20 of the Second Count as paragraphs 1-20 of this Third Count, as if fully set forth herein.

5

688595

Updike, Kelly & Spellacy, P.C.  •  100 Pearl Street  •  P.O. Box 231277  •  Hartford, Connecticut 06123-1277  •  Tel. (860) 548-2600  •  Fax (860) 548-2680  •  Juris No. 65040

21.    Levine and Hamlin knew or should have known that their representations to Trefoil were false.

22.    Trefoil reasonably relied on Levine and Hamlin's false statements to its detriment by entering into the Lease and expending substantial sums of money to fit-up the Premises, pay a brokerage fee and provide Key Holdings with a period of "free" rent.

23.    In early December, 2013, and after Key Holdings had paid only one and one-half month's rent, Key Holdings notified Trefoil that it was immediately terminating operations and abandoning the Premises.

24.    Shortly thereafter, Key Holdings discontinued its operations and abandoned the Premises.

25.    If Levine and Hamlin had been truthful and honestly provided Trefoil with accurate information, Trefoil would not have executed the Lease and thereafter performed the landlord's obligations.

26.    Trefoil has suffered damages as a direct and proximate result of the negligent misrepresentations by Levine and Hamlin.

6

688595

Updike, Kelly & Spellacy, P.C. • 100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

WHEREFORE, the Plaintiff claims:

A.    *First Count - Breach of Contract (as to Key Holdings, LLC)*
       (1) Money damages;
       (2) Costs;
       (3) Interest;
       (4) Attorneys' Fees; and
       (5) Such other relief as the Court deems just in law and equity.

B.    *Second Count – Fraudulent Misrepresentation (as to Keith Hamlin and Douglas Levine)*
       (1) Money damages;
       (2) Costs;
       (3) Interest; and
       (4) Such other relief as the Court deems just in law and equity.

C.    *Third Count – Negligent Misrepresentation (as to Keith Hamlin and Douglas Levine)*
       (1) Money damages;
       (2) Costs;
       (3) Interest; and
       (4) Such other relief as the Court deems just in law and equity.

PLAINTIFF,
TREFOIL PARK, LLC

BY: _____

BENJAMIN J. BERGER, ESQ.
KEVIN J. MCELENEY, ESQ.
Updike, Kelly & Spellacy, P.C.
100 Pearl Street, 17th Floor
P.O. Box 231277
Hartford, CT 06123-1277
(860) 548-2600
Juris No.: 65040
bberger@uks.com
kmceleney@uks.com

7

RETURN DATE: MARCH 18, 2014         :         SUPERIOR COURT

TREFOIL PARK, LLC         :         JUDICIAL DISTRICT OF FAIRFIELD

V.         :         AT BRIDGEPORT

KEY HOLDINGS, LLC, KEITH HAMLIN AND    :
DOUGLAS LEVINE         :         FEBRUARY 18, 2014

## STATEMENT OF AMOUNT IN DEMAND

The amount, legal interest or property in demand is more than Fifteen Thousand Dollars

($15,000.00), exclusive of interest and costs.

Dated at Hartford, Connecticut this 14th day of February, 2014.

PLAINTIFF,
TREFOIL PARK, LLC

BY: _____

        BENJAMIN J. BERGER, ESQ.
        KEVIN J. MCELENEY, ESQ.
        Updike, Kelly & Spellacy, P.C.
        100 Pearl Street, 17th Floor
        P.O. Box 231277
        Hartford, CT 06123-1277
        (860) 548-2600
        Juris No.: 65040
        bberger@uks.com
        kmceleney@uks.com

Updike, Kelly & Spellacy, P.C. • 100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

8

688595

OFFICERS RETURN TO COURT

STATE OF CONNECTICUT:
               : ss: HARTFORD          FEBRUARY 26, 2014
COUNTY OF HARTFORD  :

      Then and by virtue hereof on February 21, 2014, and by direction of the Plaintiff's Attorney, I made due and legal service upon the within named defendant, **DOUGLAS LEVINE** by leaving a verified true and attested copy of the original,  **DEFENDANT'S RETURN, WRIT OF SUMMONS , COMPLAINT, AND STATEMENT OF AMOUNT IN DEMAND,** at the office of, Secretary of the State of Connecticut, at least twelve days before the session of the Court to which this writ is returnable. Said Secretary is the duly authorized agent and attorney for the within named non-resident defendant in the said Town of Hartford. (Pursuant to C.G.S. Sec. 52-59b).

      And afterwards on February 21, 2014 by virtue hereof, and by direction of the Plaintiff's Attorney, I made due and legal service upon the within named defendant, **KEITH HAMLIN,** by leaving a verified true and attested copy of the original, **DEFENDANT'S RETURN, WRIT OF SUMMONS , COMPLAINT, AND STATEMENT OF AMOUNT IN DEMAND,** at the office of, Secretary of the State of Connecticut, at least twelve days before the session of the Court to which this writ is returnable. Said Secretary is the duly authorized agent and attorney for the within named non-resident defendant in the said Town of Hartford. (Pursuant to C.G.S. Sec. 52-59b).

      And afterwards on February 21, 2014 by virtue hereof, and by direction of the Plaintiff's attorney, I made due and legal service upon the within named non-resident defendant, **DOUGLAS LEVINE** by depositing in the Glastonbury Post Office, a true attested copy of the original, **DEFENDANT'S RETURN, WRIT OF SUMMONS, COMPLAINT AND STATEMENT OF AMOUNT IN DEMAND,** by certified mail, postage paid, return receipt requested, a true and attested copy thereof, to **DOUGLAS LEVINE, 2760 NORTH PAY ROAD, MIAMI BEACH, FL 33140.**

And afterwards on February 21, 2014 by virtue hereof, and by direction of the Plaintiff's attorney, I made due and legal service upon the within named non-resident defendant **KEITH HAMLIN,** by depositing in the Glastonbury Post Office, a true attested copy of the original, **DEFENDANT'S RETURN, WRIT OF SUMMONS, COMPLAINT, AND STATEMENT OF AMOUNT IN DEMAND,** by certified mail, postage paid, return receipt requested, a true and attested copy thereof, to **KEITH HAMLIN, 46 WESTCHESTER AVENUE, POUND RIDGE, NY 10576.**

And afterwards on February 21, 2014 by virtue hereof, and by direction of the Plaintiff's attorney, I made due and legal service upon the within named non-resident defendant **KEY HOLDINGS, LLC,** by depositing in the Glastonbury Post Office, a true attested copy of the original, **DEFENDANT'S RETURN, WRIT OF SUMMONS, COMPLAINT, AND STATEMENT OF AMOUNT IN DEMAND,** by certified mail, postage paid, return receipt requested, a true and attested copy thereof, to **KEY HOLDINGS, LLC, 144 QUINCY STREET, BROOKLYN, NY 11216.**

And afterwards on February 26, 2014 by virtue hereof, and by direction of the Plaintiff's Attorney, I made due and legal service upon the within named defendant, **KEY HOLDINGS, LLC** by leaving 2 verified true and attested copies of the original, **DEFENDANT'S RETURN, WRIT OF SUMMONS , COMPLAINT, AND STATEMENT OF AMOUNT IN DEMAND,** at the office of, Secretary of the State of Connecticut, at least twelve days before the session of the Court to which this writ is returnable. Said Secretary is the duly authorized agent and attorney for the within named defendant in the said Town of Hartford. (Pursuant to C.G.S. Sec. 34-233 (c).

SUPPLEMENTAL RETURNS TO FOLLOW

The within is the original, **WRIT OF SUMMONS, COMPLAINT, AND STATEMENT OF AMOUNT IN DEMAND,** with my doings thereon endorsed.

ATTEST:

_____
ALEX J. RODRIGUEZ
STATE MARSHAL
Hartford County

FEES:
SERVICE:          190.00
PAGE:              79.00
ENDORSEMENT:       14.00
POSTAGE:           21.00
SEC. OF ST.:      150.00
TRAVEL             18.00

TOTAL:        $  472.00

# EXHIBIT A

OFFICE LEASE

Between

Trefoil Park, LLC, Landlord.

and

Key Holdings LLC

Tenant

Dated: November 13, 2012

## REFERENCE DATA

The information contained on this Reference Data page is for convenience of reference only and is subject to the terms of the Lease.

| | |
|---|---|
| LANDLORD: | Trefoil Park, LLC |
| LANDLORD'S ADDRESS: | 788 Morris Turnpike<br>Short Hills, NJ 07078 |
| TENANT: | Key Holdings LLC |
| TENANT'S ADDRESS: | |
| PREMISES: | 126 Monroe Turnpike<br>Suite 120<br>Trumbull, CT 06611 |
| RENTABLE AREA OF PREMISES: | 6,747 square foot |
| RENTABLE AREA OF BUILDING: | 42,650 square feet |
| LEASE TERM: | Ten (10) years and six (6) months |
| COMMENCEMENT DATE: | The date that exclusive possession of the Premises is delivered to Tenant with Landlord's Work substantially completed. |
| BASE RENT: | See Article 3 - Base Rent |
| BASE YEAR: | 2013 |
| TENANT'S PROPORTIONATE SHARE: | 15.82% |
| SECURITY DEPOSIT: | $30,361.00 |
| PERMITTED USES: | Gym, fitness and health center and ancillary medical and health services including physical therapy. |
| RENT COMMENCEMENT DATE: | Six (6) months after the Commencement Date |

SHB/dlp/161070v4 33839-001

2

TABLE OF CONTENTS

ARTICLE 1    GRANT OF LEASE: PREMISES: BUILDING: PROJECT: AND COMMON AREAS 6
1.1      Lease of Premises ...................................................................................... 6
1.2      The Building and the Office Complex ....................................................... 6
1.3      Common Areas ........................................................................................... 6
1.4      Landlord's Use and Operation of the Building, Project, and Common Areas.................. 7
ARTICLE 2    TERM, POSSESSION ......................................................................... 7
2.1      Term .......................................................................................................... 7
2.2      Failure to Deliver Possession ................................................................... 8
2.3      Lease Year Defined ................................................................................... 8
ARTICLE 3 BASE RENT ............................................................................................ 9
3.1      Base Rent ................................................................................................... 9
3.2      Manner of Payment ................................................................................... 10
3.3      Payment Due at Lease Execution ............................................................. 10
3.4      Late Payment ............................................................................................ 10
ARTICLE 4 RENT ADJUSTMENTS .......................................................................... 10
4.1      Obligation to Pay Rent Adjustments ....................................................... 10
4.2      Definitions ................................................................................................ 10
4.3      Computation of Rent Adjustments .......................................................... 16
4.4      Payments of Rent Adjustments; Projections .......................................... 17
4.5      Readjustments .......................................................................................... 18
4.6      Books and Records ................................................................................... 19
4.7      Audit Procedures ...................................................................................... 20
4.8      Proration and Survival ............................................................................. 20
4.9      No Decrease In Base Rent ........................................................................ 20
4.10     Additional Rent ........................................................................................ 20
ARTICLE 5 USE OF PREMISES ................................................................................ 20
5.1      Permitted Use ........................................................................................... 20
5.2      Tenant Exclusive Right/Prohibited Uses ................................................ 20
ARTICLE 6 SERVICES ............................................................................................... 22
6.1      Services Provided ..................................................................................... 22
6.2      Failure to Furnish Services ...................................................................... 23
6.3      Regulations Regarding Utilities Services ................................................ 23
ARTICLE 7 CONDITION AND CARE OF PREMISES .............................................. 24
ARTICLE 8 RETURN OF PREMISES ........................................................................ 24
8.1      Surrender of Possession ........................................................................... 24
8.2      Installations and Additions ...................................................................... 24
8.3      Trade Fixtures and Personal Property ..................................................... 25
8.4      Survival ..................................................................................................... 25
ARTICLE 9    HOLDING OVER ................................................................................. 25
ARTICLE 10  RULES AND REGULATIONS ............................................................. 26
ARTICLE 11 RIGHTS RESERVED TO LANDLORD ................................................ 26
11.1     Rights Reserved to Landlord .................................................................... 26
11.2     Use of Roof and Land ............................................................................... 28

3

ARTICLE 12  ALTERATIONS ............................................................... 28
ARTICLE 13 ASSIGNMENT AND SUBLETTING ........................................ 29
    13.1 Assignment and Subletting ..................................................... 29
    13.2 Temporary Users ................................................................. 30
    13.3 Consent by Landlord ............................................................ 30
    13.4 Tenant's Notice: Landlord's Right to Terminate .......................... 30
    13.5 Landlord's Consent .............................................................. 31
    13.6 Profits ............................................................................... 31
    13.7 Assignee to Assume Obligations ............................................. 32
    13.8 Change of Control ................................................................ 32
    13.9 Assignment or Sublet to Affiliate ........................................... 32
ARTICLE 14 WAIVER OF CERTAIN CLAIMS: INDEMNITY BY TENANT ........... 33
    14.1 Waiver of Certain Claims ...................................................... 33
    14.2 Damage Caused by Tenant's Neglect ....................................... 33
    14.3 Tenant Responsible for Personal Property ................................ 33
    14.4 Indemnification .................................................................. 33
ARTICLE 15 DAMAGE OR DESTRUCTION BY CASUALTY ........................... 34
    15.1 Damage or Destruction by Casualty ........................................ 34
    15.2 Abatement of Rent .............................................................. 35
ARTICLE 16 EMINENT DOMAIN ........................................................ 35
ARTICLE 17 DEFAULT ..................................................................... 36
    17.1 Events of Default ................................................................ 36
    17.2 Rights and Remedies of Landlord ........................................... 37
    17.3 Right to Re-Enter ............................................................... 37
    17.4 Current Damages ................................................................ 38
    17.5 Final Damages ................................................................... 38
    17.6 Removal of Personal Property ................................................ 39
    17.7 Attorneys' Fees .................................................................. 39
    17.8 Assumption or Rejection in Bankruptcy .................................... 39
    17.9 Waiver of Right of Redemption .............................................. 39
ARTICLE 18 SUBORDINATION ........................................................... 40
    18.1 Subordination .................................................................... 40
    18.2 Liability of Holder of First Mortgage; Attornment ...................... 40
    18.3 Modification Required by Holder of First Mortgage ..................... 41
    18.4 SNDA .............................................................................. 41
    18.5 Short Form Lease ............................................................... 41
ARTICLE 19 MORTGAGEE PROTECTION .............................................. 41
ARTICLE 20 ESTOPPEL CERTIFICATE .................................................. 41
ARTICLE 21 SUBROGATION AND INSURANCE ...................................... 42
    21.1 Waiver of Subrogation ......................................................... 42
    21.2 Tenant's Insurance .............................................................. 42
    21.3 Certificates of Insurance ...................................................... 43
    21.4 Compliance with Requirements .............................................. 43
    21.5 Landlord's Insurance ........................................................... 44
ARTICLE 22  NONWAIVER ............................................................... 44
ARTICLE 23   TENANT - DUE AUTHORIZATION ...................................... 44
ARTICLE 24   REAL ESTATE BROKERS .................................................. 45

4

SHB/dlp/161070v4 33839-001

ARTICLE 25  NOTICES ....................................................................................... 45
ARTICLE 26  ENVIRONMENTAL MATTERS .................................................... 46
  26.1 Tenant's Obligations with Respect to Environmental Matters .............. 46
  26.2 Landlord's Right to Inspect. ................................................................ 47
  26.3 Copies of Notices and Documentation. ............................................... 47
  26.4 Landlord's Right to Act ....................................................................... 48
  26.5 Indemnification. .................................................................................. 48
ARTICLE 27  SECURITY DEPOSIT .................................................................. 49
  27.1 Security Deposit. ................................................................................ 49
  27.2 Transfer of Security Deposit. .............................................................. 49
ARTICLE 28  RINTENTIONALLY OMITTED .................................................... 49
ARTICLE 29  TITLE AND COVENANT AGAINST LIENS ................................. 50
ARTICLE 30  MISCELLANEOUS ...................................................................... 50
  30.1 Successors and Assigns. ..................................................................... 50
  30.2 Modifications in Writing. ..................................................................... 50
  30.3 No Option; Irrevocable Offer. ............................................................. 50
  30.4 Definition of Tenant. ........................................................................... 51
  30.5 Definition of Landlord. ........................................................................ 51
  30.6 Headings. ........................................................................................... 51
  30.7 Time of Essence. ................................................................................. 51
  30.8 Default Rate of Interest. ...................................................................... 51
  30.9 Severability. ........................................................................................ 51
  30.10 Entire Agreement. .............................................................................. 51
  30.11 Force Majeure. ................................................................................... 52
  30.12 Security Interest. ................................................................................ 52
  30.13 Choice of Law. ................................................................................... 52
  30.14 Relationship. ...................................................................................... 52
30. 15 No Recording. \l 2 .............................................................................. 52
ARTICLE 31  AMERICANS WITH DISABILITIES ACT ................................... 52
ARTICLE 32  EXCULPATORY PROVISIONS .................................................. 53
ARTICLE 33 PATRIOT ACT ............................................................................. 54
ARTICLE 34 EMERGENCY DIRECTIVES ....................................................... 54
ARTICLE 35  OPTION TO EXTEND ................................................................. 55
ARTICLE 36  SIGNAGE .................................................................................... 55
ARTICLE 37  TENANT IMPROVEMENTS ........................................................ 57
ARTICLE 38  JANITORIAL SERVICES ............................................................ 57
  EXHIBIT A ................................................................................................... 59
  EXHIBIT B ................................................................................................... 60
  EXHIBIT C ................................................................................................... 61
  EXHIBIT D ................................................................................................... 69
CONFIRMATION OF COMMENCEMENT DATE ............................................. 71

SHB/dlp/161070v4 33839-001

## OFFICE LEASE

THIS OFFICE LEASE (this "Lease") is made and entered into as of the
13 day of November, 2012 ("Effective Date"), by and between Trefoil Park, LLC, a
Connecticut limited liability corporation (hereinafter referred to as "**Landlord**"), and
Key Holdings LLC (hereinafter referred to as "Tenant").

For and in consideration of the covenants herein contained, and upon the terms
and conditions herein set forth, Landlord and Tenant hereby agree as follows:

## ARTICLE 1

## GRANT OF LEASE; PREMISES; BUILDING; PROJECT; AND COMMON

## AREAS

1.1     **Lease of Premises.** Landlord hereby leases to Tenant, and Tenant
hereby leases from Landlord, the premises outlined in the floor plans) attached hereto as
**Exhibit A** and hereby made a part hereof (hereinafter referred to as the "Premises") on
the first floor of the building located at 126 Monroe Turnpike, Trumbull, CT
06611 (hereinafter referred to as the "**Building**") together with the parking,
signage rights and Common Area rights set forth herein.

1.2     **The Building and the Office Complex.** The Building, which is located
on land (the "**Land**") legally described in **Exhibit B** attached hereto and made a part
hereof, is part of an office project known as "126 Monroe Turnpike" The term "**Office
Complex,**" as used in this Lease, shall mean (i) the Building and the "Common Areas,"
as that term is defined in Section 1.3 below, (ii) the Land (which is improved with
landscaping, open-use parking lots and other improvements) upon which the Building,
and the Common Areas are located, and (iii) at Landlord's discretion, any additional
real property, areas, buildings or other improvements added thereto pursuant to the
terms of Section 1.4 of this Lease.

1.3     **Common Areas.** Tenant shall have the non-exclusive right to use in
common with other tenants in the Office Complex, and subject to the rules and regulations
referred to in Article 10 of this Lease, those portions of the Office Complex
which are provided, from time to time, for use in common by Landlord, Tenant and any
other tenants of the Office Complex, whether or not those areas are open to the general
public, or which contain facilities or equipment used or usable in the operation of the
Office Complex, even if access to such areas may be restricted to Landlord's personnel
(such areas are collectively referred to herein as the "**Common Areas**"). The term
"**Exterior Common Areas,**" as used in this Lease, shall mean the portions of the
Common Areas not located within the Building, and may include, without limitation,
any parking facilities, fixtures, systems, signs, facilities, lakes, gardens, parks, or other
landscaping used in connection with the Office Complex, and may include any city
sidewalks adjacent to the Office Complex, pedestrian walkway system, whether above

6

or below grade, park or other facilities open to the general public and roadways, sidewalks, walkways, parkways, driveways and landscape areas appurtenant to the Office Complex. The term **"Building Common Areas,"** as used in this Lease, shall mean the portions of the Common Areas located within the Building and may include, without limitation, the common entrances, lobbies, atrium areas, restrooms, elevators, elevator shafts, stairways and accessways, loading docks, ramps, platforms, passageways, serviceways, common pipes, flues, stacks, pipe shafts, conduits, wires, equipment, loading and unloading areas, machine rooms, fan rooms, janitors' closets, electrical closets, telephone closets and trash areas servicing the Building. The manner in which the Common Areas are maintained and operated shall be at the sole discretion of Landlord.

    1.4    <u>Landlord's Use and Operation of the Building, and Common Areas.</u>

Landlord reserves the right from time to time without notice to Tenant (i) to close temporarily any of the Common Areas provided that Tenant shall have adequate access to the Premises on a 24/7/365 basis; (ii) to restrict Tenant's access to any Common Areas not open to all tenants; (iii) to make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of street entrances, driveways, ramps, entrances, exits, passages, stairways and other ingress and egress, direction of traffic, landscaped areas, loading and unloading areas, and walkways provided that Tenant's access to the Premises and its parking and signage rights are not affected by such changes in more than a temporary or non-material manner; (iv) to expand the Building; (v) to add additional buildings and improvements to the Common Areas; (vi) to remove buildings and improvements from the Common Areas; (vii) to designate land outside the Office Complex to be part of the Office Complex, and in connection with the improvement of such land to add additional buildings and common areas to the Office Complex; (viii) to use the Common Areas while engaged in making improvements, repairs or alterations to the Office Complex or to any adjacent land, or any portion thereof; and (ix) to do and perform such other acts and make such other changes in, to or with respect to the Office Complex, Common Areas and Building or the expansion thereof as Landlord may, in the exercise of sound business judgment, deem to be appropriate.

## ARTICLE 2

## TERM; POSSESSION

    2.1    <u>Term</u>. The term of this Lease (hereinafter referred to as the **"Term"**) shall commence on the date of delivery of exclusive possession of the Premises to Tenant with all of Landlord's Work substantially completed (hereinafter, as the same may be adjusted as hereinafter provided, referred to as the **"Commencement Date"**), and expiring one hundred twenty six (126) months (hereinafter, as the same may be adjusted as hereinafter provided, referred to as the **"Expiration Date"**), unless sooner terminated as provided herein. Within fifteen (15) days after the Commencement Date, Landlord and Tenant shall execute a Confirmation of Commencement Date in the form attached hereto as **Exhibit E.**

7

2.2 **Failure to Deliver Possession**. If Landlord is unable to deliver exclusive possession of the Premises to Tenant on or before the date set forth above as the Commencement Date because work to be performed by Landlord under any Work Letter (as hereinafter defined) has not been substantially completed (as that term is defined in the Work Letter), for reasons beyond Landlord's control, Landlord· shall not be subject to any liability on account thereof and such failure shall not affect the validity of this Lease or the obligations of Tenant hereunder, except as otherwise specifically provided herein. Provided that if the Landlord's Work is not completed and exclusive possession of the Premises is not delivered by February 1, 2013, Tenant shall receive one days rent abatement for each day of delay and the Rent Commencement Date shall be adjusted accordingly. If Landlord is to perform work in the Premises pursuant to a work letter attached hereto as **Exhibit C** and by this reference made a part hereof (hereinafter referred to as the **"Work Letter"**) and is unable to deliver possession of the Premises to Tenant on or before the date set forth above as the Commencement Date because such work has not been substantially completed, the Commencement Date shall be deferred to the date on which such work is substantially completed. In the event, however, that substantial completion of such work has been delayed by reason of the occurrence of one or more acts constituting Tenant Delay (as defined in the Work Letter), the date of substantial completion thereof shall be deemed to be the date on which such work would have been substantially completed but for such Tenant Delay. If the Commencement Date is deferred pursuant to this paragraph, the Expiration Date shall be deferred so that the Term will expire on the last day of the calendar month in which the one hundred and twenty sixth month anniversary of said deferred Commencement Date occurs. [Neither the Commencement Date nor the Expiration Date shall be affected if the Premises are not ready for occupancy because Tenant (as distinguished from Landlord) is performing work in the Premises, pursuant to the Work Letter or otherwise. Landlord agrees to diligently pursue completion of the work set forth in the Work Letter so that the Premises may be delivered to Tenant on or before the February 1, 2013.

2.3 **Lease Year Defined**. As used in this Lease, the term **"Lease Year"** shall mean (i) if the Commencement Date is the first day of a calendar month, the twelve (12) month period commencing on the Commencement Date or (ii) if the Commencement Date is not the first day of a calendar month, the period commencing on the Commencement Date and ending on the last day of the twelfth (12th) full calendar month of the Term, and, in either case, each succeeding twelve (12) year period thereafter which falls in whole or in part during the Term.

2.4 **Early Possession.** Tenant shall have the right to access the Building and the Premises (the "Access Period") during the time that Landlord is performing the build out and prior to sheetrocking and installation of dropped ceilings for the purpose of installing data and telephone lines within the Premises, provided such installation shall not materially or unreasonably interfere with any work being performed in the Building and/or Premises by or on behalf of Landlord.

2.5. **Pre-Sales Temporary Space**. Landlord will permit Tenant to use temporary space ("Temporary Space") within the Building as long as such space is not

8

SHB/dlp/161070v4 33839-001

subject to a lease with a third party for the limited purposes of pre-sale/marketing. Landlord and Tenant will coordinate such usage at mutually acceptable times etc. Tenant agrees that it will indemnify and hold Landlord harmless for any liabilities, damages, suits, arising from Tenant's usage of the Temporary Space. If no such temporary space is available, Landlord will permit Tenant to install a temporary trailer in the parking lot (at Tenant's sole cost and expense) in front of the Premises (to be located on the opposite side of the day-care center) to conduct pre-opening sales activities. Such trailer must be permitted by the municipality and be in compliance with all laws, ordinances, etc. Upon occupancy of the Premises by Tenant, the temporary trailer will be removed in an expeditious manner.

## ARTICLE 3

## BASE RENT

3.1     **Base Rent**. Tenant shall pay an annual base rent (hereinafter referred to as **"Base Rent"**) to Landlord for the Premises payable in equal monthly installments (hereinafter referred to as **"Monthly Base Rent"**) as follows:

| Start Date | End Date | Per Sq. Ft. Amount | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|---|
| Commencement Date | Rent Commencement Date | *$0.00 | $0.00 | $0.00 |
| Lease Month 7 | Lease Month 12 | $18.00 | $121,446.00 | $10,120.50 |
| Lease Month 13 | Lease Month 24 | $18.50 | $124,819.50 | $10,401.63 |
| Lease Month 25 | Lease Month 36 | $19.00 | $128,193.00 | $10,682.75 |
| Lease Month 37 | Lease Month 48 | $19.50 | $131,566.50 | $10,963.88 |
| Lease Month 49 | Lease Month 60 | $20.00 | $134,940.00 | $11,245.00 |
| Lease Month 61 | Lease Month 72 | $20.50 | $138,313.50 | $11,526.13 |
| Lease Month 73 | Lease Month 84 | $21.00 | $141,687.00 | $11,807.25 |
| Lease Month 85 | Lease Month 96 | $21.50 | $145,060.50 | $12,088.38 |
| Lease Month 97 | Lease Month 108 | $22.00 | $148,434.00 | $12,369.50 |
| Lease Month 109 | Lease Month 126 | $22.50 | $151,807.50 | $12,650.63 |

*Notwithstanding anything to the contrary contained herein, Tenant shall have no obligation to pay Base Rent during the first six (6) months from the Commencement Date or for a longer period pursuant to Section 2.2 above, but will remain responsible for any Additional Rent during this period.

SHB/dlp/161070v4 33839-001

Such Monthly Base Rent will be payable in advance on the first day of the Term and on the first day of each calendar month thereafter of the Term, and at the same rate for fractions of a month if the Term begins on any day except the first day of a calendar month or ends on any day except the last day of a calendar month. Each full month during the Term shall be referred to as a "Lease Month" provided the first "Lease Month" shall occur on the first full month following the Rent Commencement Date.

3.2 **Manner of Payment.** Base Rent, Rent Adjustments (as hereinafter defined), Rent Adjustment Deposits (as hereinafter defined) and all other amounts becoming due from Tenant to Landlord hereunder (hereinafter collectively referred to as **"Rent"**) shall be paid in lawful money of the United States to Landlord at the office of Landlord, or as otherwise designated from time to time by written notice from Landlord to Tenant. The payment of Rent hereunder is independent of each and every other covenant and agreement contained in this Lease, and Rent shall be paid without any setoff, abatement, counterclaim or deduction whatsoever except as may be expressly provided herein.

3.3 **Payment Due at Lease Execution.** Subject to Section 3.2 above, Tenant shall pay the first month's payable Base Rent of Ten thousand one hundred twenty dollars and fifty cents ($10,120.50) as well as the Security Deposit pursuant to Section 27.1 within five (5) business days of Lease execution.

3.4 **Late Payment.** In the event payment is not received within five (5) calendar days from the applicable monthly due date, Landlord reserves the right to impose a late payment fee of five percent (5%) of the outstanding balance which shall be added to the amount due and owing to Landlord. The assessment of late charges by Landlord or the payment of same by Tenant shall not in any manner prejudice or diminish the rights of Landlord as set forth in this Lease. Imposition of a late payment fee is solely at Landlord's option and failure by Landlord to exercise this option does not waive Landlord's right to exercise this right at a future date.

## ARTICLE 4

## RENT ADJUSTMENTS

4.1 **Obligation to Pay Rent Adjustments.** In addition to paying Base Rent, Tenant shall also pay as additional rent its Proportional Share of the amounts determined in accordance with this Article 4 (hereinafter referred to as **"Rent Adjustments"**).

4.2 **Definitions.** As used in this Lease.

10

SHB/dlp/161070v4 33839-001

(a)    "**Adjustment Date**" shall mean January 1, 2014 and each January 1 thereafter falling within the Term.

(b)    "**Adjustment Year**" shall mean each calendar year during which an Adjustment Date falls.

(c)    "**Expenses**" shall mean and include those reasonable and customary costs and expenses paid or incurred by or on behalf of Landlord for owning, managing, operating, maintaining and non-capital repairs of the Building, the Building Common Areas, the Exterior Common Areas, the Land, and the personal property used in conjunction therewith (the Building and the Land hereinafter collectively referred to as the "**Real Property**" and the Real Property and such personalty hereinafter collectively referred to as the "**Project**"), including, without limitation, the following costs and expenses:

(i)    wages and salaries of all persons engaged in the operation, management, maintenance or repair of the Project, and fringe benefits, including social security taxes, unemployment insurance taxes, cost for providing coverage for disability benefits, cost of any pensions, hospitalization, welfare or retirement plans, and any other similar expenses incurred under the provisions of any collective bargaining agreement, or any other cost or expense which Landlord pays or incurs to provide benefits for employees so engaged in the operation, management, maintenance or repair of the Project;

(ii)    the cost of security and non-capital security devices and systems in Common Areas;

(iii)    the cost of snow, ice and trash removal from Common Areas;

(iv)    the cost of cleaning and sweeping in Common Areas; .

(v)    the cost of non-capital parking area repair, restoration and maintenance, including but not limited to resurfacing, repainting, restriping, relamping and cleaning;

(vi)    the cost of interior and exterior painting, decorating and landscaping, including without limitation planting and replacing decorations, flowers, lawn care and landscaping and the replacement of wall and floor coverings, ceiling tiles and fixtures in the Common Areas;

(vii)    the non-capital cost of roof repair (as distinguished from replacement and resurfacing and any other cost or expense which would be considered to be a capital item);

(viii)    the cost of customary non-capital maintenance, non-capital repair and replacement of utility systems, elevators, escalators and other

building systems and improvements not otherwise referred to in this Section 4.2(c), but including replacement only to the extent of replacement of parts and components incidental to the maintenance and non-capital repair thereof or if the cost thereof would be includable in Expenses pursuant to subsection (A) below of this Section 4.2(c), and not to the extent replacement of any item would constitute a capital improvement or a capital expenditure which is excluded from Expenses as hereinafter provided;

(ix)         the cost of exterior window cleaning;

(x)          the cost of trash removal from the Common Areas;

(xi)         the cost of insurance, including, but not limited to, fire, extended coverage, all risk, liability, workmen's compensation, elevator and any other insurance carried by Landlord and applicable to the Project;

(xii)        the cost of uniforms, supplies and sundries;

(xiii)       all payments made pursuant to the property management agreement with respect to the Project ((including the cost of any management fee (not to exceed five (5%) percent of gross rentals) but excluding the fair rental value of any office space provided to the manager thereunder));

(xiv)        the cost of sales or use taxes on supplies and services which are Permitted Expenses;

(xv)         the charges of any independent contractor (who is not an affiliate of the Landlord) who, under contract with Landlord or its representatives, does any of the work of operating, managing, maintaining or repairing the Project;

(xvi)        legal, accounting and consulting expenses relating solely to the operation of the Building, including, but not limited to, such expenses that relate to seeking or obtaining reductions in and refunds of real estate taxes;

(xvii)       the cost of tools and equipment used solely for maintenance and repair of Common Areas;

(xviii)      the cost of licenses, certificates and permits which may constitute Expenses;

(xix)        payments under any equipment rental agreements for equipment used solely for maintenance and repair of Common Areas;

(xx)         costs, fees, charges or assessments imposed by any federal, state or local government for fire and police protection, trash removal, community services, or other services not funded through taxes;

(xxi)        sums levied, assessed, imposed or required to be paid to any governmental authority on account of the parking of motor vehicles, or reduction or control of motor vehicle traffic, or motor vehicle pollution; any

12

other expense or charge, whether or not hereinbefore mentioned, which, in accordance with generally accepted accounting and management principles, would be considered a customary and reasonable expense of owning, managing, operating, maintaining or repairing the Project, except as hereinafter provided.

Expenses shall not include costs or other items included within the meaning of the terms "Taxes" or "Utility Expenses" (as hereinafter defined); costs of alterations of the premises of tenants of the Building; costs of capital improvements to the Building or the Office Complex or capital repairs or replacements of any kind (except as specifically provided in this Section 4.2(c)); depreciation charges; any salaries of personnel above the grade of Building manager or Building superintendent, interest and principal payments on mortgages; points and reserves; depreciation; ground rental payments; real estate brokerage and leasing commissions; other expenses incurred in leasing or in procuring tenants; marketing costs, advertising or promotional expenditures; any expenditures for services which are provided to one or more tenants but are not available generally to all office tenants; expenses which are covered by the Landlord's insurance or warranty or the proceeds therefrom; and any expenditures for which Landlord has been reimbursed (other than pursuant to this Article 4 or provisions in other leases requiring the tenants thereunder to pay a share of expenses associated with the Building). Fines, penalties and other costs incurred by Landlord due to the violation by Landlord or any other tenant of any legal requirement or any lease of space in the Building; Amounts paid to affiliates of Landlord for goods and/or services for the Building to the extent the same exceeds the cost of such goods and/or services that would be charged by unaffiliated third parties on a competitive basis; Penalties, fines, late payment charges or interest incurred as a result of the late payment of any Taxes, Expenses, Utility Expenses or other costs or expenses related to the ownership or operation of the Building or the Office Complex or any costs or expenses not included in the Base Year determination of Expenses, except as hereinafter provided.

Notwithstanding anything contained in this clause (c) to the contrary:

(A)   The cost of any capital improvements to the Building made after the date of this Lease (i) which are intended to and successfully reduce Expenses or Utility Expenses, or (ii) which are required under any governmental laws, regulations or ordinances which were not applicable to the Building on the Commencement Date, which costs shall be amortized over the useful life in accordance with generally accepted accounting principles, together with interest on the unamortized cost of any such improvements may be included in Expenses;

(B)   If the Building is occupied by tenants at a rate less than 95% of total building occupancy during all or a portion of any Adjustment Year, or the Base Year, as the case may be, or if during all or a portion of any Adjustment Year, or the Base Year, as the case may be, Landlord is not furnishing to any tenant or

tenants any particular service, the cost of which, if furnished by Landlord, would be included in Expenses, then Landlord shall make an adjustment for such year of components of Expenses and the amounts thereof which may vary depending upon the occupancy level of the Building or the number of tenants using the service to an amount that reflects 95% occupancy. Any such adjustments shall be deemed costs and expenses paid or incurred by Landlord and included in Expenses for such year, as if the Building had been 95% occupied during the entire Adjustment Year, or the Base Year, as the case may be, Landlord had furnished such service at its expense to all tenants for the entire Adjustment Year, or the Base Year, as the case may be, and Landlord had paid or incurred such costs and expenses for such year;

(C)   If any item of Expenses, although paid or incurred in one year, relates to more than one calendar year, such item shall be allocated proportionately among such related calendar years; and

(d)   **"Taxes"** shall mean real estate taxes, property taxes, general or special assessments; sewer and water rents, rates and charges, transit and transit district taxes, city, county, village and school district taxes, taxes based upon the receipt of rent, and any other federal, state or local governmental charge, whether general, special, ordinary or extraordinary (but not including income or franchise taxes or any other taxes imposed upon or measured by Landlord's income or profits), which may now or hereafter be levied, assessed or imposed against the Real Property.

Taxes shall also include any personal property taxes (attributable to the calendar year in which paid) imposed upon the furniture, fixtures, machinery, equipment, apparatus, systems and appurtenances which are components of the Project.

Notwithstanding anything contained in this clause (d) to the contrary:

(i)   If at any time the method of taxation then prevailing is altered so that any new or additional tax, assessment, levy, imposition or charge or any part thereof is imposed upon Landlord in place or partly in place of any such Taxes or contemplated increase therein, and is measured by or is based in whole or in part upon the Real Property or the rents or other income therefrom, then all such new taxes, assessments, levies, impositions or charges or part thereof, to the extent that they are so measured or based, shall be included in Taxes levied, assessed or imposed against the Real Property to the extent that such items would be payable if the Real Property were the only property of Landlord subject thereto and the income received by Landlord from the Real Property were the only income of Landlord.

14

(ii)        Notwithstanding the year for which any such taxes or assessments are levied, (A) in the case of taxes or special assessments which may be paid in installments, the amount of each installment, plus any interest payable thereon, paid during a calendar year shall be included in Taxes for that year and (B) if any taxes or assessments payable during any calendar year shall be computed with respect to a period in excess of twelve (12) calendar months, then taxes or assessments shall be allocated over the entire applicable period. Except as provided in the preceding sentence, all references to Taxes "for" a particular year shall be deemed to refer to taxes levied, assessed or otherwise imposed and due and payable during such year.

(e)    "**Rentable Area of the Premises**" The Rentable Area of the Premises shall be deemed to be Six thousand seven hundred forty seven (6,747) square feet.

(f)    "**Rentable Area of the Building**" The Rentable Area of the Building shall be deemed to be Forty two thousand six hundred fifty (42,650) square feet.

(g)    "**Tenant's Proportionate Share**" shall mean 15.82%, which is the percentage obtained by dividing the Rentable Area of the Premises by the Rentable Area of the Building.

(h)    "**Utility Expenses**" shall mean the cost and expenses paid or incurred by or on behalf of Landlord for all electricity, steam, water, sewer, fuel, heating, lighting, air-conditioning and utilities used in the, including without limitation, any fuel surcharges and adjustments thereto and the allocable share of such costs and expenses used at the Common Areas of the Office Complex provided that Utility Expenses shall not include any cost or expenses which are or are required to be paid for by other tenants of the Office Complex or which relate to space in the Office Complex which is exclusively leased to another tenant or user.

Notwithstanding anything contained in this clause (h) to the contrary:

(A)    If the Building is occupied by tenants at a rate less than 95% of total building occupancy during all or a portion of any Adjustment Year, or the Base Year, as the case may be, or if during all or a portion of any Adjustment Year, or the Base Year, as the case may be, Landlord is not furnishing to any tenant or tenants any particular service, the cost of which, if furnished by Landlord, would be included in Utility Expenses, then Landlord shall reasonably and equitably adjust its computation for such year of components of Utility Expenses and the amounts thereof which may vary depending upon the occupancy level of the Building or the number of tenants using the service to an amount that reflects 95% occupancy;

15

SHB/dlp/161070v4 33839-001

(B)    If any item of Utility Expenses, although paid or incurred in one year, relates to more than one calendar year such item shall be allocated proportionately among such related calendar years; and

(C)    The Tenant shall not be responsible or liable for any heating ventilation or air conditioning ("HVAC") or related usage costs which are provided or utilized in areas outside of the Common Areas as it shall be utilizing a separately metered HVAC unit which shall be installed as part of Landlord's Work and shall exclusively serve the Premises.

(h)    **"Rent Adjustments"** shall mean all amounts determined pursuant to this Article 4, including all amounts payable by Tenant to Landlord on account thereof.

4.3  <u>Computation of Rent Adjustments</u>. Tenant shall pay Rent Adjustments for each Adjustment Year determined as hereinafter set forth. Rent Adjustments payable by Tenant with respect to each Adjustment Year during which an Adjustment Date falls shall include the following amounts:

(a)    the product of Tenant's Proportionate Share multiplied by the amount, if any, by which Taxes for such Adjustment Year exceed Taxes for calendar year 2013 (the **"Base Year"**) (said product being hereinafter referred to as the **"Tax Adjustment"**); plus

(b)    the product of Tenant's Proportionate Share multiplied by the amount, if any, by which Expenses for such Adjustment Year exceed Expenses for the Base Year (said product being hereinafter referred to as the **"Expense Adjustment"**); plus

(c)    the product of Tenant's Proportionate Share multiplied by the amount, if any, by which Utility Expenses for such Adjustment Year exceed Utility Expenses for the Base Year (said product being hereinafter referred to as the **"Utility Expense Adjustment"**).

In determining the Tax Adjustment, Expense Adjustment and Utility Expense Adjustment for any given Adjustment Year, if less than the entire Adjustment Year shall fall within the Term, then for purposes of comparison, the level of Taxes, Expenses and Utility Expenses for the Base Year shall be reduced ratably based upon the relative number of days in the two periods being compared. Tenant agrees and acknowledges that Landlord has made no representation, warranty or guaranty relating to the amount of Taxes, Expenses and Utility Expenses. Tenant has had an opportunity to consult with Landlord with respect to the Taxes, Expenses and Utility Expenses projected for the operation of the Building but has not relied upon any statements or representations of Landlord or of any agent or affiliate of Landlord in regard thereto in executing this Lease and in agreeing to perform the terms and covenants hereof and shall make no claim against Landlord based thereon. Notwithstanding anything to the

16

contrary herein contained, in no event shall the Tax Adjustment, Expense Adjustment or Utility Expense Adjustment for any Adjustment Year be negative.

4.4     Payments of Rent Adjustments; Projections. Tenant shall pay Rent Adjustments to Landlord in the manner hereinafter provided.

(a)     Tax Adjustment, Expense Adjustment and Utility Expense Adjustment. Tenant shall make payments on account of Tax Adjustment, Expense Adjustment and Utility Expense Adjustment (the aggregate of such payments with respect to any Adjustment Year being hereinafter referred to as the **"Rent Adjustment Deposit"**) as follows:

(i)       Prior to each Adjustment Date and from time to time during the Adjustment Year in which such Adjustment Date falls, Landlord may deliver to Tenant a written notice or notices (each such notice being hereinafter referred to as a **"Projection Notice"**) setting forth (A) Landlord's reasonable estimates, forecasts or projections (collectively, the **"Projections"**) of any or all of Taxes, Expenses and Utility Expenses for such Adjustment Year and (B) Tenant's Rent Adjustment Deposits with respect to the Tax Adjustment, Expense Adjustment and Utility Expense Adjustment components of Rent Adjustments for such Adjustment Year based upon the Projections. Landlord's budgets of Expenses and Utility Expenses and the Projections based thereon shall assume full occupancy of the Building and that Landlord will furnish all services included in Expenses and Utility Expenses to all tenants of the Building.

(ii)      Tenant shall commence payments of monthly installments of Rent Adjustment Deposits on the first day of the first calendar month following the end of the Base Year and Landlord's delivery of the first Projection Notice hereunder. On such date, and on the first day of each calendar month thereafter of the Adjustment Year covered by such Projection Notice, Tenant shall pay to Landlord one twelfth 1/12 of the Rent Adjustment Deposits shown in the Projection Notice. Within thirty (30) days following Landlord's delivery of a Projection Notice for an Adjustment Year in progress, Tenant also shall pay Landlord a lump sum equal to the Rent Adjustment Deposits shown in the Projection Notice less the sum of (A) any previous payments on account of Rent Adjustment Deposits made with respect to such Adjustment Year and (B) monthly installments on account of Rent Adjustment Deposits due for the remainder of such Adjustment Year. If Landlord's Projections were overstated, Landlord shall apply such credit to Tenant's next succeeding of Rent Adjustments. Until such time as Landlord furnishes a Projection Notice for an Adjustment Year, Tenant shall continue to pay monthly installments of Rent Adjustment Deposits in the amount shown by the most recent Projection Notice or, if the Tax, Expense and Utility Expense Adjustment for the Adjustment Year covered by such Projection Notice has been determined, one twelfth (1/12) of such Tax, Expense and Utility Expense Adjustment.

17

4.5 <u>Readjustments</u>. The following readjustments shall be made by Landlord and Tenant for Expense Adjustment, Utility Expense Adjustment and Tax Adjustments:

(a) Following the end of each Adjustment Year and after Landlord has determined the actual amount of Expenses to be used in calculating the Expense Adjustment for such Adjustment Year which Landlord shall use best efforts to deliver by May 1st of the calendar year following such Adjustment Year, Landlord shall notify Tenant in writing (any such notice hereinafter referred to as **"Landlord's Expense Statement"**) of such Expenses and Tenant's Expense Adjustment for such Adjustment Year. If the Expense Adjustment owed for such Adjustment Year exceeds the Expense Adjustment component of the Rent Adjustment Deposits paid by Tenant during such Adjustment Year, then Tenant, within thirty (30) days after the date of Landlord's Expense Statement, shall pay to Landlord an amount equal to the excess of the Expense Adjustment over the Expense Adjustment component of the Rent Adjustment Deposits paid by Tenant during such Adjustment Year. If the Expense Adjustment component of the Rent Adjustment Deposits paid by Tenant during such Adjustment Year exceeds the Expense Adjustment owed for such Adjustment Year, then Landlord shall credit such excess to Rent payable after the date of Landlord's Expense Statement, or, at its option, may credit such excess to any Rent theretofore due and owing, until such excess has been exhausted. If this Lease expires or is terminated prior to full application of such excess, Landlord shall pay to Tenant the balance thereof not theretofore applied against Rent, subject to Tenant's obligations under Section 4.8 hereof, provided Tenant has vacated the Premises and otherwise has surrendered the Premises to Landlord in accordance with this Lease.

(b) Following the end of each Adjustment Year and after Landlord has determined the actual amount of Utility Expenses to be used in calculating the Utility Expense Adjustment for such Adjustment Year which Landlord shall use best efforts to deliver by May 1st of the calendar year following such Adjustment Year. Landlord shall notify Tenant in writing (any such notice hereinafter referred to as **"Landlord's Utility Expense Statement"**) of such Utility Expenses and Tenant's Utility Expense Adjustment for such Adjustment Year. If the Utility Expense Adjustment owed for such Adjustment Year exceeds the Utility Expense Adjustment component of the Rent Adjustment Deposits paid by Tenant during such Adjustment Year, then Tenant, within thirty (30) days after the date of Landlord's Utility Expense Statement, shall pay to Landlord an amount equal to the excess of the Utility Expense Adjustment over the Utility Expense Adjustment component of the Rent Adjustment Deposits paid by Tenant during such Adjustment Year. If the Utility Expense Adjustment component of the Rent Adjustment Deposits paid by Tenant during such Adjustment Year exceeds the Utility Expense Adjustment owed for such Adjustment Year, then Landlord shall credit such excess to

18

Rent payable after the date of Landlord's Utility Expense Statement, or, at its option, may credit such excess to any Rent theretofore due and owing, until such excess has been exhausted. If this Lease expires or is terminated prior to full application of such excess, Landlord shall pay to Tenant the balance thereof not theretofore applied against, subject to Tenant's obligations under Section 4.8 hereof, provided Tenant has vacated the Premises and otherwise has surrendered the Premises to Landlord in accordance with this Lease.

(c)     Following the end of each Adjustment Year and after Landlord has determined the actual amount of Taxes to be used in calculating the Tax Adjustment for such Adjustment Year, Landlord shall notify Tenant in writing (any such notice hereinafter referred to as **"Landlord's Tax Statement"**) of such Taxes for such Adjustment Year which Landlord shall use best efforts to deliver by May 1st of the calendar year following such Adjustment Year. If the Tax Adjustment owed for such Adjustment Year exceeds the Tax Adjustment component of the Rent Adjustment Deposits paid by Tenant during such Adjustment Year, then Tenant, within thirty (30) days after the date of Landlord's Tax Statement, shall pay to Landlord an amount equal to the excess of the Tax Adjustment over the Tax Adjustment component of the Rent Adjustment Deposits paid by Tenant during such Adjustment Year. If the Tax Adjustment component of the Rent Adjustment Deposits paid by Tenant during such Adjustment Year exceeds the Tax Adjustment owed for such Adjustment Year, then Landlord shall credit such excess to Rent payable after the date of Landlord's Tax Statement, or, at its option, may credit such excess to any Rent theretofore due and owing, until such excess has been exhausted. If this Lease expires or is terminated prior to full application of such excess, Landlord shall pay to Tenant the balance thereof not theretofore applied against Rent, subject to Tenant's obligations under Section 4.8 hereof, provided Tenant has vacated the Premises and otherwise has surrendered the Premises to Landlord in accordance with this Lease.

No interest or penalties shall accrue on any amounts which Landlord is obligated to credit or pay to Tenant pursuant to this Section.

4.6     **Books and Records**. Landlord shall maintain books and records showing Taxes, Expenses and Utility Expenses in accordance with sound accounting and management practices. Tenant or its representative shall have the right to examine Landlord's books and records showing Taxes, Expenses and Utility Expenses upon reasonable prior notice and during normal business hours at any time within ninety (90) days following the furnishing by Landlord to Tenant of Landlord's Expense Statement, Landlord's Utility Expense Statement or Landlord's Tax Statement, as the case may be, provided for in Section 4.5. Unless Tenant takes written exception to any item within ninety (90) days after the furnishing of Landlord's Expense Statement, Landlord's Utility Expense Statement or Landlord's Tax Statement, as the case may be, containing such item, such Landlord's Statement shall be considered final and accepted by Tenant.

19

4.7     **Audit Procedures.** If Tenant notifies Landlord within such one hundred eighty (180) day period that Tenant disputes any specific item or items in any Landlord's Expense Statement, Landlord's Utility Expense Statement or Landlord's Tax Statement, as the case may be, and such dispute is not resolved between Landlord and Tenant within ninety (90) days after the date such notice is given by Tenant, Tenant, during the sixty (60) day period following the expiration of the sixty (60) day period commencing on the date such notice is given, may refer such disputed item or items for determination to an independent certified public accountant ("CPA") selected by Tenant, and the determination of such accountant shall be final, conclusive and binding upon Landlord and Tenant.   Tenant agrees to pay all costs involved in such determination, except in the case of Tax Adjustment, Expense Adjustment and Utility Expense Adjustment for any Adjustment Year where it is determined that Landlord has overcharged Tenant for Tax Adjustment, Expense Adjustment and Utility Expense Adjustment for such Adjustment Yearly more than five (5%), in which case Landlord shall pay such costs.

4.8     **Proration and Survival.**   With respect to any Adjustment Year which does not fall entirely within the Term, Tenant shall be obligated to pay as Expense Adjustment, Utility Expense Adjustment and Tax Adjustment for such Adjustment Year only a pro rata share of Expense Adjustment, Utility Expense Adjustment and Tax Adjustment as hereinabove determined, based upon the number of days of the Term falling within the Adjustment Year. Following expiration or termination of this Lease and subject to reconciliation, Tenant shall pay any Rent Adjustments due to Landlord within thirty (30) days after the date of each Landlord's Statement sent to Tenant. Without limitation of other obligations of Tenant which shall survive the expiration of the Term, the obligation of Tenant to pay Rent Adjustments provided for in this Article 4 accruing during the Term shall survive the expiration or termination of this Lease.

4.9     **No Decrease In Base Rent.**    In no event shall any Rent Adjustments result in a decrease of Base Rent payable hereunder.

4.10    **Additional Rent.**    All amounts payable by Tenant as or on account of Rent Adjustments shall be deemed to be additional rent becoming due under this Lease.

## ARTICLE 5

## USE OF PREMISES

5.1     **Permitted Use.**   Tenant shall use and occupy the Premises for gym, fitness and health center purposes, and ancillary medical and health services including physical therapy (the "Permitted Use"). Landlord represents, warrants and covenants that the Permitted Use is currently allowed under applicable zoning (pursuant to the enclosed Zoning Letter dated as of October 23, 2012 and attached hereto as Exhibit F) and that all required approvals, consents and permits for the Permitted Use have been obtained and are in full force and effect as of the Effective Date.

5.2     **Tenant Exclusive Right/Prohibited Uses.**

20

SHB/dlp/161070v4 33839-001

(a)     Landlord agrees that, from and after the date of execution of this Lease, Landlord will not enter into a lease of other space within the Office Complex which permits the tenant or occupant to use its premises as a health or fitness center that provides its clients or customers with access to fitness equipment and related services through the sale of monthly or annual membership plans or per diem access fees (the "Exclusive Covenant"). The Exclusive Covenant is not intended to cover physical therapy services which are provided in a physicians' office in connection with the provision of physician service and are reimbursable or otherwise covered by a customer's or client's health insurance.

(b)     Without in any way limiting or expanding upon the foregoing, Landlord also expressly agrees that Landlord shall not permit any portion of the Office Complex to be used for any Prohibited Use (as defined below). For purposes of this Lease, "Prohibited Use" shall be deemed to mean any of the following: (i) adult (xxx) or sexually explicit or oriented stores which sell products or services for adult entertainment, including, without limitation, bookstores or video stores; (ii) family planning services or clinics that promote the use of contraception or provide abortions; or (iii) massage parlors or so called "head shops". Notwithstanding subsection (ii) above, the term Prohibited Use shall not be deemed to include a general medicine, obstetric or gynecological medical practice.

(c)     If the Exclusive Covenant or the Prohibited Use provision shall be violated, and said violation is the result of Landlord's having failed to restrict or to prohibit the other tenant(s) from using their premises for a use which is a Prohibited Use or which violates the Exclusive Covenant (an "**intentional or willful violation**"), Tenant shall not be entitled to terminate this Lease, but Tenant shall be entitled to seek all other remedies available to it, at law and in equity.

Without limiting the foregoing, Landlord specifically acknowledges and agrees that in the event of a violation or threatened violation of any of the restrictions or prohibitions set forth in this Article 5, Tenant shall be entitled to an injunction (including a temporary restraining order and preliminary injunction) issued by an court of competent jurisdiction as well as the right of specific performance and reimbursement by Landlord of reasonable legal fees incurred by Tenant in the successful enforcement of this provision.

(d)     If the restrictions or prohibitions set forth in this Section shall be violated and same is not an "intentional or willful violation", Tenant shall give Landlord notice of the violation, and, provided Landlord proceeds as set forth in this paragraph to cause the cessation of the violation, Landlord shall have a period of sixty (60) days (or such longer period of time as shall be reasonably necessary) within which to use its best efforts to enjoin the violation and diligently to take such other steps as may be necessary or desirable to cause the cessation of the violation, including any and all necessary legal proceedings. If Landlord fails to proceed as provided herein, Tenant may deem said failure to be an intentional or willful violation.

21

SHB/dlp/161070v4 33839-001

(e)     In the event of a judicial determination that Landlord failed to restrict or prohibit other tenant(s) from using their premises subject to the provisions of this Section, same shall be deemed to be an intentional or willful violation.

## ARTICLE 6

## SERVICES

6.1     **Services Provided.**     Landlord shall furnish the following services:

(a)     Domestic water in common with other tenants for drinking, lavatory and toilet purposes drawn through fixtures installed by Landlord, or by Tenant in the Premises with Landlord's written consent, and hot water in common with other tenants for lavatory purposes from regular Building supply. Tenant shall pay Landlord at Landlord's scheduled rates for domestic water and hot water furnished for any other purpose. Tenant shall not waste or permit the waste of water.

(b)     24/7/365 access to the Building and the Premises.

(c)     Tenant Electric costs will be computed provided by sub-meter with no mark-up at the same rate as Landlord's actual costs or direct meter. Electric charges shall be paid by Tenant within ten (10) days after billing by Landlord. If usage is metered directly, Tenant will have the account billed directly by the utility.

A default in payment of such bills shall be a default in payment of Rent. Landlord shall not in any way be liable or responsible to Tenant for any loss, damage, expenses and causes beyond Landlord's control, which Tenant may sustain or incur if either the quantity or character of electric service is changed.

(d)     Tenant shall make no alterations or additions to those electric equipment or appliances within the Premises which affect the base building systems without the prior written consent of Landlord in each instance.  Tenant also agrees to purchase from Landlord or its agents all lamps, bulbs, ballasts and starters used in the Premises during the term.

(e)     In addition to the HVAC units which are to be installed as part of Landlord Work, Tenant has the right to install a new rooftop unit at Tenant's sole cost and expense and included in the submetered electric to provide with up to five additional tons of cooling capacity to the Premises in accordance with and pursuant to the applicable provisions of the Work Letter.

(f)     Tenant covenants and agrees that at all times its use of electric current shall never exceed the capacity of the feeders to the

Building or the risers or wiring installed thereon which is 6 watts per usable square foot).

(g)   Landlord may provide such extra or additional services as it is reasonably possible for Landlord to provide, and as Tenant may request from time to time, within a reasonable period after the time such extra or additional services are requested. Tenant shall pay, for such extra or additional services, an amount equal to one hundred fifteen percent (115%) of Landlord's actual cost reasonably incurred in providing such additional services, such amount to be considered additional rent hereunder. All charges for such extra or additional services shall be due and payable at the same time as the installment of Base Rent with which they are billed, or if billed separately, shall be due and payable within thirty (30) days after such billing. Any such billings for extra or additional services shall include an itemization of the extra or additional services rendered, and the charge for each such service.

(h)   Onsite parking, at no cost to Tenant. The number of parking spaces at the Building, which shall be available to Tenant on a non-exclusive basis, shall be equal to not less than four (4) parking spaces per thousand (1,000) square feet of the total Rentable Area of the Premises.

6.2   **Failure to Furnish Services.**   Except as otherwise provided below, Tenant agrees that Landlord and its beneficiaries and their agents shall not be liable in damages, by abatement of Rent or otherwise, for failure to furnish or for delay in furnishing any service when such failure or delay is occasioned, in whole or in part, by any strike, lockout or other labor trouble, by inability to secure electricity, gas, water or other fuel at the Building after reasonable effort to do so, by any accident or casualty whatsoever, by the act or default of Tenant or other parties; or by any cause beyond the reasonable control of Landlord; and such failures or delays shall never be deemed an eviction or disturbance of Tenant's use or possession of the Premises or relieve Tenant from paying Rent or performing any of its obligations under this Lease.

Notwithstanding the foregoing, in the event that there is a stoppage or suspension of services for a period of ten (10) consecutive business days, which materially affects the operation of Tenant's business, Rent shall abate until such services are restored.

6.3   **Regulations Regarding Utilities Services.**   Tenant agrees to cooperate fully, at all times, with Landlord in abiding by all reasonable regulations and requirements which Landlord may prescribe for the proper functioning and protection of all utilities and services reasonably necessary for the operation of the Premises and the Building. Throughout the Term of this Lease, Landlord shall have free access to any and all mechanical installations, and Tenant agrees that there shall be no construction of partitions or other obstructions which might interfere with access to or the moving of servicing equipment to or from the enclosures containing said installations. Tenant further agrees that neither Tenant nor its employees, agents, licensees, invitees or contractors shall at any time tamper with, adjust or otherwise in any manner affect Landlord's mechanical installations.

23

## ARTICLE 7

### CONDITION AND CARE OF PREMISES

Subject to completion of Landlord's Work and terms of Lease, Tenant's taking possession of the Premises or any portion thereof shall be conclusive evidence against Tenant that the portion of the Premises taken possession of was then in good order and satisfactory condition. No promises of Landlord to alter, remodel, improve, repair, decorate or clean the Premises or any part thereof have been made, and no representation respecting the condition of the Premises, the Building or the Land, has been made to Tenant by or on behalf of Landlord except to the extent expressly set forth herein, if any; provided, however, that Landlord shall deliver exclusive possession of the Premises free of all debris, in a broom-clean condition and will paint and carpet the Premises and perform Landlord's Work. Subject to the provisions of Article 15 hereof, Tenant, at its own expense, shall keep the Premises in good repair and tenantable condition and shall promptly and adequately repair all damage to the Premises caused by Tenant or any of its employees, contractors, agents, invitees or licensees, including replacing or repairing all damaged or broken glass, fixtures and appurtenances resulting from any such damage, reasonable wear and tear and casualty excepted. If Tenant does not do so promptly and adequately and after thirty (15) days written notice and failure to cure, Landlord may, but need not, make such repairs and replacements and Tenant shall pay Landlord the cost thereof on demand.

## ARTICLE 8

### RETURN OF PREMISES

8.1    **Surrender of Possession.**    At the termination of this Lease by lapse of time or otherwise or upon termination of Tenant's right of possession without termination of this Lease in accordance with applicable law, Tenant shall surrender possession of the Premises to Landlord and deliver all keys and other access devices to the Premises to Landlord and make known to Landlord the combination of all locks of vaults then remaining in the Premises, and, subject to the following paragraph, shall return the Premises and all equipment and fixtures of Landlord therein to Landlord in as good condition as when Tenant originally took possession or, if a Workletter is attached to this Lease, when the work provided for in the Workletter is completed, ordinary wear, loss or damage by fire or other insured casualty, and damage resulting from the act of Landlord or its employees and agents excepted, failing which Landlord may restore the Premises and such equipment and fixtures to such condition and Tenant shall pay the cost thereof to Landlord on demand.

8.2    **Installations and Additions**. All installations, additions, partitions, hardware, light fixtures, non-trade fixtures and improvements, whether temporary or permanent, except movable furniture and equipment, fitness equipment and related machinery installed by Tenant belonging to Tenant ("Tenant's Property"), in or upon the Premises, whether placed there by Tenant or Landlord, shall be Landlord's property

24

and, upon termination of this Lease by lapse of time or otherwise, or of Tenant's right of possession without termination of this Lease, shall remain upon the Premises, all without compensation, allowance or credit to Tenant; provided, however, that if at least forty five (45) days prior to such termination Landlord so directs by written notice, Tenant, at Tenant's sole cost and expense, shall promptly remove such of the installations, additions, partitions, hardware, light fixtures, non-trade fixtures and improvements placed in the Premises by Tenant as are designated in such notice (other than Tenant's initial alterations to prepare the Premises for operation of its business which shall not be subject to removal under this provision) and repair any damage to the Premises caused by such removal, failing which Landlord may remove the same and repair the Premises and Tenant shall pay the cost thereof to Landlord on demand.  At the sole option of Landlord, Tenant shall leave in place any floor covering without compensation to Tenant, or Tenant shall remove any floor covering and shall remove all fastenings, paper, glue, bases or other vestiges and restore the floor surface to its previous condition, or shall pay to Landlord upon demand the cost for restoring the floor surface to such condition.

 8.3 **Trade Fixtures and Personal Property**.  At the termination of the Lease, Tenant shall remove Tenant's Property and repair any damage to the Premises caused thereby, such removal and restoration to be performed prior to the end of the Term or within ten (10) days following termination of this Lease or Tenant's right of possession, whichever is earlier.  If Tenant fails to remove such items, Landlord may do so, and thereupon the provisions of Section 17.6 shall apply and Tenant shall pay to Landlord upon demand the cost of removal and of restoration of the Premises.

 8.4 **Survival.** All obligations of Tenant under this Article 8 shall survive the expiration of the Term or earlier termination of this Lease.

<p align="center">**ARTICLE 9**</p>

<p align="center">**HOLDING OVER**</p>

Tenant shall pay Landlord for each day Tenant retains possession of the Premises or any part thereof after termination of this Lease, by lapse of time or otherwise, or of Tenant's right to possession of the Premises, an amount which is one hundred fifty percent (150%) of the amount of Base Rent and Rent Adjustments for a day based upon the annual rate of Base Rent set forth in Section 3.1 and on Rent Adjustments provided for in Article 4 for the period in which such possession occurs, calculated as though such period were within the Term (collectively **"Holdover Rent"**), and if Tenant holds over for more than thirty (30) days, without Landlord's consent, Tenant shall also pay all damages, consequential as well as direct, sustained by Landlord by reason of such retention. Such holding over shall, constitute a month-to-month tenancy under the terms and conditions of this Lease except that Holdover Rent shall apply. Acceptance by Landlord of rent after such termination shall not of itself constitute either the creation of such a month-to-month tenancy or a renewal. Nothing contained in this

SHB/dlp/161070v4 33839-001

Article 9 shall be construed or shall operate as a waiver of Landlord's right of reentry or any other right or remedy of Landlord.

## ARTICLE 10

## RULES AND REGULATIONS

Tenant agrees to observe and not to interfere with the rights reserved to Landlord in Article 11 and agrees, for itself, its employees, agents, contractors, invitees and licensees, to comply with the rules and regulations set forth in **Exhibit D** attached to this Lease and made a part hereof and such other rules and regulations as may be adopted by Landlord pursuant to Section 11.1 (m) of this Lease provided that if there is an inconsistency or conflict between the body of this Lease and such rules and regulations, the body of the Lease shall govern. Any violation by Tenant of any of the rules and regulations contained in **Exhibit D** or in any Section of this Lease, or as may hereafter be adopted by Landlord pursuant to Section 11.1 (m) of this Lease, may be restrained; but whether or not so restrained, Tenant acknowledges and agrees that it shall be and shall remain liable for all damages, loss, costs and expenses resulting from any violation by Tenant of any of said rules and regulations. Nothing contained in this Lease shall be construed to impose upon Landlord any duty or obligation to enforce said rules and regulations or the terms, covenants and conditions of any other lease against any other tenant or any other persons, and Landlord and its beneficiaries shall not be liable to Tenant for violation of the same by any other tenant, its employees, agents or invitees, or by any other person.

## ARTICLE 11

## RIGHTS RESERVED TO LANDLORD

11.1 **RIGHTS RESERVED TO LANDLORD.** Landlord reserves the following rights, exercisable upon fifteen (15) days prior notice and without liability to Tenant for damage or injury to property, person or business and without effecting an eviction or disturbance of Tenant's use or possession or giving rise to any claim for setoff or abatement of Rent or affecting any of Tenant's obligations under this Lease:

(a)     To the exclusive use of the name of the Building and Office Complex for all purposes, except that Tenant may use such name(s) as its business address and for no other purpose;

(b)     To change the name or street address of the Building;

(c)     To install and maintain signs on the exterior and interior of the Building;

26

(d)     To prescribe the location and style of the suite number and identification sign or lettering for the Premises and to designate and limit the space allotted to Tenant on the directory of the Building;

(e)     To retain at all times, and to use in appropriate instances, pass keys or other access devices to the Premises;

(f)     To grant to anyone the exclusive right to conduct any business or render any service in the Building except as otherwise provided in Article 5;

(g)     To exhibit the Premises at reasonable hours and to decorate, remodel, repair, alter or otherwise prepare the Premises for reoccupancy at any time after termination or sooner expiration of the Term;

(h)     To enter the Premises at reasonable hours for reasonable purposes, including inspection and supplying janitorial service or other service to be provided to Tenant hereunder;

(i)     To require all persons entering or leaving the Building during such hours as Landlord may reasonably determine from time to time to identify themselves to security personnel by registration or otherwise in accordance "with security controls, and to establish their right to enter or to leave in accordance with the provisions of **Exhibit D.** Landlord shall not be liable in damages for any error with respect to admission to or eviction or exclusion from the Building of any person. In case of fire, invasion, insurrection, mob, riot, civil disorder, public excitement or other commotion, or threat thereof, Landlord reserves the right to limit or to prevent access to the Building during the continuance of the same, to shut down elevator service, to activate elevator emergency controls, or otherwise to take such action or preventive measures deemed necessary by Landlord for the safety or security of the tenants or other occupants of the Building or for the protection of the Building and the property in the Building. Tenant agrees to cooperate with any reasonable safety or security program developed by Landlord;

(j)     To regulate access to telephone, electrical and other utility closets in the Building and to require use of designated contractors for any work involving access to the same;

(k)     To control and prevent access to Common Areas and other non-general public areas of the Building;

(l)     Provided that reasonable access to the Premises and the parking areas shall be maintained and the business of Tenant shall not be interfered with, to rearrange, relocate, enlarge, reduce or change corridors, exits, entrances in or to the Building and to decorate and, at its own expense, to make repairs, alterations, additions and improvements, structural or otherwise, in or to the Building or any part thereof, and any

27

adjacent building, land, street or alley, including for the purpose of connection with or entrance into or use of the Building in conjunction with any adjoining or adjacent building or buildings, now existing or hereafter constructed, and may for such purposes erect scaffolding and other structures reasonably required by the character of the work to be performed, and during such operations may enter upon the Premises and take into and upon or through any part of the Building, including the Premises, all materials that may be required to make such repairs, alterations, improvements or additions, and in that connection, Landlord may temporarily close public entry ways, other public spaces, stairways or corridors and interrupt or temporarily suspend any services or facilities agreed to be furnished by Landlord, all without the same constituting an eviction of Tenant in whole or in part and, without abatement of Rent by reason of loss or interruption of the business of Tenant or otherwise and without in any manner rendering Landlord liable for damages or relieving Tenant from performance of Tenant's obligations under this Lease. Landlord, at its option, may make any repairs, alterations, improvements and additions in and about the Building and the Premises during ordinary business hours and, if Tenant desires to have such work done at times other than business hours, Tenant shall pay all overtime and additional expenses resulting therefrom; and

(m)   From time to time to make and to adopt such reasonable rules and regulations, in addition to or other than or by way of amendment or modification of the rules and regulations contained in **Exhibit D** or other Sections of this Lease, for the protection and welfare of the Building and its tenants and occupants, as Landlord may determine, and Tenant agrees to abide by and comply with all such rules and regulations provided that they are consistent with the terms of this Lease and enforced in a uniform and non-discriminatory manner.

11.2 **Use of Roof and Land.** Landlord specifically excepts and reserves to itself the use of any roof decks, the exterior portions of the Premises, all rights to the land and improvements below the improved floor level of the Premises, to the improvements and air rights above the ceiling of the Premises and to the improvements and air rights located outside the demising walls of the Premises and to such areas within the Premises required for installation of utility lines and other installations required to serve other occupants of the Building and to maintain and repair same, and no rights with respect thereto are conferred upon Tenant, unless otherwise specifically provided herein. This Lease does not grant any rights to light or air.

## ARTICLE 12

## ALTERATIONS

Tenant shall not make, without the prior written consent of Landlord, any structural alterations, additions or improvements to the Premises. Landlord's decision to refuse such consent shall not be unreasonably withheld and/or delayed. If Landlord consents

28

to such alterations, additions or improvements, before commencement of the work or delivery of any materials onto the Premises or into the Building. Tenant shall furnish to Landlord for approval (i) plans and specifications, (ii) names and addresses of contractors, (iii) copies of necessary permits and licenses and (iv) instruments of indemnification against any and all claims, costs, expenses, damages and liabilities which may arise in connection with such work, all in such form, substance and amount as may be satisfactory to Landlord. In addition, prior to commencement of any such work or delivery of any materials into the Premises, Tenant shall provide Landlord with appropriate evidence of Tenant's ability to pay for such work and materials in full, and if requested by Landlord, shall deposit with Landlord at such time such security for the payment of said work and materials as Landlord may require. All alterations, additions and improvements shall be' installed in a good, workmanlike manner and only new, high-grade materials shall be used. All such work shall be done only by contractors or mechanics approved by Landlord acting reasonably. Tenant further agrees to hold Landlord harmless from any and all liabilities of every kind and description which may arise out of or be connected in any way with said alterations, additions or improvements. Before commencing any Alteration to the Building, including the Premises, occasioned by such alterations, additions and improvements work in connection with such alterations, additions or improvements, Tenant shall furnish Landlord with certificates of insurance from its general contractor performing labor or furnishing materials insuring Landlord against any and all liabilities which may arise out of or be connected in any way with said alterations, additions or improvements. Tenant shall permit Landlord to supervise construction operations in connection with the foregoing work if Landlord requests to do so. Tenant shall pay the cost of all such alterations, additions and improvements, as well as the cost of decorating and repairing any damage, including the cost of labor and materials and Landlord's out-of-pocket reasonable costs of a review of structural alterations is reasonably required. Upon completing any alterations, additions or improvements, Tenant shall furnish Landlord with contractors' affidavits in form required by law, and full and final waivers of lien and receipted bills covering all labor and materials expended and used. All alterations, additions and improvements shall comply with all insurance requirements and with all city and county ordinances and regulations and with the requirements of all state and federal statutes and regulations.

## ARTICLE 13

## ASSIGNMENT AND SUBLETTING

13.1 **Assignment and Subletting.** Except as otherwise provided in Sections 13.2 and 13.9 below, Tenant, without the prior written consent of Landlord which will not be unreasonably withheld in each instance, shall not (a) assign, transfer, mortgage, pledge, hypothecate or encumber or subject to or permit to exist upon or be subjected to any lien or charge, this Lease or any interest under it, (b) allow to exist or occur any transfer of or lien upon this Lease or Tenant's interest herein by operation of law, (c) sublet the Premises or any part thereof, (d) permit the use or occupancy of the Premises or any part thereof for any purpose not provided for under Article 5 of this Lease or by

29

anyone other than Tenant and Tenant's agents and employees, or affiliate companies, or (c) cause, suffer or permit to occur any "Change of Control" (as such term is defined in Section 13.8 hereof). In no event shall this Lease be assigned or assignable by voluntary or involuntary bankruptcy proceedings or otherwise, and in no event shall this Lease or any rights or privileges hereunder be an asset of Tenant under any bankruptcy, insolvency or reorganization proceedings.

Notwithstanding the foregoing, any assignment or sublet must be in writing and subject to the terms and conditions of this Lease. Landlord has the right acting reasonably to withhold its consent for the reasons set forth in Section 13.5(a)-(g) below.

13.2 **Temporary Users.** The Landlord acknowledges and agrees that the restrictions against subletting and assignment contained in this Article, shall not apply to temporary users within the Premises who provide ancillary services related to the Permitted Use (each a "Temporary User") provided that (a) Tenant shall indemnify and hold Landlord harmless from any damage, cost, expense or liability incurred by Landlord due to the acts of such Temporary Users, (b) such Temporary Users shall only provide services which are expressly permitted under Section 5.1 of this Lease and (c) such Temporary Users shall maintain appropriate general liability insurance naming Landlord as an additional insured.

13.3 **Consent by Landlord.** Consent by Landlord to any assignment, subletting, use, occupancy or transfer shall not operate to relieve Tenant from any covenant or obligation hereunder except to the extent, if any, expressly provided for in such consent, or be deemed to be a consent to or relieve Tenant from obtaining Landlord's consent to any subsequent assignment, transfer, lien, charge, subletting, use or occupancy. Tenant shall pay all of Landlord's costs, charges and expenses, including attorneys' fees, incurred in connection with any assignment, transfer, lien, charge, subletting, use or occupancy made or requested by Tenant. Tenant agrees that all advertising by Tenant or on Tenant's behalf with respect to the assignment of this Lease or subletting of space must be approved in writing by Landlord prior to publication.

13.4 **Tenant's Notice; Landlord's Right to Terminate.** Tenant, by notice in writing, shall advise Landlord of its intention from, on and after a stated date (which shall not be less than twenty (20) days after the date of Tenant's notice) to assign this Lease or sublet any part or all of the Premises for the balance or any part of the Term, and, in such event, Landlord shall have the right only in the case of an assignment or sublet of the entire Premises for the remainder of the term, which is not a Permitted Transfer, to be exercised by giving written notice to Tenant within thirty (30) days after receipt of Tenant's notice, to recapture the space described in Tenant's notice and such recapture notice, if given, shall terminate this Lease with respect to the space therein described as of the date stated in Tenant's notice. Tenant's notice shall state the name and address of the proposed subtenant or assignee, and a true and complete copy of the proposed sublease or assignment and sufficient information to permit Landlord to determine the financial responsibility and character of the proposed subtenant or assignee shall be delivered to Landlord with said notice. If Tenant's notice covers all of

30

the space hereby demised, and if Landlord gives its recapture notice with respect thereto, the Term of this Lease shall expire on the date stated in Tenant's notice as fully and completely as if that date had been herein definitely fixed for the expiration of the Term.

13.5 **Landlord's Consent**. If Landlord, upon receiving Tenant's notice with respect to any such space, does not exercise its right to terminate as aforesaid. Landlord will not unreasonably withhold its consent to Tenant's assignment of this Lease or subletting the space covered by its notice. Landlord shall not be deemed to have unreasonably withheld its consent to a sublease of part or all of the Premises or an assignment of this Lease if its consent is withheld because: (a) Tenant is then in monetary default hereunder beyond notice and cure periods; (b) any notice of termination of this Lease or termination of Tenant's possession was given under Article 17; (c) the portion of the Premises which Tenant proposes to sublease, including the means of ingress thereto and egress therefrom and the proposed use thereof, or the remaining portion of the Premises, or both, will violate any city, state or federal law, ordinance or regulation, including, without limitation, any applicable building code or zoning ordinances; (d) the proposed use of the Premises by the subtenant or assignee does not conform with the use permitted by Article 5; (e) in the reasonable judgment of Landlord, the proposed subtenant or assignee is of a character or is engaged in a business which would be deleterious to the reputation of the Building, or the subtenant or assignee is not sufficiently financially responsible to perform its obligations under the proposed sublease or assignment; (f) the proposed subtenant or assignee is a government or a government agency; or (g) the proposed subtenant or assignee is an occupant of the Office Complex and comparable space is available in the Office Complex or an entity to whom Landlord or Landlord's agent have been marketing comparable space in the Office Complex within the past six (6) months: provided, however, that the foregoing are merely examples of reasons for which Landlord may withhold its consent and shall not be deemed exclusive of any permitted reasons for reasonably withholding consent, whether similar to or dissimilar from the foregoing examples.

13.6 **Profits**. If Tenant, having first obtained Landlord's consent to any sublease or assignment, or if Tenant or a trustee in bankruptcy for Tenant pursuant to the Bankruptcy Code, assigns this Lease or sublets the Premises, or any part thereof (except in connection with a Permitted Transfer), at a rental or for other consideration in excess of the Rent or pro rata portion thereof due and payable by Tenant under this Lease, then Tenant shall pay to Landlord as additional rent fifty percent (50%) of any such excess rent or other monetary consideration (after the deduction of all costs of brokerage, fit-up, legal fees, permitting fees, and fees incurred in connection with such assignment or sublet) immediately upon receipt under any such assignment or, in the case of a sublease, on the first day of each month during the term of any sublease, fifty percent (50%) of the excess of all rent and other consideration received from the subtenant for such month over the Rent then payable to Landlord pursuant to the provisions of this Lease for said month (or, if only a portion of the Premises is being sublet, fifty percent (50%) of the excess of all rent and other consideration due from the subtenant for such month over the portion of the Rent then payable to Landlord pursuant to the provisions of this Lease for said month which is allocable on a square footage basis to the space sublet(after the deduction of all costs of brokerage, fit-up, legal fees, permitting fees,

31

SHB/dlp/161070v4 33839-001

and fees incurred in connection with such assignment or sublet)) it being agreed, however, that Landlord shall not be responsible for any deficiency if Tenant assigns this Lease or sublets the Premises or any part thereof at a rental less than that provided for herein.

      13.7 **Assignee to Assume Obligations**. If Tenant assigns this Lease as permitted herein, the assignee shall expressly assume all of the obligations of Tenant hereunder in a written instrument satisfactory to Landlord and furnished to Landlord not later than fifteen (15) days prior to the effective date of the assignment. If Tenant subleases the Premises as permitted herein, Tenant shall obtain and furnish to Landlord, not later than fifteen (15) days prior to the effective date of such sublease and in form satisfactory to Landlord, the written agreement of such subtenant to the effect that the subtenant, at Landlord's option and written request, will attorn to Landlord in the event this Lease terminates before the expiration of the sublease.

      13.8 **Change of Control.** If Tenant is a corporation (other than a corporation the stock of which is publicly traded) the term "Change of Control" shall mean any direct or indirect change in more than fifty (50%) percent of the legal or beneficial ownership or control of more than fifty (50%) percent of the shares of stock which constitute control of Tenant other than by reason of gift or death estate planning or Tenant's raising of equity capital and obtaining investors for its business. The term "control" as used herein means the power, directly or indirectly, to direct or cause the direction of the management or policies of Tenant. If Tenant is a partnership, whether general or limited, or a limited liability company, the term "Change of Control" shall mean any direct or indirect change in more than fifty (50%) percent of the legal or beneficial ownership or control of the partnership interests or, as the case may be, any change in more than fifty (50%) percent of the membership or control of said limited liability company, which constitute control of Tenant other than by reason of gift estate planning or death or Tenant's raising of equity capital and obtaining investors for its business.

      13.9 **Assignment or Sublet to Affiliate**.   Notwithstanding anything set forth above to the contrary, provided Tenant is not in monetary default in the performance of its obligations hereunder beyond applicable notice and cure periods, Tenant shall have the right without the prior consent of Landlord (and without being subject to Section 13.4, 13.5, 13.6, 13.7, or 13.8 of this Lease), to assign this Lease or sublet the Premises or any part thereof to an Affiliate, as hereinafter defined or to assign this Lease or its rights hereunder to any successor by merger or consolidation or a purchaser of all or substantially all of the assets of Tenant, (each a "Permitted Transfer") on the following conditions: (a) Tenant shall notify Landlord in writing of such assignment, subletting or transfer not less than thirty (30) days prior to the effective date thereof, and furnish to Landlord such information (including the most recent financial statement) regarding the identity, business, reputation and financial condition of such Affiliate or Permitted Transferee as Landlord may reasonably require; (b) Tenant shall deliver to Landlord evidence reasonably satisfactory to Landlord that such Affiliate or Permitted Transferee satisfies the requirements of this Section 13.9; (c) Tenant shall deliver to Landlord copies of all operative documents effecting such assignment or subletting; (d) any such subletting, assignment or transfer shall not release or discharge the initial Tenant of or from any liability, whether past, present or future, under this Lease and the initial

SHB/dlp/161070v4 33839-001

Tenant shall continue fully liable hereunder. "Affiliate" is defined as any entity that through one or more intermediaries, controls or is controlled by, or is under common control with, Tenant ("control" as used in this Section 13.9 means the direct or indirect ownership of more than fifty percent (50%) of the beneficial interest of the entity). "Permitted Transferee" is defined as a purchaser of all or substantially all of the assets of Tenant or a successor by merger, consolidation or operation of law or Affiliate of Tenant.

## ARTICLE 14

### WAIVER OF CERTAIN CLAIMS; INDEMNITY BY TENANT

14.1 **Waiver of Certain Claims.** To the extent not prohibited expressly by law, Tenant releases Landlord and its beneficiaries, if any, and their agents, servants and employees, from and waives all claims for damages to person or property sustained by Tenant or by any occupant of the Premises or the Office Complex, or by any other person, resulting directly or indirectly from fire or other casualty, cause or any existing or future condition, defect, matter or thing in or about the Premises, the Office Complex or any part of it, or from any equipment or appurtenance therein, or from any accident in or about the Office Complex, or from any act or neglect of any tenant or other occupant of the Office Complex or any part thereof or of any other person, including Landlord, and its agents, employees and contractors. This Section shall apply especially, but not exclusively, to damage caused by water, snow, frost, steam, excessive heat or cold, sewerage, gas, odors or noise, or the bursting or leaking of pipes or plumbing fixtures, broken glass, sprinkling or air conditioning devices or equipment, or flooding of basements, and shall apply without distinction as to the person whose act or neglect was responsible for the damage and whether the damage was due to any of the acts specifically enumerated above, or from any other thing or circumstance, whether of a like nature or of a wholly different nature.

14.2 **Damage Caused by Tenant's Neglect.** Subject to Section 21.1 below, if any damage to the Premises or the Office Complex results from any grossly negligent act or omission of Tenant, its employees, agents, contractors, licensees, Tenant shall be liable therefore and Landlord, at its option, may repair such damage and Tenant, upon demand by Landlord, shall reimburse Landlord for all reasonable out of pocket costs of such repairs and damages in excess of amounts, if any, paid to Landlord under insurance covering such damage.

14.3 **Tenant Responsible for Personal Property.** All personal property belonging to Tenant or any occupant of the Premises that is in the Project or the Premises shall be there at the risk of Tenant or other person only and absent negligence by Landlord, its agents, contractors, representatives or employees, Landlord shall not be liable for damage thereto or theft or misappropriation thereof.

14.4 **Indemnification.** To the extent not prohibited expressly by law or covered by Landlord's insurance, and subject to Landlord's agents, contractors, representatives or employee's gross negligence or misconduct or breach of this Lease, Tenant agrees to

hold Landlord and its agents, employees, and contractors harmless and to indemnify each of them against claims and liabilities, including reasonable attorneys' fees, for injuries to all persons and damage to or theft, misappropriation or loss of property occurring in or about the Premises or the Office Complex arising from Tenant's occupancy of the Premises or the conduct of its business or from any activity, work or thing done, permitted or suffered by Tenant in or about the Premises or the Office Complex or from any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed pursuant to the terms of this Lease or due to any other grossly negligent act or omission of Tenant, its agents, contractors, invitees, licensees or employees, but only to the extent of Landlord's liability, if any, in excess of amounts, if any, paid to Landlord under insurance covering such claims or liabilities.

## ARTICLE 15

## DAMAGE OR DESTRUCTION BY CASUALTY

15.1    **Damage or Destruction by Casualty**. If the Premises or the Building are damaged by fire or other casualty and if such damage does not render all or a substantial portion of the Premises or the Building untenantable, then Landlord shall proceed to repair and restore the same with reasonable promptness and in all cases within one hundred eighty (180) days, subject to reasonable delays for insurance adjustments and delays caused by matters beyond Landlord's reasonable control. If any such damage renders all or a substantial portion of the Premises or the Building untenantable, Landlord, with reasonable promptness after the occurrence of such damage, shall estimate the length of time that will be required to substantially complete the repair and restoration of such damage and shall advise Tenant by notice of such estimate. If it is estimated that the amount of time required to substantially complete such repair and restoration will exceed one hundred eighty (180) days from the date such damage occurred, then either Landlord or Tenant (but as to Tenant, only if all or a substantial portion of the Premises are rendered untenantable) shall have the right to terminate this Lease as of the date of such damage upon giving notice to the other at any time within twenty (20) days after Landlord gives Tenant the notice containing said estimate (it being understood that, if it elects to do so, Landlord may also give such notice of termination together with the notice containing said estimate). Unless this Lease is so terminated, Landlord shall proceed with reasonable promptness to repair and restore the Premises, subject to reasonable delays for insurance adjustments and delays caused by matters beyond Landlord's reasonable control, and also subject to zoning laws and building codes then in effect. Landlord shall have no liability to Tenant, and Tenant shall not be entitled to terminate this Lease, except as hereinafter provided, if such repairs and restoration in fact are not completed within the time period estimated by Landlord or within one hundred eighty (180) days. If the Premises are not repaired or restored within two hundred ten (210) days after the date of such fire or other casualty, then either party may terminate this Lease, effective as of the date of such fire or other casualty, by written notice given to the other party not later than thirty (30) days

34

SHB/dlp/161070v4 33839-001

after the expiration of said two hundred ten (210) day period, but prior to substantial completion of repair or restoration. Notwithstanding anything to the contrary set forth herein, (a) Landlord shall have no duty pursuant to this Section to repair or restore any portion of the alterations, additions or improvements owned or made by Tenant in the Premises or existing in the Premises as of the date such space is leased to, or occupied by, Tenant (other than Landlord's Work), or to expend for any repair or restoration amounts in excess of insurance proceeds paid to Landlord and available for repair or restoration; (b) Tenant shall not have the right to terminate this Lease pursuant to this Section if the damage or destruction was caused by the intentional or willful act of Tenant or its agents; and (c) if any such damage rendering all or a substantial portion of the Premises or the Building untenantable shall occur during the last two (2) years of the Term, Landlord or Tenant shall have the option to terminate this Lease by giving written notice to Tenant within sixty (60) days after the date such damage occurred, and if such option is so exercised, this Lease shall terminate as of the date of such notice.

15.2 **Abatement of Rent**. In the event any fire or casualty damage not caused by the grossly negligent or willful act of Tenant, its agents or employees, renders the Premises untenantable and if this Lease is not terminated pursuant to Section 15.1 by reason of such damage, then Rent shall abate during the period beginning with the date of such damage and ending with the date Landlord tenders the Premises to Tenant as being ready for occupancy. Such abatement shall be in an amount bearing the same ratio to the total amount of Rent for such period as the portion of the Premises not ready for occupancy from time to time bears to the entire Premises. In the event of termination of this Lease pursuant to Section 15.1, Rent shall be apportioned on a per diem basis and shall be paid to the date of the fire or casualty.

## ARTICLE 16

## EMINENT DOMAIN

If the entire Building or a substantial part thereof, or any part thereof which includes all or a substantial part of the Premises, shall be taken or condemned by any competent authority for any public or quasi-public use or purpose, the Term of this Lease shall end upon and not before the earlier of the date when the possession of the part so taken shall be required for such use or purpose or the effective date of the taking, and without apportionment of the award to or for the benefit of Tenant. If any condemnation proceeding shall be instituted in which it is sought to take or damage any part of the Building, the taking of which, in Landlord's opinion, would prevent the economical operation of the Building, or if the grade of any street or alley adjacent to the Building is changed by any competent authority, and such taking, damage or change of grade makes it necessary or desirable to remodel the Building to conform to the taking, damage or changed grade, Landlord or Tenant shall have the right to terminate this Lease upon written notice given to Tenant not less than ninety (90) days prior to the date of termination designated in said notice. In either of these events, Rent at the then current rate shall be apportioned as of the date of the earlier of termination or taking. No money or other consideration shall be payable by Landlord to Tenant for the right of termination, and Tenant shall have no right to share in the condemnation award, whether for a total or partial taking, for loss of Tenant's leasehold or improvements or

35

## ESTOPPEL CERTIFICATE

Tenant agrees that from time to time within fifteen (15) days of written request received from Landlord, or the holder of any First Mortgage, Tenant (or any permitted assignee, subtenant, licensee, concessionaire or other occupant of the Premises claiming by, through or under Tenant) will deliver to Landlord or to the holder of any First Mortgage, a statement in writing signed by Tenant (and/or such other party) certifying (a) that this Lease is unmodified and in full force and effect (or if there have been modifications, that this Lease as modified is in full force and effect and identifying the modifications); (b) the date upon which Tenant began paying Rent and the dates to which Rent and other charges have been paid; (c) that Landlord is not in default under any provision of this Lease, or, if in default, the nature thereof in detail; (d) that the Premises have been completed in accordance with the terms hereof and Tenant is in occupancy and paying Rent on a current basis with no rental offsets or claims; (e) that there has been no prepayment of Rent other than that provided for in this Lease; (f) that there are no actions, whether voluntary or involuntary, pending against Tenant under the bankruptcy laws of the United States or any State thereof; and (g) such other matters as may be reasonably required by Landlord or the holder of the First Mortgage.

## ARTICLE 21

## SUBROGATION AND INSURANCE

21.1 **Waiver of Subrogation**. Landlord and Tenant agree to have all fire and extended coverage and other property damage insurance which may be carried by either of them endorsed with a clause providing that any release from liability of or waiver of claim for recovery from the other party entered into in writing by the insured thereunder prior to any loss or damage shall not affect the validity of such policy or the right of the insured to recover thereunder, and providing further that the insurer waives all rights of subrogation which such insurer might have against the other party. Without limiting any release or waiver of liability or recovery set forth elsewhere in this Lease, and notwithstanding anything in this Lease which may appear to be to the contrary, each of the parties hereto waives all claims for recovery from the other party for any loss or damage to any of its property insured under valid and collectible insurance policies to the extent of any recovery collectible under such insurance policies. Notwithstanding the foregoing or anything contained in this Lease to the contrary, any release or any waiver of claims shall not be operative, nor shall the foregoing endorsements be required, in any case where the effect of such release or waiver is to invalidate insurance coverage or to invalidate the right of the insured to recover thereunder or to increase the cost thereof (provided that in the case of increased cost, the other party shall have the right, within ten (10) days following written notice thereof, to pay such increased cost and thereby keep such release or waiver in full force and effect).

21.2 **Tenant's Insurance**. Tenant shall carry insurance during the entire Term hereof with terms, coverages and companies (which shall be licensed to do business in the State of Connecticut and shall be rated no lower than A-X by A.M. Best Company) satisfactory to Landlord and with such increases in limits as Landlord may reasonably

other loss or expenses or to share in any judgment for damages caused by the change of grade provided that Tenant shall have the right to bring a separate claim for its losses, relocation costs, leasehold improvements costs and expenses.

## ARTICLE 17

## DEFAULT

17.1 **Events of Default.** The occurrence of anyone or more of the following matters constitutes a Default by Tenant under this Lease, following notice and cure by Tenant:

(a)     Failure by Tenant to pay any Rent within five (5) days after written notice from Landlord to Tenant of said failure to pay the same on the due date;

(b)     Failure by Tenant to pay, within five (5) days after written notice from Landlord to Tenant of said failure to pay on the due date, any other monies required to be paid by Tenant under this Lease;

(c)     Failure by Tenant to observe or perform any of the covenants with respect to assignment and subletting set forth in Article 13 not cured within thirty (30) days;

(d)     Failure by Tenant to comply with Tenant's warranties, representations or covenants set forth in Article 26 not cured within thirty (30) days;

(e)     Failure by Tenant to commence a cure, immediately after receipt of notice from Landlord, of any hazardous condition which Tenant has created in violation of law or of this Lease;

(f)     Failure by Tenant to cure a default arising pursuant to Section 21.4 of this Lease within the period of time provided in said Section or longer period if Tenant is reasonably proceeding to cure such default; or any other failure by Tenant to maintain the insurance required to be maintained by Tenant pursuant to Article 21, if such failure continues for forty eight hours (48) following written notice thereof from Landlord;

(g)     Failure by Tenant to observe or perform any other covenant, agreement, condition or provision of this Lease not otherwise referred to in this Section 17.1, if such failure continues for thirty (30) days after notice thereof from Landlord to Tenant or longer period if reasonable proceeding to cure;

(h)     The levy upon, under writ of execution or the attachment by legal process of, the leasehold interest of Tenant, or the filing or creation of a lien with respect to such leasehold interest, which lien shall not be

36

released or discharged within twenty (20) days from the date of notice to Tenant thereof;

(i)     Tenant becomes insolvent or bankrupt or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors, or applies for or consents to the appointment of a trustee or receiver for Tenant or for the major part of its property;

(j)     A trustee or receiver is appointed for Tenant or for the major part of its property and is not discharged or stayed within sixty (60) days after such appointment; or

(k)     Any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding for relief under any bankruptcy law, or similar law for the relief of debtors, is instituted (i) by or on behalf of Tenant or (ii) against Tenant and is allowed against it or is consented to by it or is not dismissed within sixty (60) days after such institution.

17.2  **Rights and Remedies of Landlord.** If a Default occurs, Landlord shall have the rights and remedies set forth in this Article 17, which shall be distinct, separate and cumulative and shall not operate to exclude or deprive Landlord of any other right or remedy allowed it by law:

(a)     Landlord may terminate this Lease by giving to Tenant notice of Landlord's election to do so, in which event the Term of this Lease shall end, and all right, title and interest of Tenant hereunder shall expire, on the date stated in such notice and demanding that Tenant deliver possession of the Premises on such date;

(b)     Landlord may terminate the right of Tenant to possession of the Premises without terminating this Lease by giving notice to Tenant that Tenant's right to possession shall end on the date stated in such notice, whereupon the right of Tenant to possession of the Premises or any part thereof shall cease on the date stated in such notice and demanding that Tenant deliver possession of the Premises on such date; and

(c)     Landlord may enforce the provisions of this Lease and may enforce and protect the rights of Landlord hereunder by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy, including recovery of all moneys due or to become due from Tenant under any of the provisions of this Lease.

17.3  **Right to Re-Enter.** If Landlord exercises either of the remedies provided in Sections 17.2(a) or (b), Tenant shall surrender possession and vacate the Premises and immediately deliver possession thereof to Landlord, and Landlord may re-enter and take complete and peaceful possession of the Premises, with process of law, full and complete license to do so being hereby granted to Landlord, and Landlord may remove

37

all occupants and property therefrom, in compliance with law using such force as may be necessary, without being deemed guilty in any manner of trespass, eviction or forcible entry and detainer and without relinquishing Landlord's right to Rent or any other right given to Landlord hereunder or by operation of law.

17.4 **Current Damages.** If Landlord terminates the right of Tenant to possession of the Premises without terminating this Lease, Landlord shall have the right to immediate recovery of all amounts then due hereunder. Such termination of possession shall not release Tenant, in whole or in part, from Tenant's obligation to pay Rent hereunder for the full Term, and Landlord shall have the right, from time to time, to recover from Tenant, and Tenant shall remain liable for, all Base Rent, Rent Adjustments and any other sums accruing as they become due under this Lease during the period from the date of such notice of termination of possession to the stated end of the Term. In any such case, Landlord shall make commercially reasonable good faith efforts to relet the Premises or any part thereof for the account of Tenant for such rent, for such time (which may be for a term extending beyond the Term of this Lease) and upon such terms as Landlord shall determine and may collect the rents from such reletting. Landlord shall not be required to accept any tenant offered by Tenant or to observe any instructions given by Tenant relative to such reletting. Also, in any such case, Landlord may make repairs, alterations and additions in or to the Premises and redecorate the same to the extent deemed by Landlord necessary or desirable and in connection therewith change the locks or other access devices to the Premises, and Tenant upon demand shall pay the reasonable and customary cost of all of the foregoing together with Landlord's expenses of reletting. The rents from any such reletting shall be applied first to the payment of the expenses of reentry, redecoration, repair and alterations and the expenses of reletting and second to the payment of Rent herein provided to be paid by Tenant. Any excess or residue shall operate only as an offsetting credit against the amount of Rent due and owing as the same thereafter becomes due and payable hereunder, and the use of such offsetting credit to reduce the amount of Rent due Landlord, if any, shall not be deemed to give Tenant any right, title or interest in or to such excess or residue and any such excess or residue shall belong to Landlord solely, and in no event shall Tenant be entitled to a credit on its indebtedness to Landlord in excess of the aggregate sum (including Base Rent and Rent Adjustments) which would have been paid by Tenant for the period for which the credit to Tenant is being determined, had no Default occurred. No such reentry or repossession, repairs, alterations and additions, or reletting shall be construed as an eviction or ouster of Tenant or as an election on Landlord's part to terminate this Lease, unless a written notice of such intention is given to Tenant, or shall operate to release Tenant in whole or in part from any of Tenant's obligations hereunder, and Landlord, at any time and from time to time, may sue and recover judgment for any deficiencies remaining after the application of the proceeds of any such reletting.

17.5 **Final Damages.** If this Lease is terminated by Landlord pursuant to Section 17.2(a), Landlord shall be entitled to recover from Tenant all Rent accrued and unpaid for the period up to and including such termination date, as well as all other additional sums payable by Tenant, or for which Tenant is liable or for which Tenant has agreed to indemnify Landlord under any of the provisions of this Lease, which may be then owing and unpaid, and all costs and expenses, including court costs and

38

attorneys' fees incurred by Landlord in the enforcement of its rights and remedies hereunder, and, in addition, Landlord shall be entitled to recover as damages for loss of the bargain and not as a penalty (a) the unamortized portion of any concessions offered by Landlord to Tenant in connection with this Lease, including without limitation Landlord's contribution to the cost of tenant improvements and alterations, if any, installed by either Landlord or Tenant pursuant to this Lease, (b) the aggregate sum which at the time of such termination represents the excess, if any, of the present value of the aggregate rents which would have been payable after the termination date had this Lease not been terminated, including, without limitation, Base Rent at the annual rate or respective annual rates for the remainder of the Term provided for in Article 3 of this Lease or elsewhere herein and the amount projected by Landlord to represent Rent Adjustments for the remainder of the Term pursuant to Article 4 of this Lease, over the then present value of the then aggregate fair rental value of the Premises for the balance of the Term, such present worth to be computed in each case on the basis of a four percent (4 %) per annum discount from the respective dates upon which such rentals would have been payable hereunder had this Lease not been terminated, and (c) any damages in addition thereto, including reasonable attorneys' fees and court costs, which Landlord sustains as a result of the breach of any of the covenants of this Lease other than for the payment of Rent. .

17.6 **Removal of Personal Property.** All property of Tenant removed from the Premises by Landlord pursuant to any provision of this Lease or applicable law may be handled, removed or stored by Landlord at the cost and expense of Tenant, and Landlord shall not be responsible in any event for the value, preservation or safekeeping thereof. Tenant shall pay Landlord for all expenses incurred by Landlord with respect to such removal and storage so long as the same is in Landlord's possession or under Landlord's control. All such property not removed from the Premises or retaken from storage by Tenant within thirty (30) days after the end of the Term, however terminated, at Landlord's option, shall be conclusively deemed to have been conveyed by Tenant to Landlord as by bill of sale without further payment or credit by Landlord to Tenant and Landlord may transfer, dispose of or use that property in any manner it desires without any liability or obligation to Tenant.

· 17.7 **Attorneys' Fees.** The prevailing party shall pay all of the non-prevailing party's costs, charges and expenses, including court costs and attorneys' fees, incurred in enforcing the non-prevailing party's obligations under this Lease, or incurred by the prevailing party in any litigation, negotiation or transaction in which the non-prevailing party causes the prevailing party, without the prevailing party's fault, to become involved or concerned.

17.8 **Assumption or Rejection in Bankruptcy.** If Tenant is adjudged bankrupt, or a trustee in bankruptcy is appointed for Tenant, Landlord and Tenant, to the extent permitted by law, agree to request that the trustee in bankruptcy determine within thirty (30) days thereafter whether to assume or to reject this Lease.

17.9 **Waiver of Right of Redemption.** Tenant hereby waives all right of redemption to which Tenant or any person under Tenant may be entitled by any law now or hereafter in force. In addition, in the event of a Default consequent to which

39

Landlord recovers possession of the Premises, Landlord shall be under a duty to mitigate Landlord's damages.

## ARTICLE 18

## SUBORDINATION

18.1 **Subordination**. Landlord hereafter from time to time may execute and deliver a first mortgage or first trust deed in the nature of a mortgage (both hereinafter referred to as a "First Mortgage"), against the Land and Building or any interest therein. If requested by the mortgagee or trustee under any First Mortgage, but subject to delivery of a non-disturbance agreement from the holder of the First Mortgage and any other mortgage granted by Landlord, Tenant will either (a) subordinate its interest in this Lease to said First Mortgage, and to any and all advances made thereunder and to the interest thereon, and to all renewals, replacements, supplements, amendments, modifications and extensions thereof, or (b) make certain of Tenant's rights and interests in this Lease superior thereto; and Tenant will promptly execute and deliver such agreement or agreements as may be reasonably required by such mortgagee or trustee under any First Mortgage. Tenant covenants that it will not subordinate this Lease to any mortgage or trust deed other than a First Mortgage without the prior written consent of the holder of the First Mortgage.

18.2 **Liability of Holder of First Mortgage; Attornment.** It is further agreed that (a) if any First Mortgage is foreclosed, (i) the holder of the First Mortgage or its grantees, or purchaser at any foreclosure sale (or grantee in a deed in lieu of foreclosure), as the case may be, shall not be (x) liable for any act or omission of any prior landlord (including Landlord) other than those relating to continuing defaults, (y) subject to any offsets or counterclaims which Tenant may have against a prior landlord (including Landlord) other than those relating to continuing defaults, or (z) bound by any prepayment of Base Rent or Rent Adjustments which Tenant may have made in excess of the amounts then due for the next succeeding month, (ii) the liability of the mortgagee or trustee hereunder or purchaser at such foreclosure sale or the liability of a subsequent owner designated as Landlord under this Lease shall exist only so long as such trustee, mortgagee, purchaser or owner is the owner of the Building or Land and such liability shall not continue or survive after further transfer of ownership; and (iii) upon request of the mortgagee or trustee, if the First Mortgage is foreclosed, Tenant will attorn, as Tenant under this Lease, to the purchaser at any foreclosure sale under any First Mortgage, and Tenant will execute such instruments as may be necessary or appropriate to evidence such attornment; and (b) this Lease may not be modified or amended so as to reduce the rent or shorten the term provided hereunder, or so as to affect adversely in any other respect to any material extent the rights of Landlord, nor shall this Lease be cancelled or surrendered, without the prior written consent, in each instance, of the mortgagee or trustee under any First Mortgage.

40

18.3 **Modification Required by Holder of First Mortgage.** Should any holder of a First Mortgage or any prospective first mortgagee require a modification or modifications of this Lease, which modification or modifications will not cause any increased cost, expense or liability or responsibility to Tenant or in any other way adversely affect the rights and obligations of Tenant hereunder, Tenant agrees that this Lease may be so modified and agrees to execute whatever documents are required therefore and deliver the same to Landlord within ten (10) business days following the request therefore.

18.4 **SNDA.** Landlord will use best efforts to deliver an SNDA from the holder of any existing First Mortgage and any other existing mortgage in form mutually acceptable to Tenant and Landlord simultaneously or prior to the date of this Lease. Landlord represents, warrants and covenants that as of the Commencement Date, there is no First Mortgage affecting the Land or Building.

18.5 **Short Form Lease.** Should holder of a First Mortgage or any prospective mortgagee or the Tenant desire execution of a short form of lease for recording (containing the names of the parties, a description of the Premises, and the term of this Lease) or a certification from Tenant concerning this Lease in such form as may be required by said holder of a First Mortgage or said prospective mortgagee or said Tenant . Tenant and Landlord agree to execute promptly such short form of lease or certificate and deliver the same within ten (10) days following the request therefore.

## ARTICLE 19

## MORTGAGEE PROTECTION

Tenant agrees to give any holder of any First Mortgage, as defined in Section 18.1, against the Land or Building, or any interest therein, by registered or certified mail, a copy of any material notice or claim of default served upon Landlord by Tenant, provided that prior to such notice Tenant has been notified in writing (by way of service on Tenant of a copy of an assignment of Landlord's interests in leases, or otherwise) of the address of such First Mortgage holder. Tenant further agrees that if Landlord has failed to cure such default within twenty (20) days after such notice to Landlord (or if such default cannot be cured or corrected within that time, then such additional time as may be necessary if Landlord has commenced cure or correction within such twenty (20) days and is pursuing diligently the remedies or steps necessary to cure or correct such default), then the holder of the First Mortgage shall have an additional thirty (30) days within which to cure or correct such default (or if such default cannot be cured or corrected within that time, then such additional time as may be necessary if such holder of the First Mortgage has commenced cure or correction within such thirty (30) days and is pursuing diligently the remedies or steps necessary to cure or correct such default, including the time necessary to obtain possession if possession is necessary to cure or correct such default).

## ARTICLE 20

41

request from time to time, but initially Tenant shall maintain the following coverages in the following amounts:

(a)     Comprehensive or commercial general liability insurance, including contractual liability and the broad or extended liability endorsement, insuring against claims for death, bodily injury, personal injury and property damage occurring upon, in or about the Premises or the Office Complex on an occurrence basis, in an amount not less than One Million Dollars ($1,000,000.00) combined single limit per occurrence, and umbrella coverage in an amount not less than Three Million Dollars ($3,000,000.00), both comprehensive or commercial general liability insurance and umbrella coverage covering Tenant as a named insured and Landlord, the managing agent for the Building and their respective officers, directors, shareholders, partners, members, agents and employees as additional insureds.

(b)     Insurance against fire, sprinkler leakage and vandalism, and the extended coverage perils for the full replacement cost of all additions, improvements and alterations to the Premises whether owned, made or installed by or on behalf of Tenant or existing in the Premises as of the date such space is leased to, or occupied by, Tenant, if any, and of all office furniture, trade fixtures, office equipment, merchandise and all other items of Tenant's property on the Premises, with loss or damage payable to Landlord and Tenant as their interests may appear.

(c)     Business interruption insurance in such amounts as will reimburse Tenant for direct or indirect loss of earnings attributable to all perils covered by the insurance described in clause (b) above or attributable to prevention or denial of access to the Premises, Building or Project as a result of such perils.

21.3 **Certificates of Insurance**. Tenant shall furnish to Landlord, prior to the commencement of the Term, policies or certificates evidencing such coverage, which policies or certificates shall state that such insurance coverage may not be reduced, cancelled, modified or not renewed without prior written notice to Landlord.

21.4 **Compliance with Requirements**. Tenant shall comply and cause the Premises to comply with all applicable laws and ordinances, all court orders and decrees and all requirements of other governmental authorities, and shall not make, directly or indirectly, any use of the Premises which may be prohibited thereby, which may be dangerous to person or property, which may jeopardize any insurance coverage or which may increase the cost of insurance or require additional insurance coverage. If any insurance policy carried by Landlord or Tenant shall be cancelled or cancellation shall be threatened or the coverage thereunder reduced or threatened to be reduced in any way by reason of the use or occupation of the Premises, the Building or the Project or any part thereof by Tenant, any party claiming by, through or under Tenant or anyone permitted by Tenant to be upon the Premises, and if Tenant fails to remedy the conditions giving rise to said cancellation or threatened cancellation or reduction in coverage on or before the earlier of (i) forty eight (48) hours after notice thereof from

43

Landlord, or (ii) prior to said cancellation or reduction becoming effective, Tenant shall be in default hereunder and Landlord shall have all of the remedies available to Landlord pursuant to this Lease. The parties hereto acknowledge that Landlord shall obtain the Certificate of Occupancy for the Premises.

21.5 **Landlord's Insurance.** Landlord shall carry and maintain throughout the Term, comprehensive "all-risk" property insurance covering the Building in an amount equal to not less than ninety (90%) percent of the full replacement value thereof, and commercial general liability insurance coverage in amounts held by reasonably prudent commercial landlords of comparable office/mixed use properties in Fairfield, Connecticut. Landlord shall maintain such insurance throughout the Term, subject to changes in amounts which its institutional mortgagee(s) require.

## ARTICLE 22

## NONWAIVER

No waiver of any condition expressed in this Lease shall be implied by any neglect of Landlord to enforce any remedy on account of the violation of such condition whether or not such violation is continued or repeated subsequently, and no express waiver shall affect any condition other than the one specified in such waiver and that one only for the time and in the manner specifically stated. Without limiting Landlord's rights under Article 9, it is agreed that no receipt of moneys by Landlord from Tenant after the termination in any way of the Term or of Tenant's right to possession hereunder or after the giving of any notice shall reinstate, continue or extend the Term or affect any notice given to Tenant prior to the receipt of such moneys. It is also agreed that after the service of notice or the commencement of a suit or after final judgment for possession of the Premises, Landlord may receive and collect any moneys due, and the payment of said moneys shall not waive or affect said notice, suit or judgment.

## ARTICLE 23

## TENANT - DUE AUTHORIZATION

In case Tenant is a corporation, (a) Tenant represents and warrants that this Lease has been duly authorized, executed and delivered by and on behalf of Tenant and constitutes the valid and binding agreement of Tenant in accordance with the terms hereof and (b) if Landlord so requests, Tenant shall deliver to Landlord or its agent, concurrently with the delivery of this Lease executed by Tenant, certified resolutions of the board of directors (and shareholders, if required) authorizing Tenant's execution and delivery of this Lease and the performance of Tenant's obligations hereunder. In case Tenant is a partnership, Tenant represents and warrants that all of the persons who are general or managing partners in the partnership have executed this Lease on behalf of Tenant, or that this Lease has been executed and delivered pursuant to and in conformance with a valid and effective authorization therefore by all of the general or managing partners of such partnership, and constitutes the valid and binding agreement of the partnership and each and every partner therein in accordance with its terms. Also,

44

SHB/dlp/161070v4 33839-001

it is agreed that each and every present and future general partner in Tenant shall be and shall remain at all times jointly and severally liable hereunder and that the death, resignation or withdrawal of any general partner shall not release the liability of such partner under the terms of this Lease unless and until Landlord consents in writing to such release. In case Tenant is a limited liability company, Tenant represents and warrants that all of the persons who are managing members of the limited liability company have executed this Lease on behalf of Tenant, or that this Lease has been executed and delivered pursuant to and in conformance with a valid and effective authorization therefore by all of the managing members of such limited liability company, and constitutes the valid and binding agreement of the limited liability company in accordance with its terms.

## ARTICLE 24

## REAL ESTATE BROKERS

Tenant and Landlord represent to the other that it has dealt with and only with Cushman & Wakefield (whose commission, if any, shall be paid by Landlord pursuant to separate agreement), as a broker in connection with this Lease and agrees to indemnify and hold the other party harmless from all damages, liabilities, claims, losses, costs and expenses, including reasonable attorneys' fees, arising from any claims or demands of any other broker or brokers or finders for any commission alleged to be due such broker in connection with its having introduced Tenant to the Premises or having participated in the negotiation with Tenant of this Lease.

## ARTICLE 25

## NOTICES

All notices, demands and requests which may be given or which are required to be given by either party to the other must be in writing. All notices, demands and requests by Landlord or Tenant shall be (i) sent by a nationally recognized overnight courier, (ii) sent by telefacsimile transmission (provided that an original is deposited on the same day for delivery by a recognized overnight courier service) or (iii) sent by United States certified mail, postage prepaid, and addressed as follows or at such substitute addresses as may be specified by either party by written notice furnished to the other in accordance herewith:

| If to Landlord: | If to Tenant: |
|---|---|
| Trefoil Park, LLC | Key Holdings LLC |
| 788 Morris Turnpike | 46 Westchester Avenue |
| Short Hills, NJ 07078 | Pound Ridge, NY 10576 |
| Attention: Mark Steinbauer, | Attn: Keith Hamlin |
|     Vice President of Real Estate | Phone: (917) 279-6530 |
| Phone: (973) 765-0100 | Fax: (212) 837-4896 |
| Fax: (973) 765-0101 | |

SHB/dlp/161070v4 33839-001

-45

with a copy to:
Cohn Birnbaum & Shea, P.C.
100 Pearl Street, 12th Floor
Hartford, CT 06103
Attention: Staci H. Bachman Esq.
Phone: (860) 493-2200
Fax: (860) 727-0361

Notices, demands and requests delivered in the manner provided hereinabove will be deemed received: (i) if sent by a nationally recognized overnight courier, on the next business day following deposit therewith, and (ii) if sent by certified mail, three (3) business days after the date of postmark thereof. Notices and demands from Landlord to Tenant may be signed by Landlord, its beneficiaries, the managing agent for the Real Property or the agent of any of them.

## ARTICLE 26

## ENVIRONMENTAL MATTERS

26.1 **Tenant's Obligations with Respect to Environmental Matters.** Tenant hereby represents, warrants and covenants that, during the Term of this Lease, (i) in connection with its use of the Premises, Tenant shall comply at its sole cost and expense with all federal, state and local statutes, ordinances, regulations and rules in effect and as amended from time to time relating to Hazardous Materials, environmental quality, health, safety, contamination and cleanup, including, without limitation, the Clean Air Act, 42 U.S.C. Section 7401 et seq.; the Clean Water Act, 33 U.S.C. Section 1251 et seq., and the Water Quality Act of 1987; the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq.; the Resource Conservation and Recovery Act (**"RCRA"**), 42 U.S.C. Section 6901 et seq., as amended by the Hazardous and Solid Waste Amendments of 1984; the Safe Drinking Water Act, 42 D.S.C. Section 300f et seq.; the Comprehensive Environmental Response, Compensation and Liability Act (**"CERCLA"**), 42 U.S.C. Section 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act, the Emergency Planning and Community Right-to-Know Act, and the Radon Gas and Indoor Air Quality' Research Act; the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq.; Title 22a, of The Connecticut General Statutes as amended from time to time; and all now existing and herein after arising state, regional, county, municipal, and other local laws, regulations, and ordinances insofar as they are equivalent or similar to the federal laws recited above or purport to regulate Hazardous Materials (**"Environmental Laws"**). Landlord also represents that to best of its knowledge as of the Commencement Date, the Building is free of any Hazardous Materials and that there exist no violations of Environmental Laws at the Office Complex. **"Hazardous Materials"** shall mean and include the following, including mixtures thereof: any hazardous substance, pollutant, contaminant, waste, by-product or constituent regulated under any Environmental Law, including but not limited to oil, petroleum products, natural *gas*, natural gas liquids, liquified natural gas and synthetic *gas* usable for fuel, pesticides, asbestos, asbestos-containing materials and PCBs; (ii) Tenant shall not install any underground storage tanks without prior

46

SHB/dlp/161070v4 33839-001

written disclosure to and prior written approval by Landlord; (iii) Tenant shall not take any action that would subject the Premises to the permit requirements under RCRA for storage, treatment or disposal of Hazardous Materials; (iv) Tenant shall not dispose of Hazardous Materials in dumpsters provided by Landlord for tenant use; (v) Tenant shall not discharge Hazardous Materials into Project drains or sewers; (vi) Tenant shall not cause or allow the Release of any Hazardous Materials on, to or from the Project or land. For purposes of this Article 26, **"Release"** or **"Released"** shall mean any actual or threatened spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of Hazardous Materials into the environment; and (vii) if Tenant's use, including treatment, storage and disposal of Hazardous Materials at the Premises (a) gives rise to liability or to a claim under any Environmental Law, or any common law theory of tort or otherwise, or (b) causes a threat to, or endangers human health or the environment, Tenant shall, at its sole cost and expense, promptly take all actions as are necessary to return the Premises or any adjacent property to the condition existing prior to the introduction of any such Hazardous Material and to comply with all applicable Environmental Laws and eliminate or avoid any liability claim with respect thereto. Landlord's written approval of such actions to be taken with respect to the Premises or any adjacent property shall first be obtained.

26.2 **Landlord's Right to Inspect.** Landlord and Landlord's employees shall have the right to enter the Premises and conduct such inspections or tests, including soil and groundwater sampling, as Landlord in its sole discretion deems appropriate or necessary, for the purpose of determining Tenant's compliance with Tenant's environmental obligations pursuant to this Lease and this Article 26. Tenant agrees to cooperate with such investigations and to provide any relevant information requested by Landlord.

26.3 **Copies of Notices and Documentation.** Within ten (10) days of Tenant's receipt of a written request by Landlord, Tenant shall provide Landlord with (i) copies of all environmental reports and tests obtained by Tenant; (ii) copies of transportation and disposal contracts (and related manifests, schedules, reports, and other information) entered into or obtained by Tenant with respect to any Hazardous Materials; (iii) copies of any permits issued to Tenant under Environmental Laws with respect to the Premises; (iv) copies of any and all reports, notifications, and other filings made by Tenant to any federal, state, or local environmental authorities or agencies; and (v) any other applicable documents and information with respect to environmental matters relating to the Premises. During the Term of this Lease, Tenant shall provide Landlord promptly with copies of all summonses, citations, directives, information inquiries or requests, notices of potential responsibility, notices of violation or deficiency, orders or decrees, claims, complaints, investigations, judgments, letters, notices of environmental liens or response actions in progress, and other communications, written or oral, actual or threatened, from any federal, state, or local agency or authority, or any other entity or individual, concerning (i) any actual or alleged Release of a Hazardous Material on, to or from the Premises; (ii) the imposition of any lien on the Premises; (iii) any actual or alleged violation of, or responsibility under, any Environmental Laws; or (iv) any actual or alleged liability under any theory of common law tort or toxic tort, including without limitation, negligence, trespass, nuisance, strict liability, or ultra hazardous activity.

47

SHB/dlp/161070v4 33839-001

26.4 **Landlord's Right to Act.** In the event that Tenant shall fail to comply with any of its obligations under this Article 26 within thirty (30) days after notice as and when required hereunder, Landlord shall have the right (but not the obligation) to take such action as is required to be taken by Tenant hereunder and in such event, Tenant shall be liable and responsible to Landlord for all costs, expenses, liabilities, claims and other obligations paid, suffered, or incurred by Landlord in connection with such matters. Tenant shall reimburse Landlord immediately upon demand for all such amounts for which Tenant is liable.

26.5 **Indemnification.** Notwithstanding anything contained in this Lease to the contrary, Tenant shall reimburse, defend, indemnify and hold Landlord, and its beneficiaries, officers, directors, shareholders, employees, and agents, free and harmless from and against any and all claims, response costs, losses, liabilities, damages, costs, and expenses, including, but not limited to, the costs and expenses of investigations, studies, health or risk assessments and consulting fees, and including, without limitation, loss of rental income, loss due to business interruption, and reasonable attorneys' fees and costs, arising out of or in any way connected with any or all of the following:

     (i)     any Hazardous Materials which, at any time during the Term, are or were actually or allegedly generated, stored, treated, released, disposed of, by Tenant on or at the Premises, including but not limited to, any and all (a) liabilities under any common law theory of tort, nuisance, strict liability, ultra hazardous activity, negligence or otherwise based upon, resulting from or in connection with any Hazardous Material; and (b) obligations to take response, cleanup or corrective action pursuant to any investigation or remediation in connection with the decontamination, removal, transportation, incineration, or disposal of any of the foregoing; and

     (ii)     any actual or alleged illness, disability, injury, or death of any person in any manner arising out of or allegedly arising out of exposure to Hazardous Materials caused by Tenant at the Premises, regardless of when any such illness, disability, injury, or death shall have occurred or been incurred or manifested itself; and

     (iii) any actual or alleged failure of Tenant at any time and from time to time to comply with all applicable Environmental Laws after the effective date of this Lease; and

     (iv) any failure by Tenant to comply with its obligations under this Article 26. In the event any claims or other assertion of liability shall be made against Landlord for which Landlord is entitled to indemnity hereunder, Landlord shall notify Tenant of such claim or assertion of liability and thereupon Tenant shall, at its sole cost and expense, assume the defense of such claim or assertion of liability and continue such defense at all times thereafter until completion. The obligations of Tenant under this Article 26 shall survive any termination or expiration of this Lease.

SHB/dlp/161070v4 33839-001

Notwithstanding the foregoing, Landlord represents that it will indemnify and hold Tenant harmless from any pre-existing environmental conditions at the Premises and/or the Building and from the existence of any Hazardous Substances or violations of Environmental Laws on the Land, at the Office Complex or at the Building which are not caused by Tenant, whether now or hereafter occurring.

## ARTICLE 27

### SECURITY DEPOSIT

27.1   **Security Deposit.**   Within five (5) business days after the the Effective Date, Tenant will deposit with Landlord the sum of Thirty thousand three hundred sixty one dollars ($30,361.00) as security deposit ("Security Deposit") for the full and faithful performance of every provision of this Lease to be performed by Tenant. If Tenant is in Default with respect to any provision of this Lease, including, but not limited to, the provisions relating to the payment of Rent, Landlord may use, apply or retain all or any part of the security deposit for the payment of any Rent and any other sum with respect to which Tenant is in Default, or for the payment of any other amount which Landlord may spend or become obligated to spend by reason of Tenant's Default or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's Default. If any portion of the security deposit is to be used or applied, Tenant, within five (5) days after written demand therefore, shall deposit cash with Landlord in an amount sufficient to restore the security deposit to its original amount and Tenant's failure to do so shall be a material breach of this Lease. Landlord shall not be required to keep the security deposit separate from its general funds and Tenant shall not be entitled to interest on any security deposit. If Tenant fully and faithfully performs every provision of this Lease to be performed by it, the security deposit or any balance thereof shall be returned to Tenant (or at Landlord's option to the last assignee of Tenant's interest hereunder) within thirty (30) days after the expiration of the Term and Tenant's vacation of the Premises.

27.2   **Transfer of Security Deposit.**   Tenant hereby agrees not to look to any mortgagee as mortgagee, mortgagee in possession, or successor in title to the Building for accountability for any security deposit required by Landlord hereunder, unless said sums have actually been received by said mortgagee as security for Tenant's performance of this Lease. Landlord may deliver the funds deposited hereunder by Tenant to the purchaser of Landlord's interest in the Building, in the event that such interest is sold, and thereupon Landlord, and its beneficiaries, if any, shall be discharged from any further liability with respect to such security deposit.

## ARTICLE 28

### INTENTIONALLY OMITTED

SHB/dlp/161070v4 33839-001

## ARTICLE 29

## TITLE AND COVENANT AGAINST LIENS

Landlord's title is paramount and always shall be paramount to the title of Tenant and nothing contained in this Lease shall empower Tenant to do any act which can, shall or may encumber the title of Landlord. Tenant covenants and agrees not to do any act, make any contract or suffer or permit anything to occur which may create or be the foundation for any lien or other encumbrance upon or against the Premises, the Building, the Land, the Project or against Tenant's leasehold interest in the Premises and, in case of any such lien attaching, to pay and remove or bond off the same within thirty (30) days. Tenant has no authority or power to cause or permit any lien or encumbrance of any kind whatsoever, whether created by act of Tenant, operation of law or otherwise, to attach to or be placed upon the Premises, the Building, the Project or the Land, and any and all liens and encumbrances created by Tenant shall attach only to Tenant's interest in the Premises. If any such liens so attach and Tenant fails to pay and remove the same within thirty (30) days, Landlord, at its election, may pay and satisfy the same and in such event the sums so paid by Landlord, with interest from the date of Landlord's payment thereof at the rate set forth in Section 30.8 for amounts owed to Landlord by Tenant, shall be deemed to be additional rent due and payable by Tenant at once without notice or demand. All materialmen, contractors, artisans, mechanics, laborers, and any other persons now or hereafter contracting with Tenant or any contractor or subcontractor of Tenant for the furnishing of any labor services, materials, supplies, or equipment with respect to any portion of the Premises, at any time from the date hereof until the end of the Term, are hereby charged with notice that they look exclusively to Tenant to obtain payment for same. Landlord represents that it has fee simple title to the Office Complex and the Building.

## ARTICLE 30

## MISCELLANEOUS

30.1 **Successors and Assigns.** Each provision of this Lease shall extend to and shall bind and inure to the benefit not only of Landlord and Tenant, but also of their respective heirs, legal representatives, successors and assigns, but this provision shall not operate to permit any transfer, assignment, mortgage, encumbrance, lien, charge or subletting contrary to the provisions of this Lease.

30.2 **Modifications in Writing.** No modification, waiver or amendment of this Lease or of any of its conditions or provisions shall be binding upon Landlord or Tenant unless in writing signed by Landlord and Tenant.

30.3 **No Option; Irrevocable Offer.** Submission of this instrument for examination shall not constitute a reservation of or option for the Premises or in any manner bind Landlord and no lease or obligation on Landlord shall arise until this instrument is signed and delivered by Landlord and Tenant; provided, however, the

50

execution and delivery by Tenant of this Lease to Landlord or the agent of Landlord's beneficiary, if any, shall constitute an irrevocable offer by Tenant to lease the Premises on the terms and conditions herein contained, which offer may not be revoked for ten (10) days after such delivery.

30.4 **Definition of Tenant.** The word **"Tenant"** whenever used herein shall be construed to mean the party named above as Tenant or anyone or more of them in all cases where there is more than one party named above as Tenant; and the necessary grammatical changes required to make the provisions hereof apply either to corporations, partnerships or other entities or individuals shall in all cases be assumed as though in each case fully expressed. In all cases where there is more than one party named above as Tenant, the liability of each shall be joint and several.

30.5 **Definition of Landlord.** The term **"Landlord"** as used in this Lease means only the owner or owners at the time being of the Building, so that in the event of any assignment, conveyance or sale, once or successively, of the Building, or any assignment of this Lease by Landlord, said Landlord making such sale, conveyance or assignment shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder accruing after such sale, conveyance or assignment, and Tenant agrees to look solely to such purchaser, grantee or assignee with respect thereto. This Lease shall not be affected by any such assignment, conveyance or sale, and Tenant agrees to attorn to the purchaser, grantee or assignee.

30.6 **Headings.** The headings of Articles and Sections are for convenience only and do not limit, expand or construe the contents of the Articles and Sections.

30.7 **Time of Essence.** Time is of the essence of this Lease and of all provisions hereof.

30.8 **Default Rate of Interest.** All amounts, including, without limitation, Base Rent and Rent Adjustments, owed by Tenant to Landlord pursuant to any provision of this Lease shall bear interest from the date due until paid at the annual rate of three percent (3 %) in excess of the rate of interest announced from time to time by the national banking association which has the largest assets of all national banking associations with headquarters in New York, New York, as its prime, reference or corporate base rate, changing as and when said prime, reference or corporate base rate changes, unless a lesser rate is then the maximum rate permissible by law with respect thereto, in which event said lesser rate shall be charged.

30.9 **Severability.** The invalidity of any provision of this Lease shall not impair or affect in any manner the validity, enforceability or effect of the rest of this Lease.

30.10 **Entire Agreement.** All understandings and agreements, oral or written, previously made between the parties hereto are merged in this Lease, which alone fully and completely expresses the agreement between Landlord (and its beneficiaries, if any, and their agents) and Tenant. This Lease cannot be amended or modified except by a written instrument executed by Landlord and Tenant.

51

30.11 **Force Majeure**. If Landlord or Tenant fails to perform timely any of the terms, covenants or conditions of this Lease to be performed by Landlord or Tenant and such failure is due in whole or in part to any strike, lockout, labor trouble, civil disorder, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrections, war, fuel shortages, accidents, casualties, acts of God, or any other cause beyond the reasonable control of Landlord or Tenant as applicable, then Landlord or Tenant shall not be deemed in default under this Lease as a result of such failure and any time for performance by Landlord or Tenant provided for herein shall be extended by the period of delay resulting from such cause.

30.12 **Security Interest**.   Landlord hereby subordinates to the lien of any lender providing financing for equipment and all or any part of Tenant's Property, any lien provided for in this Lease and any statutory or possessory liens, including, without limitation, rights of levy or distraint for rent, Landlord may have or assert under this Lease against any of the assets of Tenant's property located within the Premises. Landlord hereby consents to such lender's entering the Premises (with reasonable prior written notice to Landlord) for the purpose of exercising its rights and remedies under the security agreement securing its interest in such equipment and other assets of the Tenant including, without limitation, removing equipment, trade fixtures and other personal property from the Premises; provided, however, such lender agrees to repair any damage resulting from such removal within thirty (30) days of such damage and pays Rent for such period of usage and shall execute a written instrument evidencing such agreement within a reasonable time following Tenant's request for the same.

30.13 **Choice of Law**. This Lease shall be governed by and all of its terms construed according to the laws of the State of Connecticut. The parties hereto consent to the full in personam jurisdiction of the Connecticut courts with respect to all disputes associated with this Lease.

30.14 **Relationship.** The relationship of Landlord and Tenant hereunder is solely that of landlord and tenant and the parties disclaim any intention to create a joint venture, partnership or agency relationship.

30. 15 **No Recording**. The parties agree that this Lease shall not be recorded, but Landlord and Tenant hereby agree, upon written request of either party, to enter into a Notice of Lease in recordable form, setting forth the actual date of commencement and the actual date of termination of this Lease and such other provisions, except economic provisions, with respect to this Lease as will put on notice any third party of the existence of this Lease.

## ARTICLE 31

## AMERICANS WITH DISABILITIES ACT

The parties acknowledge that the Americans With Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.) and regulations and guidelines promulgated thereunder, as all of the same may be amended and supplemented from time to time (collectively referred to herein as the **"ADA"**) establish requirements under Title III of the ADA (**"Title III"**)

52

SHB/dlp/161070v4 33839-001

pertaining to business operations, accessibility and barrier removal, and that such requirements may be unclear and may or may not apply to the Premises and the Building depending on, among other things: (1) whether Tenant's business operations are deemed a "place of public accommodation" or a "commercial facility," (2) whether compliance with such requirements is "readily achievable" or "technically infeasible," and (3) whether a given alteration affects a "primary function area" or triggers so called "path of travel" requirements.

Notwithstanding anything to the contrary in this Lease, the parties hereby agree to allocate responsibility for Title III compliance as follows: (a) Tenant shall be responsible for all Title III compliance and costs in connection with any leasehold improvements or other work to be performed in the Premises by Tenant under or in connection with this Lease after the Commencement Date other than the initial tenant improvements at the Premises performed by the Landlord which will be Landlord's sole responsibility, (b) Landlord shall perform, and Tenant shall be responsible for the cost of, any so-called Title III "path of travel" requirements triggered by any construction activities or alterations in the Premises occurring after the Commencement Date and relating to alterations performed by Tenant, (c) Landlord shall be responsible at its cost, for compliance with and all costs associated with Title III compliance in the Common Areas and for delivering the Premises on the Commencement Date in compliance with Title III and the ADA.  Except as set forth above with respect to Landlord's Title III obligations, Tenant shall be solely responsible for all other requirements under the ADA relating to Tenant or any affiliates or persons or entities related to Tenant (collectively, **"Affiliates"**), operations of Tenant or Affiliates in the Premises, including, without limitation, requirements under Title I of the ADA pertaining to Tenant's employees.  Landlord represents and warrants that the Building and the Premises are or shall be ADA compliant on the Commencement Date.

## ARTICLE 32

## EXCULPATORY PROVISIONS

· It is understood and agreed expressly by and between the parties hereto, anything herein to the contrary notwithstanding, that each and all of the representations, warranties, covenants, undertakings and agreements made herein on the part of Landlord, while in form purporting to be the representations, warranties, covenants, undertakings and agreements of Landlord, are nevertheless each and every one of them made and intended, not as personal representations, warranties, covenants, undertakings and agreements by Landlord or for the purpose or with the intention of binding Landlord personally, but are made and intended for the purpose only of subjecting Landlord's interest in the Office Complex, Building, the Land and the Premises to the terms of this Lease and for no other purpose whatsoever, and in case of default hereunder by Landlord, Tenant shall look solely to the interests of Landlord in the Building and Land; that Landlord shall have no personal liability whatsoever to pay any indebtedness accruing hereunder or to perform any covenant, either expressed or implied, contained herein; and that no personal liability or personal responsibility of any sort is assumed by, nor shall at any time be asserted or enforceable against, said Landlord, individually or

53

personally, on account of any representation, warranty, covenant, undertaking or agreement of Landlord in this Lease contained, either express or implied, all such personal liability, if any, being expressly waived and released by Tenant and by all persons claiming by, through or under Tenant.

## ARTICLE 33

## PATRIOT ACT

Landlord and Tenant represent and warrant that they are not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by the United States Treasury Department as a Specially Designated National and Blocked Person, or for or on behalf of any person, group, entity, or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and that they are not engaged in this transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity, or nation. Each party hereby agrees to defend, indemnify, and hold harmless the other party from and against any and all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the foregoing representation and warranty.

## ARTICLE 34

## EMERGENCY DIRECTIVES

Notwithstanding anything contained in this Lease to the contrary, Tenant and all persons within the Premises or within or under Tenant's control, shall comply with any and all reasonable orders and directives that may be given by Landlord (or its agents, including for these purposes only, building management and security personnel) to Tenant in connection with Landlord's reasonable, good faith belief that there exists an life-threatening emergency or an imminent and material destruction of the Building and/or the Premises, which may include, among other things, for Tenant and its agents, employees, contractors and those under Tenant's control, to vacate the Premises and/or the Building and/or not enter or re-enter the Premises and/or the Building. Without limiting the foregoing: (a) Tenant shall designate, in writing, a person or persons who shall serve as its emergency contact for purposes of this Article 34; (b) notices and directives under this Article 34 may be given orally or in writing or by any other reasonable means (including, if applicable, the public address system of the Building); (c) if so directed by Landlord or its agents, all persons within the Premises and persons outside the Premises and within Tenant's control shall immediately vacate the Building and/or not enter or re-enter the Premises and/or the Building in accordance with Landlord's direction; (d) Landlord shall have the right with reasonable advance notice to Tenant to conduct a reasonable number of "fire drills" during Business Hours in any calendar year, and Tenant shall comply with the direction given by Landlord or its agents in connection with such "fire drills" as if a real emergency existed.

54

SHB/dlp/161070v4 33839-001

# ARTICLE 35

## OPTION TO EXTEND

35.1 Provided that Tenant is not then in monetary or material Default under this Lease, Tenant shall have the right, at Tenant's option, to extend the Term of this Lease for two (2) additional periods of five (5) years each (such additional periods being herein referred to as the "Optional Extension Term"). Such options to extend (the "Options to Extend") shall be exercised by Tenant giving written notice of the exercise thereof to Landlord at least nine (9) months before the Expiration Date. The Optional Extension Term shall be upon the same terms, covenants, and conditions as set forth in this Lease with respect to the Term, except that (a) Landlord shall have no obligation whatsoever to alter, improve or remodel the Premises and (b) the Base Rent and Rent Adjustments payable during the Optional Extension Term, if exercised, shall equal the then-prevailing Fair Market Rental Rate for the Premises, as defined below. At any time within twelve (12) months prior to the Expiration Date, Tenant may request in writing that Landlord provide Tenant with its determination of the Fair Market Rental Rate for this Premises which shall apply during the Optional Extension Term and Landlord shall furnish same in writing to Tenant within thirty (30) days after such request. For purposes of this Article 35, the term "Fair Market Rental Rate" shall mean a rate comprised of the average annual base rental and additional rental rates per square foot of rentable area (including one hundred percent (100%) of any escalation of any such base rental and additional rental rates based upon a fixed step and/or index), then being offered by Landlord for comparable space in the Building for a comparable term on an "as is" basis, taking into account any tenant improvement allowance or other leasing concessions, if any, offered by Landlord in connection therewith, but in no event less than the full escalated base rental and additional rental payable in the final year of the initial Term of this Lease.

Note that for each Optional Extension Term the real estate taxes and operating expenses for the Base Year will be adjusted to equal the calendar year of the renewal term.

# ARTICLE 36

## SIGNAGE

Landlord at its sole cost and expense and on behalf of the Tenant will make application promptly upon full execution of the Lease to the appropriate municipality for the purposes of securing any applicable signage approval necessary to permit the installation of any of the three alternatives described below and set forth on Exhibit G hereto (the "Signage Approval"). Landlord will make diligent and good faith efforts to obtain Signage Approval and keep Tenant apprised of its progress.

With respect to the Signage Approval:

1. Landlord will first make application for an enlarged monument on the top of its current monument as set forth on Exhibit G.

55

SHB/dlp/161070v4 33839-001

2. If the application described immediately above is rejected, Landlord, in the alternative, will make application for a separate and additional monument sign along Monroe Turnpike that provides Tenant with the top location thereon and dedicated space of no less than 36 inches tall and 88 inches wide as set forth on Exhibit G-1.

3. In the event that the two applications as described above are each rejected by the municipality, Landlord agrees to provide Tenant with the top three (3) slots on the current monument, which shall in the aggregate be no less than 36 inches tall and 88 inches wide.

If in the future, Landlord receives Signage Approval as described above, Tenant will agree to move its signage accordingly at Landlord's sole cost and expense.

The application for and time required to obtain the Signage Approval will in no way prevent or delay Landlord from commencing the build out for the Premises.

Following the Effective Date and prior to installation of permanent signage in accordance with clauses 1 through 3 above, Tenant shall be permitted to install temporary signage reasonably acceptable to Landlord in the top three slots of the current monument sign.

Promptly following receipt of the Signage Approval but in no event less than 30 days prior to the Commencement Date Landlord at its sole cost and expense will provide permanent monument signage (utilizing imagery provided by Tenant) consistent with clauses 1 through 3 of this Article 36. In all cases such permanent signage shall be illuminated with direct spot light.  Landlord shall also install a temporary banner (at Tenant's sole cost) on the building facing Monroe Tpke for 30-60 days prior to and after the Commencement Date. Such temporary banner is subject to municipal approval.

In addition to the foregoing, Tenant shall be permitted to install:

(a) directional signage in the Common Areas, including the entrance to the entrance to upper parking level at the Office Complex , sufficient to direct customers and invitees to the entrance to the Premises.

(b) front entrance signage on entrance doors to Premises and decals at the entrance of the Premises and on the windows.

(c) Signage on windows and entry doors at the Premises will be permitted as reasonably acceptable to Landlord; provided, that, any and all required permits or approvals shall have been obtained at Tenant's sole cost and expense

Date.

56

## ARTICLE 37

## TENANT IMPROVEMENTS

Landlord will provide a turnkey buildout to the Tenant at its sole cost and expense pursuant to a work letter ("Work Letter") attached hereto as Exhibit C. All tenant improvements ("Tenant Improvements") to the Premises will be made using building standard materials and are more particularly described in Exhibit C-1 attached hereto.

## ARTICLE 38

## JANITORIAL SERVICES

Tenant will be solely responsible for its own janitorial service at the Premises. Said janitorial service must be approved in writing in advance by the Landlord.

**(EXECUTION PAGE FOLLOWS)**

SHB/dlp/161070v4 33839-001

IN WITNESS WHEREOF, the parties hereto have caused this Lease to be executed as of the date first written above.

LANDLORD:

Trefoil Park, LLC a Connecticut limited liability company

By: _____

Name: _____

Blake Silverman

Its: _____

Member

TENANT:
Key Holdings LLC

By: _____

Name: _____

KEITH HAMLIN

By Its: _____

MANAGER

signature page to Office Lease

SHB dlp/161070v4 33839-001

58

## EXHIBIT A

## FLOOR PLAN

EXHIBIT A



**2ND FLOOR**
**PROPOSED FOR KEY FITNESS**
126 MONROE TURNPIKE
TRUMBULL CONNECTICUT
10-09-2012

KEY PLAN

SHB:dlp:161070v1 33839-001

## EXHIBIT B

## LEGAL DESCRIPTION OF LAND

126 Monroe Turnpike

All that certain piece or parcel of land, together with any buildings and improvements thereon, situated in the town of Trumbull, County of Fairfield and State of Connecticut, being known and designated as Lot No. 8 on a certain map entitled "Re-Subdivision Plan Lots No. 7 and No. 8 Trefoil Park North Route No. 111 and Corporate Drive, Trumbull, Connecticut. Scale 1" = 100', dated December 17, 1984,' prepared for Route 111 Associates Limited Partnership, by J & D Kasper & Associates, Inc., Bridgeport, Connecticut, on file with the Trumbull Town Clerk as Map No. 2335. Less and except a 0.039+/- acre strip of said Lot 8 along route 111 (Monroe Turnpike) conveyed by American Trading Real Estate Property, Inc., to the State of Connecticut by Deed dated July 16, 1992 and recorded in the Trumbull Land Records on July 27, 1992, in Volume 777, at Page 425, and less the strip of land designated as "20" R.O.W. to the Town of Trumbull (to be abandoned), conveyed to the Town of Trumbull by deed recorded in Volume 42 at Page 334 of the Trumbull Land Records.

Together with the benefit of a Declaration of Easement record in Volume 543, at Page 28 of the Trumbull Land Records.

Together with a right of way for pedestrian and vehicular ingress and egress over the 20-foot right of way to the Town of Trumbull reserved in a deed recorded in Volume 10, Page 45 of the Trumbull Land Records.

Together with the benefit of a 30-foot wide emergency access easement across Lot 7 to Corporate Drive, as shown on Map 2336.

## EXHIBIT C

## WORK LETTER

THIS Work Letter is attached to and forms a part of a certain Lease dated November, 2012 between Key Holdings LLC, as Tenant, and Trefoil Park, LLC as Landlord.

    1.    **Definitions.** As used herein, a "Tenant Delay is delay in the performance of the Landlord Work (defined below) that occurs solely because of any of the following reasons: (a) Tenant fails to timely furnish any information or deliver or approve any required documents within 5 business days after request by Landlord, (b) any requested change by Tenant to the Approved Plans that results in additional time for the construction, or (c) Tenant or its agents, contractors or representatives otherwise delays completion of the Landlord Work by interfering with such construction during installation of Tenant's furniture, fixtures or equipment.  As used herein, "Substantial Completion," or "Substantially Completed" means that all of the following have been performed: the Landlord Work in the Premises is completed in accordance with the Approved Plans, and Tenant is permitted to occupy the Premises and to conduct business therein, and, Tenant has been furnished with a temporary or final certificate of occupancy and final approval of all inspections required by governmental authorities that authorize the lawful complete occupancy of the Premises and operation of business of Tenant and the use of the Premises to conduct its business.  Substantial Completion shall have occurred even though minor details of decoration and adjustments remain to be completed by Landlord as provided on the Punchlist (defined herein).

    2.    **Approved Plans.**

        **Approval Process.** Attached as Exhibit A is a Preliminary Layout of the Premises (the "Preliminary Layout") which has been approved by Landlord and Tenant. Landlord will cause to be prepared for Tenant's approval plans and specifications, including the specifications of Tenant attached hereto (the "Plans") based upon the Preliminary Layout. Tenant will review and approve or disapprove the Plans within five (5) working days following receipt thereof. If the Plans are not fully approved by both Landlord and Tenant within five (5) working days after receipt thereof by Tenant, then Landlord shall cause the Plans to be revised to accommodate Tenant's objections or requests.  After the Plans are revised and approved by Tenant, the "Approved Plans" shall mean the final approved Plans, as amended from time to time by any approved changes thereto.  The "Landlord Work" shall mean all improvements to be constructed to the Premises and Building in accordance with and as provided in the Approved Plans.  Tenant shall, at Landlord's request, sign the Approved Plans to evidence its review and approval thereof.  Without limitation, the Approved Plans must incorporate the items and specifications attached hereto.  If Tenant requests any revisions to the Plans that cause the Premises to vary from the Preliminary Layout and that result in additional cost to the Landlord, Landlord shall inform Tenant of the cost of such revisions, and such costs shall be paid by Tenant after Tenant takes occupancy of the Premises.

    3.    **Cost of Landlord Work.**

SHB-dlp 161070v1 33839-001

    (a)    <u>Costs of the Landlord Work.</u>  Landlord shall perform or cause to be performed, all Landlord Work, at Landlord's sole cost and expense, including obtaining all permits, inspections, costs for the design and engineering of the Landlord Work and preparation of the Approved Plans, and all costs of construction fees, management, labor and materials, including any overtime costs, if performed. Landlord shall have the responsibility for ensuring that all inspections, approvals, and/or permits for any and all aspects of the Landlord Work are obtained from all applicable and appropriate local, state and federal governmental authorities and for complying with all requirements of all such governmental authorities which are required for Tenant to undertake installation of the Tenant's improvements, to install its fixtures in the Premises, to open its offices, and to obtain a a temporary or final certificate of occupancy or final approval of all inspections required by governmental authorities that authorize the lawful complete occupancy of the Premises and operation of business of Tenant and the use of the Premises to conduct its business.

    During the construction of the Landlord Work, Tenant or its contractor shall have the right from time to time to inspect the aspects of the same that affect the Premises, without any obligation by Tenant to do so.  Tenant shall also have the right not less than thirty (30) days prior to the anticipated date of substantial completion of the Landlord Work to install furniture, fixtures and equipment and such leasehold improvements as are necessary to prepare the Premises for the operation of Tenant's business therein.  Landlord and its contractor shall coordinate the work of the general contractor with Tenant's and all other contractors employed by the parties for construction of their respective improvements.  In the event of a dispute, Landlord shall notify Tenant in writing of the same.  Landlord and Tenant agree to cooperate with each other in order that the Landlord Work and Tenant's work shall be completed in a timely fashion and at no increase in cost to the other.

    (b)    <u>Change Orders.</u>  Tenant may initiate changes in the Landlord Work. Each such change must receive the prior written approval of Landlord, such approval not to be unreasonably withheld, conditioned or delayed; however, if such requested change would adversely affect (in the judgment of Landlord) (i) the Building's structure or the Building's roof, or (ii) the exterior appearance of the Building, Landlord may withhold its consent in its sole and absolute discretion.  In the event any such change increases the total construction costs, Landlord shall obtain at least 2 bids for such requested change order work, and if Tenant approves such cost and elects to proceed with the requested change, Landlord shall incorporate the requested change into the Landlord Work, and Tenant shall pay the amount of such approved costs for the change order work provided that such change results in an increase in the overall cost of Landlord Work. Landlord will notify Tenant at the time Tenant requests the change in the Landlord Work whether such change will result in additional construction time or be considered a "Tenant Delay", and if Tenant continues to elects to have Landlord proceed with the change, the additional time identified by Landlord will be a Tenant Delay for such days. However, if the change requested by Tenant does not result in any specified additional construction days, the change will not be deemed a Tenant Delay.  In no event will a requested change by Tenant constitute a Tenant Delay if the change results from non-conforming or defective Landlord Work.

    4.    <u>Performance; Purchase of Materials.</u>  After the Approved Plans have been approved, Landlord shall cause the Landlord Work to be performed in accordance with the Approved Plans, using contractors and subcontractors selected by Landlord.  Landlord represents and warrants that upon its delivery of the Premises to Tenant, the Landlord Work and the Premises shall be completed in a good and workmanlike manner, in accordance with all Approved Plans and in compliance with applicable Laws. All materials and equipment incorporated and installed pursuant to the Approved Plans shall be new and in working condition. Landlord shall provide a one-year warranty from the date of completion, under which any defects or work not in

compliance with the Approved Plans (excluding normal wear and tear) shall be corrected or replaced within one year after Substantial Completion. Tenant shall notify Landlord of any of Landlord Work affecting the Premises or Tenant's use and occupancy thereof of which Tenant is aware that requires such correction or replacement, and Landlord shall perform, or cause its contractor to perform, such warranty work.

All Landlord Work shall be performed by contractors and subcontractors approved by Tenant. If Tenant identifies to Landlord certain contractors and/or subcontractors for the Landlord Work, Landlord shall utilize such contractors or subcontractors provided the bids from such contractors or subcontractors are competitive with others.

5.      **Liens.**   At the conclusion of the Landlord Work, Landlord shall obtain appropriate lien waivers from each party performing any of the Landlord Work. The Building shall be free of all contractors', mechanics', and materialmen liens.

6.      **Construction Schedule.**   Landlord's general contractor shall provide a construction schedule for commencement and completion of the Landlord Work, which Landlord shall provide to Tenant for Tenant's review and approval. The construction schedule shall require that all Landlord Work to be completed, and a temporary or final certificate of occupancy is issued to Tenant or final approval of all inspections required by governmental authorities that authorize the lawful complete occupancy of the Premises and operation of business of Tenant and the use of the Premises to conduct its business. Landlord and Tenant shall reasonably cooperate so that Tenant may enter on the Premises after the effective date of this Lease and in all cases thirty (30) days prior to the substantial completion of Landlord Work (the "Completion Date") and install the telecommunications and data services and fixtures, furniture and equipment desired by Tenant, provided Tenant does not unreasonably interfere with Landlord Work. Landlord shall provide Tenant with written notice at least ninety (90) days prior to the Completion Date, setting forth the anticipated date of substantial completion of Landlord Work.

7.      **Walk-Through; Punchlist.**   When Landlord determines that the Landlord Work in the Premises is Substantially Completed, Landlord will notify Tenant and thereafter at a mutually acceptable date, Landlord's representative and Tenant's representative shall conduct a walk-through of the Premises and identify any necessary touch-up items, repairs and minor completion items that are necessary for the final completion of the Landlord Work, and a punchlist of such items shall be prepared and signed by both parties. Landlord shall cause the contractor performing the Landlord Work to complete all punchlist items within 30 days after the punchlist is complete. In no event may completion of the punchlist items disrupt Tenant's use or occupancy of the Premises or Tenant's installation of its fixtures and improvements.

8.      **Construction Representatives.**   Landlord's and Tenant's representatives for coordination of construction and approval of change orders will be as follows, provided that either party may change its representative upon written notice to the other:

> Landlord's Representative:     _____
>
> _____
>
> Telephone: _____
> Facsimile: _____

Tenant's Representative: _____
_____
_____
Telephone: _____
Facsimile: _____

## EXHIBIT C-1
## TENANT IMPROVEMENTS

## KEY FITNESS
Tenant Improvements
126 Monroe Turnpike, Trumbull CT, 2nd Floor
11.12.2012

Please note, the specifications below have been agreed upon by Landlord and Tenant. Any cost related to changes, modifications and/or work additions requested by Tenant in connection with the work which are not contained in this Exhibit will be Tenant's sole responsibility.

Items:

Item 1.    Exhibit is based on drawings dated 10.09.2012.

Item 2.    Construct build-out per attached drawing & final construction plans.

Notes:

Note 1:    Furnish and install 3'-0" x 7'-0" solid core wood doors and knock down metal frame. Doors to have ADA lever passage hardware unless otherwise requested by tenant. Solid core wood doors with glass inserts to be provided at the Director's Office and Fitness Office.

Note 2:    Telecom Room to have (2) dedicated outlets. Exhaust fan to be installed with thermostat. Furnish and install VCT flooring and vinyl base. Colors to be selected by tenant. Furnish and install one 4'x8' fire-rated plywood panel on rear wall. Final location of 4'x8' plywood to be verified by tenant prior to install.

Note 3    All walls to be primed and painted in a flat finish unless otherwise specified. Door frames and trim work to be painted in semi-gloss finish unless otherwise specified. Colors to be selected by tenant. Where specified the landlord shall provide a semi-gloss at a determined height to resist smudging and to be easily cleanable.

Note 4    All new tenant demising walls will be framed to deck and insulated. All interior walls framed 1'-0" above ceiling and insulated.

Note 5.    Furnish and install new 15/16 white ceiling grid with Armstrong 2' x 4' Cortega Second Look ceiling tile in reception area, office areas and locker room. Fitness Center to have exposed ceiling.

Note 6:    Furnish and install new T-5 2' x 4' lights. Coordinate lighting with client based on reflected ceiling plan. All lighting fixtures to be agreed upon by both landlord and tenant. Landlord to install standard ceiling fans provided by tenant.

SHB dlp 161070v1 33839-001

65

Note 7:     Furnish and install building standard 26 oz. carpet in Lobby (except near doors where there needs to be tile), in offices, reception office, in front of lockers, under the lockers and up to the base of the lockers and changing area. Base to be 4" carpet base. Color to be selected by tenant.

Note 8:     Men's and Women's Bathrooms to receive ceramic tile and base in wet areas. Specification should be mutually agreed upon by both tenant and landlord. All standard details must meet local codes and be ADA compliant. Details to include, but not be limited to countertops in locker area, all sinks, grab bars, stalls, mirrors, towel hooks and showers. Install countertop receptacles where required. Furnish and install soap dispensers and toilet paper dispensers. Bathroom partitions to be extra tall and made of composite material as mutually agreed upon by tenant and landlord. Color to be selected by tenant. Showers to have built-in tray for soap. Multiple floor drains to be provided as per local and state plumbing code requirements.

Note 9:     Furnish and install VCT and vinyl base in storage areas and janitors closet. Color to be selected by tenant.

Note 10.    Furnish and install Mondo 'Ramflex' flooring and base or approved equal in Fitness Area.

Note 11:    Furnish and install (3) wall receptacles and 1 switch for lighting in each room except where otherwise noted.  Area where water is present to have GFI receptacles.

Note 12.    Existing window blinds to remain, repair as needed or replace if not in good working condition.

Note 13:    Furnish and install power benches in Fitness Center for all cardio equipment. Treadmills will require 220 VAV 20 Amp individual branch circuits. Provide 120 VAC 15 Amp as required by final equipment layout.

Note 14.    Furnish and install Rubber flooring to be throughout Fitness Center.

Note 15.    Furnish and install Janitor closet with slop sink.

Note 16.    Tenant is responsible for all millwork (built-in work stations, reception desk, trash receptacles, locker room counters, etc.).  Landlord to provide only standard countertops in locker rooms.

Note 17     Landlord to furnish and install demised 4 ton unit for restrooms and locker area. Specification for unit to be mutually agreed upon by both landlord and tenant.

Note 18:   Landlord to furnish and installed 1500 cfm exhaust fan for restrooms and locker area. Specification for unit to be mutually agreed upon by both landlord and tenant.

Note 19:   Furnish and install demised 3 ton unit for entry and office area. Specification for unit to be mutually agreed upon by both landlord and tenant.

Note 20:   Landlord to install associated mechanicals for open ceiling plenum.   Final mechanical layout shall be subject to final review and comment prior to install by tenant and landlord.

Note 21   Tenant to supply office furniture.

Note 22:   Tenant will be responsible for all voice and data cabling inclusive of contracting phone service to suite and installation of their voice and data equipment.  Phone service for building is provided in a demarc room in the common area outside the tenant's space.

Note 23:   Tenant is responsible for their own security and card access systems.

Note 24:   Tenant responsible for lockable bulletin boards.  (1) at Reception/ Lobby area and (2) others in the Fitness Area.  Landlord to provide appropriate blocking in walls where required.

Note 25:   Tenant to supply (2) wall mounted water coolers – one near locker rooms, the other in the cardio area or by entry.  Landlord to install water colers.

Note 26:   Tenant to supply and install 7'-0" Mirrors along entire east wall of fitness center.

Note 27:   Furnish and install aluminum and glass entrance and exit doors from reception area with push bar hardware.

Note 28:   Furnish and install closer hardware where required by tenant.  Closer hardware specified to comply with all local and state codes for egress requirements.

Note 29:   Furnish and install building standard door hardware.  Tenant to specify all lock functions and be given 10 copies of a master key.

Note 30:   Tenant to furnish and install chair rails in lobby, reception area, director's office, fitness office and assessment room as identified by tenant.

Note 31:   Tenant to furnish and install wall mounted coat rack.  Landlord to provide all wall blocking as required.

Note 32:   Tenant to furnish and install wall mounts for flat screens.  Landlord to provide all wall blocking as required.

Note 33:   Landlord to furnish and install slat boards for Reception Office pro shop display with approx. 18" deep laminate lower cabinets and locking hardware.

Note 34:   Janitor's Closet and (2) small locker room closets will have backer board (plywood) throughout so tenant can hang shelves, etc.

Note 35:   Tenant to furnish and install anchors for tenant supplied safe.

Note 36:   Furnish and install auto flush mechanism for newly installed toilets.

Note 37:   Tenant to supply and install lockers wall mounted lockers with gap between bottom of lockers and floor.  Landlord to provide all required blocking and shoring.

Note 38:   All closets with sliding doors to be lockable.

Note 39:   Landlord to furnish and install 12" laminate counter/ledge directly under the reception window on the lobby side.

Note 40:   Reception window to be a minimum of 4'-0" wide with lockable hardware.

Note 41:   Landlord to review drawings with the Tenant before work begins to make certain both parties agree to the improvements.

Note 42:   Landlord to provide all new mechanical ducting and diffusers for existing 15 ton unit in Fitness Area.

# EXHIBIT D

## RULES AND REGULATIONS

1. The [illegible] sidewalks, stairways, [illegible] and public [illegible] of the building shall not be obstructed or encumbered [illegible] Tenant or used by Tenant for any purpose other than [illegible] and [illegible] from the Premises.

2. No [illegible] shall be attached to the [illegible] or otherwise project from the building [illegible] consent of Landlord.

3. No [illegible] lettering shall be affixed by Tenant on any part of the [illegible] of the premises or on any part of the inside of the premises so as to be [illegible] from the outside of the premises, without the prior written consent of Landlord [illegible]

4. The [illegible] in the premises shall not be covered [illegible] by Tenant, nor shall [illegible] articles be placed in the window sills or in the halls [illegible] any other part of the building nor shall [illegible]

5. [illegible] linoleum or other [illegible] floor covering so that the [illegible] floor of the premises [illegible] if linoleum or other similar floor covering is desired to be used [illegible] builder's deadening felt shall be first fixed to the floor by a paste or other material that [illegible] the use of cement or other similar adhesive [illegible] prohibited.

6. Tenant shall not make, or permit to be made [illegible] other tenants or those having business with them.

7. [illegible] shall be placed upon any of the doors or [illegible] the tenancy [illegible] to Landlord [illegible] space within the building, either furnished to [illegible] Tenant's possession [illegible] Tenant shall [illegible] Landlord the cost thereof [illegible] Landlord [illegible] upon the Commencement Date. Tenant shall not [illegible] Tenant [illegible] Landlord [illegible] Tenant's expense.

8. [illegible] freight, furniture or bulky matter [illegible] such hours as Landlord may [illegible] The [illegible] of such [illegible] shall be made upon previous notice to [illegible] Landlord and the persons employed by Tenant for such work must be reasonably acceptable to Landlord. [illegible] must supply Landlord [illegible] certificate of insurance [illegible] as Landlord [illegible] reasonably [illegible]

9. Landlord reserves the right to prescribe the weight and position of all safes and [illegible] equipment so as to distribute properly the weight thereof and to [illegible] damage [illegible] Business machines and other [illegible] shall be placed and maintained by Tenant at Tenant's expense in [illegible] in Landlord's reasonable judgment to [illegible] reasonable [illegible]

10. Tenant shall comply with such [illegible] from time to time [illegible] pursuant to the Lease and such [illegible] regulations may provide for the [illegible] display of [illegible] passes or parking passes by [illegible] of the building [illegible] Landlord may deem necessary or desirable for the [illegible] management of the building. Tenant may be asked to supply [illegible] plate [illegible] parking passes.

11. [illegible] shall not [illegible] covering or [illegible] upon the exterior of any [illegible] Landlord shall have the right to [illegible] placed on [illegible] on the exterior of the premises [illegible]

12. Landlord shall not be responsible to Tenant for the non-observance or violation of any of these rules and regulations by any other tenants.

13. [illegible] cigars, pipes [illegible] in the Building is prohibited.

## CONNECTICUT LEGAL HOLIDAYS

| | | |
|---|---|---|
| *January 1 | - | New Year's Day |
| Third Monday in January | - | Martin Luther King, Jr. Day |
| Third Monday in February | - | Washington's Birthday |
| Last Monday in May | - | Memorial Day |
| *July 4 | - | Independence Day |
| First Monday in September | - | Labor Day |
| Second Monday in October | - | Columbus Day |
| *November 11 | - | Veteran's Day |
| Fourth Thursday in November | - | Thanksgiving Day |
| *December 25 | - | Christmas Day |

*Should any of these dates fall on a Sunday, the Holiday is observed on the following Monday.

### EXHIBIT E

### CONFIRMATION OF COMMENCEMENT DATE

THIS CONFIRMATION AGREEMENT is made and agreed upon as of this ____ __ day of_____, _____by and between **Trefoil Park, LLC**, a New Jersey limited liability company (the "Landlord"), Key Holdings LLC (the "Tenant").

### W I T N E S S E T H :

WHEREAS, Landlord and Tenant have previously entered into that certain lease agreement dated _____, _____ (the "Lease"), covering certain premises located in Trumbull, CT as more particularly described in the Lease; and

WHEREAS, Landlord and Tenant wish to set forth their agreements as to the commencement of the term of the Lease;

NOW, THEREFORE, in consideration of the foregoing, the parties hereto mutually agree as follows:

1.    For the purpose of confirming the establishment of the Commencement Date, as required by the provisions of the Lease, Landlord and Tenant hereby agree that:

a.    The date of _____, _____ is hereby established as the "**Commencement Date**" referred to in the Lease; and

b.    The date of _____, _____ is hereby established as the "**Expiration Date**" referred to in the Lease.

2.    The Rentable Area of the Premises is _____ square feet and the Rentable Area of the Building is _____ square feet.

3.    Tenant's Proportionate Share, as defined in the Lease, as of the Commencement Date, is ____ percent (_____%).

4.    This Confirmation Agreement and each and all provisions hereof shall inure to the benefit of, or bind, as the case may require, the parties hereto and their respective heirs, successors and assigns.

SHB dlp/161070v1 33839-001

71

IN WITNESS WHEREOF, the parties hereto have executed this instrument as of the date and year first written above.

**TENANT:**

Key Holdings LLC

By:_____
    Its:_____

**LANDLORD:**

Trefoil Park LLC

By:_____
Its:_____

E-2

SHB/dlp/161070v1 33839-001

**EXHIBIT F**
**ZONING LETTER**



Planning and Zoning
Department
5866 Main Street
Trumbull, Connecticut 06611
Telephone 203.452.5047
Fax 203.452.5169

**Town of Trumbull**
CONNECTICUT

Jamie Bratt
Director of Planning &
Development
203.452.5047
jbratt@trumbull-ct.gov

October 23, 2012

Mark Steinbauer
Vice President, Real Estate
The Silverman Group
789 Morris Turnpike
Short Hills, NJ 07078

Re: Acceptable Uses at 126 Monroe Turnpike

Dear Mark:

The applicable land use zoning at 126 Monroe Turnpike in Trumbull, CT is IL-2 (Industrial). The relevant regulations for this zone are covered in Article II Section 4.2 of the Trumbull Zoning Regulations adopted in 2009. In particular, Section 4.2.4 provides a list of special permit uses.

I have reviewed the Key Fitness use through the following resources:
    a) Written description provided by the Silverman Group
    b) Review of web site
    c) Discussion with landlord broker
    d) Discussion with representative from Key Fitness

After gathering this information, I also conducted close review of our local regulations and had three discussions with the Town Attorney who specializes in land use matters. We have concluded that Key Fitness would be considered a Recreational Facility, which is an approved Special Permit Use within the IL-2 zone according to current zoning regulations. Furthermore, research shows that the ownership of 126 Monroe Turnpike duly obtained a Special Permit for the building and recorded said permit June 4, 1985 volume 584 page 404 (see notice attached). No further special permit is required to be obtained in connection with the Key Fitness Use.

Best regards,

Jamie Bratt

SHB/dlp/161070v1 33839-001

## EXHIBIT G
## SIGNAGE



## PROPOSED FOR KEY FITNESS
### 126 MONROE TURNPIKE
### TRUMBULL CT
### 2ND FLOOR

EXHIBIT G-1

## EXHIBIT G-1

