**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **TREFOIL PARK, LLC,** | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : | **3:14-CV-00364 (VLB)** |
| | : | |
| **v.** | : | |
| | : | |
| **KEY HOLDINGS, LLC, KEITH HAMLIN,** | : | |
| **and DOUGLAS LEVINE,** | : | |
| **Defendants.** | : | **March 13, 2015** |

**MEMORANDUM OF DECISION DENYING**
**DEFENDANTS' MOTION TO DISMISS [Dkt. # 28]**

**I.    Introduction**

Plaintiff Trefoil Park, LLC ("Trefoil"), a Connecticut limited liability
company, brings this action against Key Holdings, LLC ("Key Holdings") and Key
Holdings' members, Keith Hamlin ("Mr. Hamlin"), a resident of New York, and
Douglas Levine ("Mr. Levine"), a resident of Florida.  In its Complaint, Plaintiff
alleges a breach of contract claim against Key Holdings arising out of a
commercial lease entered into by Plaintiff as the landlord and Key Holdings as
the tenant (Count I).  Plaintiff also asserts claims of fraudulent misrepresentation
(Count II) and negligent misrepresentation (Count III) against Mr. Hamlin and Mr.
Levine, and seeks to pierce Key Holdings' corporate veil to find Mr. Hamlin and
Mr. Levine individually liable for Key Holding's breach (Count IV).  Defendants Mr.
Hamlin and Mr. Levine now move to dismiss Counts II, III and IV for failure to state
a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), and
with respect to Count II, for failure to plead fraud with particularity pursuant to

1

Fed. R. Civ. P. 9(b). For the reasons that follow, Defendants' Motion to Dismiss is DENIED.

II.   <u>Factual Background</u>

The following facts and allegations are taken from the Plaintiff's First Amended Complaint and are deemed to be true for purpose of this motion.

Plaintiff Trefoil is a Connecticut limited liability company with a business address at 788 Morris Turnpike, Short Hills, New Jersey.  [Dkt. # 27, First Am. Compl. at Count II, ¶ 1.]  Defendant Key Holdings is a New York limited liability company with an address at 144 Quincy Street, Brooklyn, New York.  [*Id.* at ¶ 4.] Defendant Mr. Hamlin is an individual who resides at 46 Westchester Avenue, Pound Ridge, New York, and Defendant Mr. Levine is an individual who resides at 2760 North Bay Road, Miami Beach, Florida.  [*Id.* at ¶¶ 2–3.]  Plaintiff alleges that Mr. Hamlin and Mr. Levine are, and at all times pertinent were, the members of Key Holdings.  [*Id.* at ¶ 5.]

Plaintiff alleges that in and during 2012, Plaintiff sought to lease a vacant space in its building located at 126 Monroe Turnpike, Trumbull, Connecticut (hereinafter the "Premises").  [*Id.* at ¶ 6.]  Plaintiff further alleges that in and about May 2012, Defendants Mr. Levine and Mr. Hamlin expressed interest in leasing the Premises for a fitness center.  [*Id.* at ¶ 7.]  Plaintiff alleges that Defendants first approached Plaintiff through a broker, Cushman and Wakefield, who introduced Plaintiff's representative Toby Nelson ("Mr. Nelson") to two representatives of the prospective tenant: Defendant Mr. Hamlin, and a non-party by the name of Daniel Lynch ("Mr. Lynch").  [*Id.* at ¶¶ 8–9.]  Plaintiff alleges that at this initial meeting,

Mr. Hamlin made it clear that he spoke for himself and for Defendant Mr. Levine, who Mr. Hamlin described as his partner.  [*Id.* at ¶ 11; *see also id.* at ¶ 10(b).] Plaintiff alleges that Mr. Hamlin and Mr. Lynch told Mr. Nelson that Mr. Hamlin and Mr. Levine were in a business relationship and were launching a new business enterprise of wellness-based fitness centers, with Mr. Lynch serving as a consultant.  [*Id.* at ¶ 10(b)–(d).]  Plaintiff further alleges that Mr. Hamlin and Mr. Lynch told Mr. Nelson that the Premises would be leased by Defendant Key Holdings, an entity formed, or to be formed, by Mr. Levine and Mr. Hamlin, and that Mr. Levine and Mr. Hamlin would serve as the entity's principals while Mr. Lynch managed the facility.  [*Id.* at ¶¶ 7, 9.]

At this initial meeting, Plaintiff alleges that Mr. Hamlin and Mr. Lynch asserted that Key Holdings had ample financial resources and would be well-capitalized.  [*Id.* at ¶ 10(h).]  Mr. Hamlin and Mr. Lynch also allegedly represented that Defendant Mr. Levine was the founder and creator of Crunch Fitness, which was sold for "millions upon millions" of dollars.  [*Id.* at ¶ 10(a).]  Mr. Hamlin and Mr. Lynch allegedly further told Plaintiff that the facility to be sited on the Premises would be the first of many such fitness centers that would be "rolled out" over time, and that it would serve as the "Flag Ship" center and as a model for future centers.  [*Id.* ¶ 10(d), (g).]

Mr. Hamlin and Mr. Lynch allegedly informed Mr. Nelson that the key component of their new business enterprise was the establishment of a contract-based partnership with a local hospital that would refer patients in need of rehab and related services to Defendants' fitness center.  [*Id.* at ¶ 10(e).]  Mr. Hamlin and

Mr. Lynch allegedly further represented that a contract with St. Vincent's Hospital was under negotiation (hereinafter, the "Contract"), and that the lease of the Premises (hereinafter, the "Lease") would be contingent upon execution of this Contract.  [*Id.* at ¶ 10(f).]  Furthermore, Mr. Hamlin and Mr. Lynch represented that the Contract would assure the success of the business by providing at least seventy-five (75%) of the fitness center's total revenue.  [*Id.* at ¶ 10(i).]

After this initial meeting, Plaintiff alleges that Mr. Levine and Mr. Hamlin, together with or through Mr. Lynch, participated in subsequent conversations and negotiations that preceded the execution of the Lease.  [*Id.* at ¶¶ 12–13.] Plaintiff alleges that during these exchanges, which occurred between June 2012 and October 2012, Defendants Mr. Hamlin and Mr. Levine continued to make representations that Plaintiff alleges pertained to the nature of the Contract with St. Vincent's Hospital and the capitalization of Key Holdings.  [*Id.*]

Specifically, Plaintiff alleges that during these conversations Mr. Levine confirmed the information initially relayed by Mr. Hamlin and Mr. Lynch about Mr. Levine's background, financial commitment to the business, and the fact that the proposed fitness center would be a model for future centers.  [*Id.* at ¶ 13.] Plaintiff further alleges that at some unspecified point during these exchanges, "it was stated that no expense was being spared" in developing the fitness center, and that "state of the art equipment" would be installed.  [*Id.*]  Plaintiff also alleges on June 14, 2012, Mr. Lynch sent an email to Plaintiff, copied to Mr. Hamlin, representing that investors were being shown the proposed site and would have to approve it.  [*Id.* at ¶ 15.]  Plaintiffs allege that this representation

**4**

served as further confirmation by Defendants that they were committed to well-capitalizing Key Holdings and the overall business.  [*Id.*]

Plaintiff also claims that throughout this time, Defendants made additional representations, some with and through Mr. Lynch, about the nature of the Contract with St. Vincent's.  In support of this claim, Plaintiffs allege that when Plaintiff attempted to close the deal on the Lease in June 2012, Mr. Lynch responded by email with copies to Mr. Hamlin that they were still working on the Contract.  [*Id.* at ¶ 14.]  Plaintiff alleges that this email is evidence of Defendants' position that the Contract was central to the lease and thus the lease would only be executed if, and after, the Contract was signed.  [*Id.*]  Plaintiff also alleges that Mr. Levine made independent statements to Plaintiff that the Contract was required and would assure the success of the facility.  [*Id.* at ¶ 22.]

Plaintiff further cites to representations in written information submitted by Mr. Hamlin and Mr. Lynch to the Town of Trumbull in August and September 2012, while the Contract was still waiting to be finalized.  [*Id.* at ¶¶ 16–20.] Plaintiff alleges that the written information, which was submitted by Mr. Hamlin and Mr. Lynch in order to secure a zoning approval for the Premises, included a brochure which advertised the facility as a medically-integrated fitness center "in association with St. Vincent's Health Services" and described this association as providing "a captive audience in the patient population of the physicians affiliated with our hospital partner."  [*Id.* at ¶¶ 18–20.]  The sign for the fitness center also advertised an association with St. Vincent's.  [*Id.* at ¶ 19.]

Plaintiff alleges that at some unspecified point, presumably after this process concluded, Mr. Levine and Mr. Hamlin "ultimately represented" to Plaintiff that Key Holdings had successfully established a partnership agreement and executed the Contract with St. Vincent's Hospital for treatment of its patients. [*Id.* at ¶ 21.]  Plaintiff further alleges that when the lease was finally signed, it was specifically represented by Mr. Hamlin and with the implied authorization of Mr. Levine that "St. Vincent's Hospital was contractually obligated to make the referrals and this would—based upon similar arrangements in other locations with other hospitals—ensure the success of Key Holdings' fitness center."  [*Id.* at ¶ 22.]  Plaintiff alleges that Mr. Levine's authorization is evinced by independent statements Mr. Levine made to Plaintiff that the Contract was required and would assure the success of the facility.  [*Id.*]

In reliance upon such representations, Plaintiff alleges that on November 13, 2012, it entered into a 10 year and 6 month written lease with Key Holdings granting Key Holdings permission to utilize approximately 6,747 square feet of space on the Premises.  [*Id.* at ¶¶ 23–24 and Ex. A.]  Under the terms of the Lease, Key Holdings was not obligated to begin making monthly base rent payments until six months after the Lease term commenced.  [Dkt. # 27, Ex. A at Art. 3.1.] Plaintiff alleges that on December 5, 2013, after Key Holdings had paid only one and one-half month's rent, Mr. Levine emailed Plaintiff, copying Mr. Hamlin, to notify it that Key Holdings was immediately terminating operations and abandoning the Premises, including equipment that Plaintiff subsequently learned was leased, rather than owned, by Key Holdings.  [*Id.* at ¶¶ 32–33.]

**6**

Specifically, Plaintiff alleges that Mr. Levine stated the center was not "doing well" because the relationship with St. Vincent's was "a bust."  [*Id.* at ¶ 32.] Plaintiff alleges that the next day, Mr. Levine also stated that the decision was made to abandon the business because it was failing.  [*Id.* at ¶ 33.]  Plaintiff alleges that when Plaintiff asked whether rent would continue, Mr. Levine "laughed and stated that this is a Limited Liability Company with no money," and that the landlord could do whatever it wanted.  [*Id.* at ¶ 33.]

Plaintiff alleges that Mr. Levine's and Mr. Hamlin's representations that 1) St. Vincent's Hospital was contractually obligated to refer patients to Key Holdings and that 2) Key Holdings was adequately capitalized both turned out to be false.  [*Id.* at ¶ 25.]  Instead, Plaintiff alleges that the agreement between Key Holdings and St. Vincent's Hospital did not obligate St. Vincent's to make referrals to Key Holdings or otherwise support it.  [*Id.* at ¶ 26.]  Plaintiff also alleges that Mr. Levine and Mr. Hamlin had not adequately capitalized Key Holdings with sufficient funds to operate and meet the company's obligations as they accrued, and that as a result Key Holdings was "no more than a shell that was never solvent." [*Id.* at ¶¶  27–28.]  In support of this claim, Plaintiff points to the fact that Key Holdings folded after only paying one and one-half month's rent and never paying the equipment lessor.  [*Id.* at ¶ 28.]

Plaintiff alleges that Plaintiff reasonably relied on Defendants' statements to its detriment and has suffered damages as a result of entering into the lease and expending substantial sums of money to fit-up the Premises, pay a brokerage fee, and provide Key Holdings with a period of free rent.  [*Id.* at ¶¶ 30; 34–35.]

7

III.   <u>Standard of Review</u>

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sarmiento v. United States*, 678 F.3d 147 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While Fed. R. Civ. P.  8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citations and internal quotation marks omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint.  *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "The plausibility

standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citations and internal quotation marks omitted).

When a party pleads fraud, the alleged fraud must be pled with the particularity required by Rule 9(b).  Fed. R. Civ. P. 9(b).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."   In this Circuit, therefore, a complaint based on fraudulent acts must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). "Rule 9(b) [also] provides that '[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally.'  However, to safeguard a defendant's reputation from unsubstantiated charges of wrongdoing or a strike suit, the Second Circuit has instructed that plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.'"  *Parola v. Citibank (South Dakota) N.A.*, 894 F. Supp. 2d 188, 200 (D. Conn. 2012) (quoting Fed. R. Civ. P. 9(b) and *Gabrielle v. Law Office of Martha Croog*, No. 3:10-cv-1798(WWE), 2012 WL 460264, at *4 (D. Conn. Feb. 9, 2012) (citing *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004))).   "The 'strong inference of fraud' may be established by either alleging facts to show that a defendant had both the motive and opportunity to commit fraud, or facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Parola*, 894 F. Supp. 2d at 200 (D. Conn. 2012)

(quoting *Gabrielle*, 2012 WL 460264, at *4 (citing *James F. Canning Agency v. Nationwide Ins. Co. of Am.*, No. 3:09-cv-1413(MRK), 2010 WL 2698292, at *2 (D. Conn. Mar. 10, 2010))).

## IV.   <u>Discussion</u>

### A.  The Merger Clause

As an initial matter, the Court will address Defendants' argument that Counts II and III should be dismissed on the basis that the parties' Lease contains "a full merger and/or integration clause, making it clear that the Lease is the entire agreement between the parties." [Dkt. # 28 at 12–15.]  The clause at issue (hereinafter, the "Merger Clause") states that:

> <u>Entire Agreement</u>. All understandings and agreements, oral or written, previously made between the parties hereto are merged in this Lease, which alone fully and completely expresses the agreement between Landlord (and its beneficiaries, if any), and their agents and Tenant. This Lease cannot be amended or modified except by a written instrument executed by Landlord and Tenant.

[See Dkt. # 27, Ex. A at Art. 30.10.]  Defendants take the position that this Merger Clause demonstrates that the Lease is an integrated writing and precludes the Court from considering any of Defendants' alleged pre-execution misrepresentations regarding the nature of the Key Holdings' Contract with St. Vincent's Hospital and Key Holdings' capitalization under the parol evidence rule. [Dkt. # 28 at 12–15.]  Defendants' argument misstates the law and must fail.

The parol evidence rule prohibits the introduction of evidence outside the four corners of the contract offered solely to vary or contradict the written terms of an integrated contract.  *See Heyman Assoc. No. 1 v. Ins. Co. of State of Pa.*, 653

A.2d 122, 135 (Conn. 1995).  "Ordinarily, a merger clause provision indicates that the subject agreement is completely integrated, and parol evidence is precluded from altering or interpreting the agreement."  *Weiss v. Smulders,* 96 A.3d 1175, 1189 (Conn. 2014) (citing *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 21 (2d Cir. 1997)).  However, as recently reaffirmed by the Connecticut Supreme Court, the parol evidence rule does not itself bar the presentation of parol evidence, "but forbids only the use of such evidence to vary or contradict the terms of such a contract.  Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, legally irrelevant.  When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant.  By implication, such evidence may still be admissible if relevant . . . to prove [*inter alia*] a collateral oral agreement which does not vary the terms of the writing. . . ."  *Id.* at 1189–90 (internal quotations and citations omitted).  Parol evidence is also admissible to show fraud.  *Schilberg Integrated Metals Corp. v. Contl. Cas. Co.*, 819 A.2d 773, 794 (Conn. 2003).  These exceptions to the parol evidence rule are "situations in which the evidence . . . does not vary or contradict the contract's terms, or . . . tends to show that the contract should be defeated or altered on the equitable ground that relief can be had against any deed or contract in writing founded in mistake or fraud."  *Id.* (citation omitted).

In their Motion to Dismiss, Defendants argue that the alleged representations regarding the St. Vincent's Contract and Key Holdings' adequate capitalization are "terms" that are being offered by Plaintiff to contradict the terms of the Lease.  [Dkt. # 28 at 13.]  Defendants attempt to bolster this position

by arguing that "[h]ad the financial status of Key and the St. Vincent's agreement been so critical to plaintiff's entering into the lease, plaintiff should have required actual legal representations and warranties in the Lease regarding these 'critical' business points. The Lease contains no such protections for plaintiff."  [*Id.*]

It is true that the Lease contains no provisions articulating such protections for the Plaintiff; however, and more significantly, the Lease contains no representations or warranties of any kind, much less representations and warranties regarding Key Holdings' financial structure or funding.  An integrated agreement "operates to exclude evidence of the alleged extrinsic negotiation if the subject matter of the latter is mentioned, covered or dealt with in the writing . . . if it is not, then probably the writing was not intended to embody that element." *Neiditz v. Hous. Auth. of City of Hartford*, 654 A.2d 812, 816 (Conn. Super. 1994) *aff'd*, 651 A.2d 1295 (Conn. 1995) (citing Connecticut Supreme Court cases).  A review of the Lease before the Court suggests that its subject matter is clearly limited to the terms and obligations between the parties in performance of the lease, including, *inter alia*, the rent owed; the use, conditions and care of premises; the furnishing of utilities; and rules and regulations governing issues such as eminent domain, default, subordination, and environmental matters. [*See* Dkt. # 27 at Ex. A.]  The Lease does not purport to memorialize the representations and warranties of the Defendants on which the Plaintiff relied in agreeing to enter into the Lease.  Inasmuch as the Lease does not purport to set forth the parties' agreement regarding the tenant's business plan, financing, or any other conditions precedent to the Lease or in reliance on which the Lease

was entered into, the Court agrees that Plaintiff "is not attempting to rely upon an oral agreement to supplement or modify the terms of the lease" such that its allegations of pre-execution discussions should be barred.   [Dkt. # 30 at 17.]

Instead, the Court finds that Plaintiff's allegations are made in an effort to claim that it was induced to enter into the Lease by material misrepresentations that were fraudulent or collateral to the subject matter governed by the Lease.  It is well established under Connecticut law that a plaintiff asserting misrepresentation claims may allege statements made prior to the execution of an integrated writing without running afoul of the parol evidence rule, even in the presence of a merger or integration clause like the Clause here.  As Plaintiff points out in its Opposition, "no rule of law exists that will deprive the Court of the power to allow oral testimony to prove fraud."  [Dkt. # 30 at 19.] The same is true when a plaintiff alleges pre-execution statements to establish a claim for negligent misrepresentation.  *See, e.g.*, *Pearsall Holdings, LP v. Mountain High Funding, LLC*, 3:13CV437(JBA), 2014 WL 7270334, at *6 (D. Conn. Dec. 18, 2014) (holding that because all plaintiff's claims were premised on its assertion that the defendant engaged in misrepresentations to induce plaintiff's investment, the merger clause in the written investment agreement did not bar plaintiff's claims); *Off. Furniture Rental Alliance, LLC v. Liberty Mut. Fire Ins. Co.*, 981 F. Supp. 2d 111, 119 (D. Conn. 2013) (holding that even in the face of an integrated writing, parol evidence was admissible to support a negligent misrepresentation claim); *Hull v. Fonck,* 999 A.2d 775, 779 (Conn. App. Ct. 2010) ("a claim that a seller's intentional, reckless or negligent misrepresentation caused a buyer to enter into

a contract for the sale of property is a valid cause of action, even if the contract that the parties entered into constituted the entire agreement between the parties and the contract included a clause disclaiming any representations by the seller as to the conditions of the property") (internal quotation marks omitted).

In short, the Court may consider Defendants' alleged pre-execution representations in assessing the sufficiency of Plaintiff's Complaint.

### B.  Count II – Fraudulent Misrepresentation

Plaintiff alleges that Mr. Levine and Mr. Hamlin knowingly made false representations about 1) the nature Key Holdings' Contract with St. Vincent's Hospital and 2) the capitalization of Key Holdings.  [Dkt. # 27 at Count II, ¶¶ 1–35.] Plaintiff further alleges that Mr. Levine and Mr. Hamlin made these false representations to induce Plaintiff to enter into the Lease; that Plaintiff relied on these false statements to its detriment by entering into the Lease, expending money to fit-up the Premises, paying a brokerage fee, and providing Key Holdings with a period of "free" rent; and that Plaintiff has suffered damages as a direct and proximate result of Defendants' fraudulent actions.  [*Id.* at ¶¶ 29–30; 35.]  Defendants move to dismiss Count II on the grounds that Plaintiff's allegations of fraud and misrepresentation are impermissibly vague and conclusory and therefore fail to meet the heightened pleading standard for fraud under Fed. R. Civ. P. 9(b).  [Dkt. # 28 at 7–11.]  Defendants also seek to dismiss Plaintiff's claim on the basis that Plaintiff has failed to allege facts giving rise to fraudulent misrepresentations of material fact, and that Plaintiff's allegations are

**14**

consistent with Defendants' lawful negotiation efforts and attempt to consummate a transaction.  [*Id.* at 11–12.]

In order to allege a claim for fraudulent misrepresentation under Connecticut law, a plaintiff must establish that "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury . . . . In contrast to a negligent representation, [a] fraudulent representation . . . is one that is knowingly untrue, or made without belief in its truth, or recklessly made and for the purpose of inducing action upon it." *Sturm v. Harb Development, LLC*, 2 A.3d 859, 872 (Conn. 2010) (internal quotation marks and citations omitted).

Under the first element, the general rule is that a misrepresentation must relate to an existing or past fact.  *Paiva v. Vanech Heights Const. Co.*, 271 A.2d 69, 71 (Conn. 1970); *see also Allstate Ins. Co. v. Adv. Health Professionals, P.C.*, 256 F.R.D. 49, 61 (D. Conn. 2008) ("a conclusion that a representation is fraudulent requires . . . that the representation be false—which in turn requires the *existence of a fact* with which the representation is inconsistent. . . .") (footnotes omitted) (emphasis added).  Connecticut courts have long interpreted "statement of fact" to exclude statements of opinion and promises to act in the future unless the promisor had a present intention not to fulfill that promise.  *See, e.g., Bradley v. Oviatt*, 84 A. 321, 322 (Conn. 1912) ("The law does not fasten responsibility upon one for expression of opinion as to matters which, in their nature, are contingent and uncertain"); *Web Press Services Corp. v. New London*

*Motors, Inc.*, 525 A.2d 57, 62 (Conn. 1987) (holding that it was not error to find that statements that vehicle was an "excellent" and "unusual" one, and that it was in "mint" condition, were merely "puffing" and did not create an express warranty); *Flaherty v. Schettino*, 70 A.2d 151, 152 (Conn. 1949) (holding that a promise to pay was not a representation of the ability to pay). To satisfy the second element of a fraudulent misrepresentation claim, a plaintiff must allege that the party making the statement of fact knew that it was false at the time it was made.  *See, e.g., Glazer v. Dress Barn, Inc.*, 873 A.2d 929, 955 (Conn. 2005).  Finally, as discussed *supra*, it is well established that parol evidence is admissible to show fraud, even when the fraud relates to an integrated writing.

      1.  **Statements regarding Key Holdings' Contract with St. Vincent's Hospital**

      Plaintiff's Complaint alleges several representations by and through Defendants about the nature of Key Holdings' Contract with St. Vincent's Hospital.  These representations relate to the Contract's role in the center's business plan and to the specific terms of the Contract.  The Court finds that they are sufficiently alleged under Rule 9(b) to constitute fraudulent statements of fact, and that for the reasons below, Plaintiff has adequately pled a claim of fraudulent misrepresentation as to those statements. However, the Court notes that the Complaint sometimes does not clearly state which Defendant made what statements, and therefore some claims against Mr. Levine or Mr. Hamlin or both may not survive summary judgment.

      Plaintiff makes several allegations regarding Defendants' representations that the Contract with St. Vincent's would play a central role in the success of the

Key Holdings' business venture by obligating St. Vincent's Hospital to refer its patients to Defendants' fitness center.  Plaintiffs allege that Defendants stated the "key component" of their new business enterprise was the establishment of a "contract-based partnership" with a local hospital that would refer patients to Defendants' fitness center, and more precisely, that "the Contract would assure the success of the business by providing at least seventy-five (75%) of the fitness center's total revenue."  [Dkt. # 27 at Count II, ¶¶ 10(e), (i).]  Information and proposed signage for the center that was submitted by Defendants advertised the facility as a medically-integrated fitness center "in association with St. Vincent's Health Services" and described this association as providing "a captive audience in the patient population of the physicians affiliated with our hospital partner." [*Id.* at ¶¶ 18–20.]  Plaintiff also maintains that Defendants represented that the Lease would only be executed "if, and after, a contract with St. Vincent's Hospital was signed."  [*Id.* at ¶ 15.]  Plaintiff then alleges that ultimately, Defendants told Plaintiff that Key Holdings had successfully established a partnership agreement and executed the Contract with St. Vincent's Hospital for treatment of its patients, and that under the terms of this Contract "St. Vincent's Hospital was contractually obligated to make the referrals and this would – based upon similar arrangements in other locations with other hospitals – ensure the success of Key Holdings' fitness center."  [*Id.* at ¶¶ 21–22.]  Plaintiff further alleges that unbeknownst to Plaintiff, this Contract "did not obligate St. Vincent's to make referred [*sic*] to Key Holdings or otherwise support it."  [*Id.* at ¶ 25.]

The Court finds that Plaintiff could prove facts showing that Defendants' representations about the obligatory nature or the scope of the Contract were untrue; that Defendants knew them to be untrue at the time they were said; and that as the alleged cornerstone of the Defendants' business model, the nature and scope of the Contract induced Plaintiff's reliance in entering into the Lease, and Plaintiff was harmed as a result.  The Court notes that some of the alleged statements about the Contract are forward-facing and, standing alone, are arguably insufficient to constitute statements of "existing or past fact."  *Paiva*, 271 A.2d at 71.  However, the Court finds that the Defendants' factual representations, considered in context with their aspirational representations and their execution of the Lease, sufficiently assert the factual component of a claim of fraudulent misrepresentation. *See Meyers v. Cornwell Quality Tools, Inc.*, 674 A.2d 444, 450 (Conn. App. Ct. 1996) ("The requirement that a representation be made as a statement of fact focuses on whether, under the circumstances surrounding the statement, the representation was intended as one of fact as distinguished from one of opinion . . . the subject matter, the form of the statement, the surrounding circumstances, and the respective knowledge of the parties all have a bearing upon the question") (internal citations and quotations omitted).

2.  Representations regarding the capitalization of Key Holdings

The Court also construes the Complaint to allege four categories of statements related to Key Holdings' capitalization and the profitability of the business enterprise as a whole, to wit: 1) Defendants' representation during Mr.

18

Hamlin and Mr. Lynch's initial meeting with Plaintiff in May 2012 that "Key Holdings had ample financial resources and would be well-capitalized" [Dkt. # 27 at Count II, ¶ 10(h)]; 2) Defendants' statement to Plaintiff in Mr. Lynch's June 14, 2012 email representing that investors were being shown the proposed site and would have to approve it [*id.* at ¶ 15]; 3) Defendants' representations regarding Mr. Levine's prior successful business venture, financial background and commitment to the business enterprise [*id.* at ¶¶ 10(a), 13]; and 4) Defendants' statements regarding the value of the business enterprise [*id.* at ¶¶ 10(d), (g); 13]. For the reasons that follow, the Court finds that most of these representations are subjective and thus alone may not sustain a fraudulent misrepresentation claim with regards to Key Holdings' capitalization. However, Plaintiff alleges two adequately pled statements of fact that preclude the Court from dismissing this part of Plaintiff's claim at the motion to dismiss stage.

First, the Court finds that under the circumstances alleged, Defendants' statement in May 2012 that "Key Holdings had ample financial resources and would be well-capitalized" does not constitute a knowingly false statement of fact sufficient to satisfy the first and second elements of fraudulent misrepresentation. [*Id.* at ¶ 10(h).] Plaintiff alleges that Defendants' representation regarding Key Holdings' capitalization and financial resources was made during the parties' very first meeting, at which time, Plaintiff concedes, it is possible that Key Holdings had not yet even been formed. [*Id.* at ¶ 7.] Considering the very preliminary nature of the May 2012 discussions, which would ultimately be followed by an extensive arms-length transaction between

sophisticated parties, such a broad, general statement cannot reasonably be regarded as a substantive assertion of knowable fact.  At the time it was made it was, at best, prognostic, and at base, mere puffery.

Furthermore, Plaintiff does not allege sufficient facts under Rule 9(b) to suggest why the statement is fraudulent—that is, to the extent this assertion could be considered a statement of fact, Plaintiff does not allege that it was known to be untrue at the time it was said, or that such knowledge was even possible at the time.  Plaintiff merely states that in the end, Key Holdings *turned out to be* undercapitalized.  [*Id.* at ¶¶ 27–28.]  Proof of ultimate nonperformance is not sufficient to establish fraud.  *See Flaherty*, 70 A.2d at 153.  Even Plaintiff's allegation that Key Holdings was "never solvent" [Dkt. # 27 at ¶ 28] is insufficient to suggest that a general statement at the initial meeting that Key Holdings *would be* well capitalized—in the context of other statements that Key Holdings *would have* ample financial resources from a contract *to be entered into* with St. Vincent's Hospital—was known to be false at the time, said with reckless disregard to its truth, or said with present intent not to perform.

The allegation of Defendants' representation through Mr. Lynch that "investors were being shown the proposed site and would have to approve it" suffers from similar defects.  [*Id.* at ¶ 15.]  Plaintiff alleges that this statement served to confirm Defendants' commitment to well-capitalize the new Tenant and overall business.  [*Id.*]  The Court does not see how this is a reasonable interpretation of such a statement, and Plaintiff fails to assert that Defendant's *actual* statement was falsely or recklessly made.  For example, Plaintiff does not

allege that Defendants made statements falsely suggesting that these investors did approve the site or enter into an agreement to fund the enterprise.  Even if such a statement could be read as a representation that investors did indeed approve the site and did indeed invest, there is nothing in the Complaint to suggest that that is untrue, either; certainly, investors may have approved the site, invested accordingly, and still failed to sufficiently capitalize Key Holdings.

However, the Court finds that Plaintiff's allegations regarding Defendants' statements about Mr. Levine's prior successful business venture, personal financial worth and "commitment to the business," construed in the light most favorable to Plaintiff, constitute a statement of fact about Key Holdings' capitalization sufficient to sustain a claim for fraudulent misrepresentation.  [*Id.* at ¶¶ 10(a); 13.]  Plaintiff's position is that the statements regarding Mr. Levine's financial position were tantamount to a representation that Mr. Levine had committed to using his substantial wealth to fund Key Holdings, and were meant to induce Plaintiff's reliance on the fact that Key Holdings had ample financial backing.  [Dkt. # 30 at 13.]  Considered in the context of Mr. Levine's alleged financial success as the founder and creator of Crunch Fitness, "which was sold for millions upon millions of dollars," Mr. Levine's alleged business partnership with Mr. Hamlin, and Mr. Levine's alleged participation in the Lease negotiations, Defendants' statements about Mr. Levine's "commitment to the business" could properly be characterized as a statement of material fact regarding the adequacy of Key Holdings' capitalization.  [Dkt. # 27 at Count II, ¶¶ 10(a)–(b), 12, 13.]  Furthermore, Plaintiff's allegation that Levine immediately abandoned the

business when it began to fail makes it plausible that Defendants' statements about Levine's commitment were falsely made.  [*Id.* at ¶ 33.]

In the fourth category of statements related to Key Holdings' capitalization and profitability, the Court finds that Defendants' alleged representation about the St. Vincent's Contract also properly constitutes a statement of fact regarding Key Holdings' sufficient financial condition at the time the Lease was signed.  In view of Defendants' earlier representations that they intended to enter into a contract with St. Vincent's Hospital that would bind the hospital to make referrals generating seventy-five percent of Key Holding's revenue and "would ensure the success" of Key Holdings, and that they would not enter into the Lease until they had signed the Contract, Defendants' factual statement that Key Holdings had entered into a Contract with St. Vincent's Hospital was a representation that Key Holdings had a confirmed, reliable source of income that would cover a substantial majority of the enterprise's liabilities, and is ultimately sufficient to sustain Plaintiff's claim.  [*Id.* at ¶¶ 22, 10(i).]

By contrast, however, Defendants' other representations regarding the future profitability and projected value of Key Holdings' fitness center chain do not rise to the level of actionable statements of fraud.  Plaintiff alleges that Mr. Hamlin and Mr. Lynch told Plaintiff that the proposed fitness center would be the first of many such centers that would be "rolled out" over time, and that the center located on the Premises would serve as the "Flag Ship" center and as a model for future centers.  [*Id.* ¶¶ 10(d), (g).] Plaintiff also alleges that Mr. Levine confirmed the fact that the proposed fitness center would be a model for future

centers.  [*Id.* at ¶ 13.]  Plaintiff further alleges that "it was stated that no expense was being spared" in developing the fitness center, and that "state of the art equipment" would be installed.  [*Id.*]  These assertions of optimistic puffery do not constitute statements of fact, and where there is no ascertainable statement of fact, there can be no false misrepresentation of that fact; nor do Plaintiffs allege that any of these statements were known to be untrue at the time they were said.  "[A]n opinion that a certain event will arise in the future cannot form the basis of a fraud or misrepresentation claim." *Olympic Dreams, LLC v. Clark*, 3:11CV01103 AWT, 2014 WL 4267499, at *5 (D. Conn. Aug. 28, 2014) (citation omitted).

Defendants' Motion to Dismiss Count II is DENIED.

C.  Count III – Negligent Misrepresentation

Plaintiff also alleges that Mr. Levine and Mr. Hamlin are liable under a theory of negligent misrepresentation because Mr. Levine and Mr. Hamlin knew or should have known that their representations regarding Key Holdings' capitalization and the Contract with St. Vincent's Hospital were false, and because Plaintiff reasonably relied on those representations to its detriment. [Dkt. # 27 at Count III, ¶¶ 2–3.]

To establish a claim for negligent misrepresentation under Connecticut law, a plaintiff must establish (1) that the defendant made a misrepresentation of fact; (2) that the defendant knew or should have known was false; (3) that the plaintiff reasonably relied upon the misrepresentation; and (4) that the plaintiff suffered pecuniary harm as a result thereof.  *Glazer*, 873 A.2d at 955.  As

explained *supra*, evidence of pre-execution discussions or negotiations is relevant and admissible to support a negligent misrepresentation claim and is not barred by the parol evidence rule.

The Court finds that Defendants' representations regarding the Contract with St. Vincent's, as alleged, sustain the elements of a negligent misrepresentation claim.  As already discussed *supra*, Plaintiff sufficiently alleges representations of ascertainable facts regarding the terms of the Contract and the specific role of the partnership with St. Vincent's in the fitness center's business model and identity, facts that Defendants knew or should have known were untrue at the time they were said.  Plaintiff also adequately alleges reasonable reliance on these representations to its detriment.

However, the Court finds that the majority of the allegations regarding Defendants' statements about the capitalization of Key Holdings and the financial profitability of its fitness center cannot sustain a negligent misrepresentation claim for some of the same reasons they do not sustain a claim sounding in fraud.  That is, the alleged statements are not representations of fact, or they are representations of facts—such as investors' interest in visiting the site, or the quality of the fitness equipment—upon which Plaintiff could not have reasonably relied to draw the conclusion that Key Holdings was well-capitalized or that its fitness center would be a financial success.  Overall, the deficiencies of these statements, as pled—specifically their broad, general nature, and their frequent lack of detail or substance—preclude the Court from reading the Complaint to allege a reasonable reliance thereon.  Nevertheless, the Court finds that for the

reasons articulated *supra*, Defendants' alleged statements regarding Mr. Levine's business acumen and financial commitment to funding the business enterprise, and Defendants' alleged representations about the revenue stream created by the Contract with St. Vincent's, could be construed to be statements of fact, and therefore the Plaintiff could have reasonably relied on those assertions to determine that Key Holdings was sufficiently capitalized. Accordingly, Court will sustain Plaintiff's negligent misrepresentation claim regarding Key Holdings' capitalization on those grounds, and Defendants' Motion to Dismiss Count III is also DENIED.

### D.  Count IV – Piercing the Corporate Veil

Finally, Plaintiff claims that Mr. Hamlin and Mr. Levine are liable for Key Holdings' liability under a corporate veil piercing theory because Key Holdings was an instrumentality used to perpetrate injustice and fraud on Plaintiff.  [Dkt. # 27 at Count IV, ¶¶ 2–7.]  Defendants argue that Count IV should be dismissed because Plaintiff fails to allege that Mr. Hamlin or Mr. Levine had complete control or domination over Key Holdings, and because Plaintiff fails to put forth sufficient facts to support its allegation that Key Holdings was a "shell" that was under-capitalized.  [Dkt. # 28 at 15–18.]  Plaintiffs contend that they have adequately pled a veil-piercing claim by asserting that Mr. Levine and Mr. Hamlin formed Key Holdings and permitted it to operate without adequate capital, and that they are ultimately using it to escape their obligations under the Lease.  [Dkt. # 27 at Count IV, ¶¶ 5–6.]

The concept of piercing the corporate veil is not treated as an independent cause of action under Connecticut law. *See Intermed, Inc. v. Alphamedica, Inc.*, 2009 WL 5184195, at \*8 (D. Conn. Dec. 21, 2009); *cf. Naples v. Keystone Bldg. & Dev. Corp.*, 990 A.2d 326 (Conn. 2010); *Angelo Tomasso, Inc. v. Armor Const. & Paving, Inc.*, 447 A.2d 406 (Conn. 1982). Rather, corporate veil piercing is an equitable determination allowing for the enforcement of a judgment against a party not primarily liable. *Everspeed Enterprises Ltd. v. Skaarup Ship. Int'l.*, 754 F. Supp. 2d 395, 403 (D. Conn. 2010). The corporate veil will be pierced "only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *Naples*, 990 A.2d at 340. However, a court may pierce the corporate veil and "disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor . . . ." *Id.* at 339; *see also Zaist v. Olson*, 227 A.2d 552 (Conn. 1967) (allowing piercing of corporate veil when a corporation is mere instrumentality or agent of another).

Courts can disregard the corporate structure and pierce the corporate veil under an "alter ego" or "instrumentality theory." *Naples*, 990 A.2d at 339. Here, Plaintiff appears to proceed under the latter rule, which requires Plaintiff to adequately allege three elements: (1) control by the first entity over the second to the point of complete domination of finances, policy, and business practice in respect to the transaction at issue, such that the alter-ego at the time had no

separate, mind, will or existence of its own; (2) that such control was used

dishonestly or unjustly to contravene the plaintiff's legal rights; and (3) that such

control and breach of duty proximately caused the plaintiff's injury.  *Id.*  In

assessing whether an entity is dominated or controlled, courts look at several

factors, including:

> (1) the absence of corporate formalities; (2) inadequate
> capitalization; (3) whether funds are put in and taken out
> of the corporation for personal rather than corporate
> purposes; (4) overlapping ownership, officers, directors,
> personnel; (5) common office space, address, phones;
> (6) the amount of business discretion by the allegedly
> dominated corporation; (7) whether the corporations
> dealt with each other at arm's length; (8) whether the
> corporations are treated as independent profit centers;
> (9) payment or guarantee of debts of the dominated
> corporation; and (10) whether the corporation in
> question had property that was used by other of the
> corporations as if it were its own.

*Litchfield Asset Mmgt. Corp. v. Howell*, 799 A.2d 298, 313 (Conn. App. Ct. 2002).

The second prong of the test requires the plaintiff to establish that this control

was used by the defendant "to commit fraud or wrong, to perpetrate the violation

of a statutory or other positive legal duty, or a dishonest or unjust act. . ."  *Zaist*,

227 A.2d at 558.

Plaintiff has put forth facts suggesting that Key Holdings was

undercapitalized to the extent that they were never solvent.  Specifically, Plaintiff

points to the fact that Key Holdings allegedly breached the Lease after having

only paid one-and-a-half month's rent and never having made any lease

payments on the fitness equipment they acquired and subsequently left

abandoned on the Premises.  [Dkt. #27 at Count IV, ¶¶ 2–4.].  Generally,

allegations of undercapitalization or insolvency, while relevant to the inquiry, are not sufficient in and of themselves to establish veil piercing.  *See, e.g., Duncan v. J.J.D., Inc.*, CV116020036S, 2011 WL 4583760, at *4 (Conn. Super. Sept. 12, 2011); *Sullivan v. Lake Compounce Theme Park*, CV020172497S, 2004 WL 1392842, at *6 (Conn. Super. June 3, 2004) *aff'd*, 889 A.2d 810 (Conn. 2006).  However, the Court recognizes that without the benefit of discovery, the Plaintiff is likely not yet in a position to allege additional facts, and finds that, taking into consideration the short duration of Key Holding's solvency, there is enough factual content in the Complaint to sustain Plaintiff's veil piercing count at this time.  In order to ultimately prevail on its veil-piercing theory, however, Plaintiff will have the burden of establishing facts tending to support its thinly pled allegation that "Key Holdings was an instrumentality used to perpetrate an injustice and fraud upon Trefoil" as a result of Mr. Hamlin and Mr. Levine's failure to properly capitalize the LLC.  [Dkt. # 27 at Count IV, ¶¶ 5–6.]

Accordingly, Defendants' Motion to Dismiss Count IV is DENIED.

V.    <u>Conclusion</u>

For the foregoing reasons, Defendants Mr. Levine and Mr. Hamlin's [Dkt. # 28] Motion to Dismiss is DENIED.


IT IS SO ORDERED.

_____
/s/
Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: March 13, 2015