UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TREFOIL PARK, LLC, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:14-CV-00364 (VLB) |
| | : | |
| v. | : | |
| | : | |
| KEY HOLDINGS, LLC, KEITH HAMLIN, | : | |
| and DOUGLAS LEVINE, | : | |
| Defendants. | : | March 3, 2016 |

MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [Dkt. # 57]

I.    **Introduction**

Plaintiff Trefoil Park, LLC ("Trefoil"), a Connecticut limited liability

company, brought this action against Key Holdings, LLC ("Key")[1] and Key

Holdings' members, Keith Hamlin ("Hamlin"), a resident of New York, and

Douglas Levine ("Levine"), a resident of Florida.  Plaintiff has alleged a breach of

contract claim against Key (Count I) arising out of a commercial lease entered

into by Plaintiff as the landlord and Key Holdings as the tenant (the "Lease").

Plaintiff also asserted claims of fraudulent misrepresentation (Count II) and

negligent misrepresentation (Count III) against Hamlin and Levine, and seeks to

---

[1] **Plaintiff's Amended Complaint has listed "Key Holdings LLC" as a Defendant.
Counsel for Defendants has filed a Notice of Appearance on behalf of "Key
Holdings, LLC" and has signed memoranda and motions in this case on behalf of
"Key Holdings, LLC."  [Pl.'s Rule 56(a)(2) Statement ¶ 1].  The Hospital Contract
and the Lease are both signed by "Key Holdings, LLC."  [Pl.'s Rule 56(a)(2)
Statement ¶ 1].  However, the Certificate of Incorporation in Delaware states the
name of the entity as "Key Fitness Holdings, LLC."  [Dkt. 64-4, Ex. 3].   Defendant
describes this problem as "scriveners error" in Plaintiff's Complaint. [SOMF ¶ 1].
Plaintiff argues that Key has represented itself as "Key Holdings, LLC" and
should be sued as such.  Neither party moves for entry of judgment on this basis.
[Pl.'s Rule 56(a)(2) Statement ¶ 1].**

pierce Key's corporate veil to find Hamlin and Levine individually liable for Key's breach (Count IV).  Defendants Hamlin and Levine have moved for summary judgment as to Counts II, III and IV.

For the reasons that follow, Defendants' Motion for Summary Judgment is GRANTED.  Trial on the remaining claims will proceed to the Court as scheduled for the month of January, 2017.

II.    <u>Factual Background</u>

The following facts and allegations are undisputed unless otherwise noted.

Plaintiff is a Connecticut limited liability company operated by The Silverman Group, a large real estate and private equity holding company with numerous commercial properties.  [Dkt. 59, Def.'s Rule 56(a)(1) Statement of Material Facts ("SOMF") ¶¶ 5, 7].  The sole asset of Trefoil Park, LLC, is a single property located at 126 Monroe Turnpike in Trumbull, Connecticut (the "Premises").  [Id. ¶ 8].  Defendant Key is a Delaware limited liability company founded by Defendant Hamlin, a New York resident, and Defendant Levine, a resident of Florida.  [Id. ¶¶ 2-3; Compl. ¶¶ 2-3].  At all relevant times, Hamlin and Levine were members of Key.  [SOMF ¶ 4].

Through brokers, Key's members expressed an interest in leasing space in the Premises for use as a fitness center.  [Id. ¶ 18].  The brokers introduced two representatives of Key: Defendant Hamlin, and a non-party by the name of Daniel Lynch ("Lynch") to Plaintiff's representative Toby Nelson ("Nelson").  [Id.].  At the time, Nelson handled day-to-day leasing operations for the Silverman Group and has closed more than 600 deals as a leasing professional.  [Id. ¶¶ 13-14].  In May

2012 there was an initial meeting at which Nelson, Levine, Hamlin and Lynch were present.  [Id.].

At this initial meeting Nelson was told that Levine had been successful in a prior business venture, selling a popular brand known as 'Crunch Fitness' for "millions of dollars."  [Id. ¶ 20].  At the time of the initial meeting, Key was in early discussions with St. Vincent's Hospital regarding a contractual agreement (the "Hospital Contract").  [Id. ¶ 22].  Hamlin and Levine explained to Nelson that Key would not enter into a lease until it had an agreement in place with St. Vincent's.  [Id. ¶ 21].  Nelson claims that Levine predicted that Key – at that time an entity not yet formed, would have ample financial resources by virtue of Levine's substantial finances and that Levine "confirmed his financial commitment to Key."  [Dkt. 64-9, Pl.'s Rule 56(a)(2) Statement ¶ 51.]  There is no evidence on the record quantifying Levine's financial commitment and there is no evidence that Levine signed a guarantee of Key's lease obligation.  Nelson also claims that Hamlin represented to him that the Hospital Contract "would assure the success of the business by providing at least 75 percent of the total revenue."  [Nelson Dep. Tr. 58:1-14]. There is no evidence on the record that Hamlin represented that Key would not enter into a contract that did not assure its success or that it would not enter into a lease unless it had a contract which would assure its success.   Plaintiff admits that at the time Hamlin allegedly made this representation, the Hospital Contract was still being negotiated.   [Pl.'s Rule 56(a)(2) Statement ¶ 22].  Defendants deny that any of these statements were

made.[2]  Hamlin and Lynch also allegedly told Plaintiff that the facility to be sited on the Premises would be the first of many such fitness centers that would be "rolled out" over time, and that it would serve as the "Flag Ship" center and as a model for future centers.  [Compl. ¶ 10(d), (g).]

Nelson and Blake Silverman ("Silverman") were responsible for underwriting the credit risk of the Lease.  [Id. ¶ 16].  Nelson was told by The Silverman Group's brokers Cushman and Wakefield that Levine and Hamlin had a good track record.  [Id. ¶ 31].  Nelson also did some research on St. Vincent's Hospital and Levine's background and asked Levine a series of questions by e-mail and telephone.  [Id. ¶ 34].  However, Plaintiff did not ask any specific questions about the Hospital Contract or Key's revenue projections.  Plaintiff also did not seek any personal guarantees or collateral beyond a security deposit of one and one-half month's rent.   Finally, Plaintiff did not ask to see any bank statement of Key Holdings, did not conduct any credit check and did not ask Levine and Hamlin how much money they intended invest in Key.  [Id. ¶¶ 53-54]. In sum and effect, Plaintiff admits that it "undertook no specific actions to assess the financial commitments, capitalization, and financial status of Key."  [Id. ¶ 70]. Rather, Silverman testified that he "relied upon financial wherewithal, credibility, what people say and what they have represented."  [Silverman Dep. Tr. 9:17-24].

Key and the Hospital entered into the Hospital Contract on September 24, 2012. Plaintiff did not ask for a copy of the Hospital Contract or review its terms

---

[2] Defendant claims only that Hamlin "told Nelson about Key's intention to generate customer referrals through the hospital's physician network and the type of patients or clients that were expected to come to Key through the association with St. Vincent's."  [SOMF ¶ 91].

to assure that the Hospital Contract would provide at least 75% of its revenue and thereby assure its success.  In addition, there is no evidence on the record that Key ever represented or warranted to the Plaintiff that the Contract would assure Key's success.  [Id. ¶ 57].  Nonetheless, Plaintiff alleges that Hamlin misrepresented the scope of the as-yet unsigned Hospital Contract when it earlier implied that St. Vincent's would be contractually obligated to refer clients to Key when stating that the Hospital Contract would "assure the success" of Key by providing 75% of its business.  The Hospital Contract did not in fact obligate St. Vincent's to refer any clients to Key and did not guarantee any specific revenue to Key.  [Pl.'s Rule 56(a)(2) Statement ¶ (o)].  The Hospital Contract merely permitted Key to use St. Vincent's name in signage, marketing and promotional materials.  [Id. ¶ (p)].

The parties agreed to and signed the Lease on November 13, 2012.  [SOMF ¶ 74].  Plaintiff drafted the Lease using its standard Lease document, modified to incorporate the specific business terms for the Key lease.  The Lease did not include any representations or warranties as to the terms of the Hospital Contract, Key's capitalization or Levin's financial commitment to Key. [Id. ¶ 26].  The Lease did not include any representations or warranties specifically concerning the Hospital Contract or Key's capitalization.  [Id. ¶¶ 27, 72].  The Lease obligated Key to pay monthly rent for a term of ten years and six months in exchange for the right to utilize approximately 6,747 square feet of space on the Premises.  [Compl. at 16, Ex. A].  However, on December 5, 2013, after Key  had paid only one and one-half month's rent, Mr. Levine emailed Plaintiff, copying Mr.

5

Hamlin, to notify it that Key Holdings was immediately terminating operations and abandoning the Premises.  [Pl.'s Rule 56(a)(2) Statement ¶¶ (j)-(k)].

In anticipation of earning significant revenue from a ten year lease, Plaintiff claims it had expended $437,000 to improve the Premises as well as $67,694.90 for its broker fees and $60,723 for six months of free rent.  [Id. ¶ (o)].  Plaintiff alleges that after closing its doors, Key had no remaining assets "beyond some furniture that was abandoned, and a computer that was donated to a charity."  [Id. ¶ (h)].  Plaintiff alleges that Levine and Hamlin misrepresented their commitment to financing the Key venture and that the two only invested enough money in Key – in small increments – to meet its obligations as those obligations arose.  [Id. ¶¶ (d)-(f)].  Plaintiff notes that Hamlin, in a written communication with a third party, admitted that Key was operating on a "shoe string budget" with "very limited Capital at risk."  [Id. ¶ (i)].

For their part, Defendants argue that Hamlin and Levine invested and lost nearly $450,000 in Key in total.  [SOMF ¶ 75].  At the time the parties entered into the Lease, the parties agree that Key was capitalized with approximately $100,000.  [Id. ¶ 78].  The parties also agree that Key had a staff of employees, maintained its own books and records and a separate bank account and that neither Levine nor Hamlin removed funds for personal use or intermingled Key funds with their personal funds.  [Id. ¶¶ 82-90].

In its decision on Defendants' Motion to Dismiss, the Court held that Defendants' alleged statements concerning the Hospital Contract and Levine's financial commitment to the business could have been fraudulent or negligent

misrepresentations of facts upon which Plaintiff reasonably relied, while claims based on other alleged fraudulent statements were dismissed.  [Dkt. 52]. Defendants have moved for summary judgment, arguing that Plaintiff could not have reasonably relied on Defendants' statements and that the Court should not disregard Key's corporate structure and pierce the corporate veil as to the personal assets of Levine and Hamlin.  [Dkt. 57].  In opposition to the Motion, Plaintiff argues that Nelson relied on Hamlin and Levine's statements to Plaintiff's detriment in determining whether to enter into the Lease and that Key was a "mere instrumentality" of Defendants, used to perpetrate a fraud upon the Plaintiff.  [Pl.'s Rule 56(a)(2) Statement ¶ 51].  Plaintiff seeks damages for having expended substantial sums of money to improve the Premises, pay a brokerage fee, and provide Key Holdings with a period of free rent.  [Compl. ¶¶ 30; 34–35].

III.    <u>Standard of Review</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).


IV.   Discussion

    A.  Counts II and III – Fraudulent and Negligent Misrepresentation

In order to allege a claim for fraudulent misrepresentation under Connecticut law, a plaintiff must establish that "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury . . . . In contrast to a negligent representation, [a] fraudulent representation . . . is one that is knowingly untrue, or made without belief in its truth, or recklessly made and for the purpose of inducing action upon it." *Sturm v. Harb Development, LLC*, 298 Conn. 124, 142 (2010) (internal quotation marks and citations omitted).

In contradt, to establish a claim for negligent misrepresentation under Connecticut law, a plaintiff must establish (1) that the defendant made a misrepresentation of fact; (2) that the defendant knew or should have known was false; (3) that the plaintiff reasonably relied upon the misrepresentation; and (4) that the plaintiff suffered pecuniary harm as a result thereof. *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 73 (2005).

Under the first element, the general rule is that a misrepresentation must relate to an existing or past fact. *Paiva v. Vanech Heights Const. Co.*, 271 A.2d 69, 71 (Conn. 1970); *see also Allstate Ins. Co. v. Adv. Health Professionals, P.C.*, 256 F.R.D. 49, 61 (D. Conn. 2008) ("a conclusion that a representation is fraudulent requires . . . that the representation be false—which in turn requires the *existence of a fact* with which the representation is inconsistent. . . .") (footnotes omitted) (emphasis added).  Connecticut courts have long interpreted "statement of fact" to exclude statements of opinion and promises to act in the

future unless the promisor had a present intention not to fulfill that promise.  *See,
e.g., Bradley v. Oviatt*, 84 A. 321, 322 (Conn. 1912) ("The law does not fasten
responsibility upon one for expression of opinion as to matters which, in their
nature, are contingent and uncertain"); *Web Press Services Corp. v. New London
Motors, Inc.*, 525 A.2d 57, 62 (Conn. 1987) (holding that it was not error to find that
statements that vehicle was an "excellent" and "unusual" one, and that it was in
"mint" and "good" condition, were merely "puffing" and did not create an
express warranty); *Flaherty v. Schettino*, 70 A.2d 151, 152 (Conn. 1949) (holding
that a promise to pay was not a representation of the ability to pay). To satisfy the
second element of a fraudulent misrepresentation claim, a plaintiff must allege
that the party making the statement of fact knew that it was false at the time it
was made.  *See, e.g., Glazer v. Dress Barn, Inc.*, 873 A.2d 929, 954 (Conn. 2005).
Finally, "there must be a justifiable reliance on the misrepresentation for a
plaintiff to recover damages." *Mips v. Becon, Inc.*, 799 A.2d 1093 (Conn. App.
2002).

Nelson alleged at his deposition that Levine and Hamlin made false or
negligent representations about the nature of Key's pending contract with St.
Vincent's Hospital and the founders' financial commitment to the new enterprise
which he relied upon in determining whether Plaintiff should enter into the Lease.
[See Pl.'s Rule 56(a)(2) Statement ¶ 51].  Defendants' sole argument in moving for
summary judgment on Counts II and III is that Plaintiff could not have reasonably

relied upon these statements in entering into the Lease.[3]  Defendants argue that Plaintiff "undertook no actions to assess the financial commitments, capitalization, or financial status of Key prior to executing the lease," because Plaintiff "did not ask for any documents" and did not "seek a personal guarantee" and because Plaintiff, a sophisticated real estate entity, drafted the Lease without adding any representation or warranty clause concerning the Hospital Contract or Key's capitalization or financial backing.  Essentially, Defendants argue that Plaintiff's rather stunning lack of due diligence makes any reliance upon the alleged misrepresentations unjustifiable.  Defendants offers no authority in support of their position – in fact, the ten pages of briefing submitted by counsel for the Defendants on the issue of reasonable reliance did not cite to a single legal precedent, rule, principle or treatise.  [Def.'s Mem. at 6-15].

---

[3] The Court notes that in denying Defendants' Motion to Dismiss, the Court held that "some of the alleged statements about the [Hospital Contract] are forward-facing and, standing alone are arguably insufficient to constitute statements of "existing or past fact."  *See* Dkt. 52, *citing Paiva v. Vanech Heights Const. Co.,* 271 A.2d 69, 71 (Conn. 1970).  However, the Court held that "considered in their totality, Defendants' representation to Plaintiff that they had entered into the [Hospital Contract] with St. Vincent's" could have "integrated Defendants' prior, more aspirational representations about the nature and terms of that Contract." *Id.*  On the basis of the evidence offered at this summary judgment stage, it cannot be said that any of the statements on which Plaintiff relies are factual. There was no contract.  After the Contract was signed, there was no representation that the Contract contained the anticipated term. There was no representation that the Lease would not be signed unless the Contract contained the anticipated terms.  There was no promise of any specific amount of financial backing,yes there was no representation or warranty in the lease promising any specific amount of financial backing and there was no guarantee. Because Defendant has not argued that these statements did not misrepresent an actual or past fact in its Motion for Summary Judgment after the opportunity to develop a factual record regarding its negotiations with St. Vincent's, the Court will not revisit this finding.

Connecticut courts have had occasion to consider this issue. Ordinarily there is no duty to exercise due diligence" in misrepresentation cases and "the necessary showing of care [is] 'minimal diligence'" or that a party must "negat[e] its own 'recklessness'." *Banque Franco-Hellenique de Commerce Int'l et Mar., S.A. v. Christophides*, 106 F.3d 22, 27 (2d Cir. 1997) (internal quotations omitted), *citing Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015–16 (2d Cir. 1989). In examining misrepresentation claims, the Connecticut Supreme Court has cited to the Restatement (Second) of Torts, which provides that the victim of a fraudulent misrepresentation of fact "is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." Restatement (Second) of Torts § 540 (1977); *Williams Ford, Inc. v. Hartford Courant Co.*, 657 A.2d 212 (1995) (*citing* Restatement § 537 for elements of negligent misrepresentation claim).[4]

---

[4] **No Connecticut authority has adopted the rule under New York law, in contrast to the Restatement position, that "[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, ... courts are particularly disinclined to entertain claims of justifiable reliance. "** *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir. 1997) (internal quotations omitted), *citing Curran, Cooney, Penney, Inc. v. Young & Koomans, Inc.*, 183 A.D.2d 742 (N.Y. App .Div. 1992) ("[w]here, as here, a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented.").

A similar factual scenario was examined by the Second Circuit under New York law in *Lazard*. In that case, Lazard attempted to sell $10 million of bank debt to Protective Life. 108 F.3d at 1534. A Lazard sales representative stated that he had knowledge of a report which would verify that twenty percent of the face value of the debt was guaranteed be paid by the debtor two months later. *Id.* Lazard prepared a contract which it sent to Protective Life and then sent a copy

In fact, in *Williams Ford*, the Connecticut Supreme Court specifically noted, but declined to adopt, the argument of the defendant who had urged that "liability for negligent misrepresentation does not exist between two sophisticated commercial parties with full access to information concerning a business transaction."  657 A.2d at 221.  Rather, the court upheld the appellate court's decision that even between sophisticated entities, whether reliance was justifiable is an issue of fact.  *Id.* at 222.  In making this determination, the fact finder "certainly could take into account the casualness of the allegedly false statements and the context in which they were made*. Id.*  And in *Duplissie v. Devino*, 902 A.2d 30 (Conn. App. 2006), an appellate court held that a trial court's finding that a plaintiff's reliance was unjustifiable was supported by the record,

---

of the report.  Protective Life had the report in its position for six days but claimed not to have read it and to have signed the contract purely on the Lazard representative's oral characterization of the report's contents.  *Id.*

On appeal from the district court's grant of summary judgment in favor of Lazard, the court first noted that viewing the evidence in the light most favorable to Protective Life, Lazard could have "set the whole deal up in such a way that Protective had to rely on Lazard's representations and had to commit itself to purchase the MCC bank debt before it had the opportunity to examine the Scheme Report."  *Id.* at 1543.  Lazard had told Protective Life it would need to act fast and Lazard also had greater knowledge regarding the debt.  *Id.*  But, Judge Calebresi noted that "[t]his conclusion, nevertheless, seems to us to be too simple."  *Id.*  Judge Calebresi went on to hold that "[a]s a substantial and sophisticated player in the bank debt market, [Protective Life] was under a further duty to protect itself from misrepresentation . . . [i]t could easily have done so by insisting on an examination of the Scheme Report as a condition of closing."  *Id.*  Further, the court held that as to the failure to insert specific representation or warranty in the asset purchase agreement, "the failure to insert such language into the contract—by itself—renders reliance on the misrepresentation unreasonable as a matter of law."  *Id.*

Defendant has not urged for adoption of the New York rule articulated in *Lazard* and has not asked for the Court to certify any issue.

where the plaintiff claimed to have relied upon his employer's oral promise to transfer a 5% interest in the business upon the plaintiff's eventual retirement. *Id.* at 41-43.  Noting that the parties never discussed either "how that 5 percent would be calculated" in terms of equity or asset value or "when the value of the interest would be calculated . . . at the time the promise was made or at the time of the plaintiff left his employment," the trial court found reliance unjustifiable because the promise was vague, key terms were undefined, the necessary involvement of the co-owners of the business was never addressed and the agreement was never reduced to writing. *Id.* at 43.

In its opinion on Defendants' Motion to Dismiss, the Court held that "Defendants' representation to Plaintiff that they had entered into the Contract with St. Vincent's" could have "integrated Defendants' prior, more aspirational representations about the nature and terms of that Contract" and therefore could have been a false statement of a then-existing fact.  [Dkt. 52].  It is another question, however, whether it was justifiable for Plaintiff to rely upon the "aspirational representations" in light of the evidence presented on summary judgment.  Now that discovery has been completed and with the benefit of a factual record, the Court finds that no reasonable jury could find that any reliance was justifiable.

Even taking all facts in the light most favorable to Trefoil Park, the alleged misrepresentation by Hamlin that the anticipated Hospital Contract "would assure the success of the business by providing at least 75 percent of the total revenue," like the promised transfer of "5 percent" in *Duplissie*, is fatally vague when

considered in light of the evidence on the Record.  First, the phrase "at least 75 percent" is an overall revenue target or projection, and not a defined amount of income.  Plaintiff cannot claim to have relied upon this statement as establishing any specific guaranteed income stream because Plaintiff was not ever made aware of any specific revenue projection.  Without a specific amount of projected revenue and expenses, Defendant could not have relied on a lease with St. vincent's Hospital.

Nor can the phrase "assure the success" be reasonably read to *guarantee* any income at all when viewed in light of the evidence on the Record.  Both parties agree that from the beginning of their interactions, the Hospital Contract was described as a source of *referrals* of potential clients. A referral may result in a paying client.  However, as the parties seem to have discovered, a referral may also result in nothing at all.  Even if the Hospital Contract had somehow guaranteed a certain number of *referrals*, which the Court doubts would have been possible, it could not have guaranteed *income*.  Finally, if Plaintiff truly relied on guaranteed income from the Hospital Contract in deciding to enter into the Lease, Plaintiff would have inquired about the terms of or read the final Hospital  Contract or at lease included a representation or warranty concerning the Hospital Contract in its Lease.  Plaintiff's claim that it relied upon the "75 percent" statement as having implied that Key would have a guaranteed stream of income is simply not justifiable.

In its opinion oh Defendant's Motion to Dismiss, the Court held that "[c]onsidered in the context of" Levine's financial success, his statement about

**15**

his "financial commitment to Key" plausibly alleged a false statement of material fact regarding the adequacy of Key Holdings' capitalization.  [Dkt. 52].  Once again, however, in light of the Record on summary judgment, the statement is simply too vague to have made Plaintiff's reliance justifiable.  The alleged "financial commitment" was never defined and never reduced to writing in the form of a contractual representation or personal guarantee.  Plaintiff has offered no testimony of what it expected Levine's "financial commitment" to be when it allegedly acted in reliance upon the statement.  The Record shows that Levine and Hamlin invested and lost $450,000 in Key, and Plaintiff has offered no evidence that it expected any particular sum greater than that.  As such Plaintiff's claim to have relied upon that statement is not justifiable.

As noted above, this is a case in which the Plaintiff willingly transacted with a newly-created corporate entity with no assets or collateral and undertook this transaction largely on the basis of Levine's successful track record and reputation.  Plaintiff cavalierly assumed a business risk in order to land a potentially successful tenant, and that risk has born unfortunate fruit because of Plaintiff's reckless contracting and failure to undertake minimal due diligence.  As a result, Plaintiff was not justified in relying on Hamlin and Levin's pre-contractual projections and subjective statements.

### B.  Count IV – Piercing the Corporate Veil

In Connecticut, the concept of piercing the corporate veil is not treated as an independent cause of action. *See Intermed, Inc. v. Alphamedica, Inc.*, 2009 WL

5184195, at *8 (D. Conn. Dec. 21, 2009); *cf. Naples v. Keystone Bldg. & Dev. Corp.*, 295 Conn. 214 (2010); *Angelo Tomasso, Inc. v. Armor Const. & Paving, Inc.*, 187 Conn. 544, 555 (1982).  Rather, corporate veil piercing is an equitable determination allowing for the enforcement of a judgment against a party not primarily liable.  *See Macomber v. Travelers Property & Cas. Corp.,* 261 Conn. 620, 623 n. 3 (2002).  Because Plaintiff may proceed on its claim for Breach of Contract (Count I), the Court next considers whether the corporate veil may be pierced as to allow the claim for breach of contract to be maintained against Defendants Hamlin and Levine.

The corporate veil will be pierced "only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *Naples*, 295 Conn. at 231–32.  However, a court may pierce the corporate veil and "disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor . . . ."  *Naples v. Keystone Bldg. & Dev. Corp.*, 990 A.2d 326, 339 (Conn. 2010) (quoting *Angelo Tomasso, Inc. v. Armor Constr. & Paving, Inc.*, 447 A.2d 406 (Conn. 1982)); *see also Zaist v. Olson*, 227 A.2d 552 (Conn. 1967) (allowing piercing of corporate veil when a corporation is mere instrumentality or agent of another).

In Connecticut, courts can disregard the corporate structure and pierce the corporate veil under the "instrumentality theory," which requires Plaintiff to

adequately allege three elements: (1) control by the first entity over the second to the point of complete domination of finances, policy, and business practice in respect to the transaction at issue, such that the alter-ego at the time had no separate, mind, will or existence of its own; (2) that such control was used dishonestly or unjustly to contravene the plaintiff's legal rights; and (3) that such control and breach of duty proximately caused the plaintiff's injury.  *Naples*, 990 A.2d at 339, *citing Angelo Tomasso, Inc.*, 447 A.2d at 410.  In assessing whether an entity is dominated or controlled, courts look at several factors, including:

> (1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; (6) the amount of business discretion by the allegedly dominated corporation; (7) whether the corporations dealt with each other at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of debts of the dominated corporation; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Litchfield Asset Mmgt. Corp. v. Howell*, 799 A.2d 298, 313 (Conn. App. Ct. 2002). The second prong of the test requires the plaintiff to establish that this control was used by the defendant "to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act. . ." *Zaist*, 227 A.2d at 558.

Noting that Levine and Hamlin invested their first $90,000 into Key only days before the Lease was signed and that periodic investments were made in smaller amounts thereafter, Plaintiff argues that Key was undercapitalized

because the two owners "made *ad hoc* decisions to feed it limited amounts of funds as, and when, absolutely needed." [Pl.'s Opp. Mem. at 13]. Even accepted as true, however, the allegation of undercapitalization or insolvency, while relevant to the inquiry, is not sufficient in and of itself to establish veil piercing. *See, e.g.*, *Duncan v. J.J.D., Inc.*, CV116020036S, 2011 WL 4583760, at *4 (Conn. Super. Sept. 12, 2011); *Sullivan v. Lake Compounce Theme Park*, CV020172497S, 2004 WL 1392842, at *6 (Conn. Super. June 3, 2004) *aff'd*, 889 A.2d 810 (Conn. 2006). The fact that Levine and Hamlin invested in an allegedly ad hoc basis prior to specific debts becoming due does suggest that Key lacked business discretion and did not adequately guarantee its debts. But on the other hand, Plaintiffs have offered no authority to support the proposition that a closely-held corporation is required to raise any specific amount of capital from its principals at any specific time. Furthermore, defendants point out that Key had its own employees, its own office, that no funds were intermingled or taken for personal use and that Key maintained its own books and records. [Def.'s Mem. at 19]. Defendants also argue that Key was not undercapitalized, given that Levine and Hamlin invested nearly $450,000 in the venture in total. Plaintiff has failed to offer sufficient evidence that Levine and Hamlin dominated and controlled Key to the extent that it had no separate will or existence.

Plaintiff has also failed to offer sufficient evidence that Key was used to commit a fraud upon the Plaintiff. "Ordinarily the corporate veil is pierced only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to

perpetuate fraud." *Angelo Tomasso* 447 A.2d at 412.  Although it is true that Key signed and then quickly broke a ten year lease with the Plaintiff, that fact alone does not lead to the conclusion that Key was formed for the purpose of defrauding Plaintiff or that its sole or primary function was to defraud Plaintiff. The Connecticut Supreme Court has noted that "[i]n the absence of a claim that the corporation was formed for an improper purpose, or that the plaintiffs were improperly induced to enter into a contract with the corporation, the mere breach of a corporate contract cannot of itself establish the basis for application of the instrumentality rule." *Campisano v. Nardi*, 212 Conn. 282, 293-94, 562 A.2d 1, 7 (1989).  Here, the Record establishes that Key was a legitimate business enterprise that, like many start-up enterprises, failed fairly soon after it opened its doors.  Plaintiff, a sophisticated landlord, was "fully aware of the type of business with which they were dealing." *See id.*  While the result in this case, as in any case in which a court must decline to pierce the corporate veil, may seem harsh, the Court will not "and cannot rescue a party from its own unfavorable or unwise business dealings." *Angelo Tomasso* 447 A.2d at 414.  Or, in other words, "[a] hard bargain is not enough to energize the equitable power to disregard the corporate form." *Id.*


## Conclusion

For the foregoing reasons, Defendants Motion for Summary Judgment [Dkt. 57] is GRANTED and Counts II, III and IV are DISMISSED.  The Clerk is directed to

enter judgment in favor of Defendants Keith Hamlin and Douglas Levine.  The

case may proceed against Key Holdings, LLC, as the sole defendant to Count I.


IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 3, 2016